UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DAVID L. GAVITT,

       Plaintiff,

v.

IONIA COUNTY, ET AL.,

       Defendants.

_____/

Case No. 14-12164

Honorable Nancy G. Edmunds

**OPINION AND ORDER GRANTING DEFENDANTS FATCHETT'S AND KALMAN'S
MOTION TO DISMISS [31]**

This is a civil rights case brought pursuant to 42 U.S.C. § 1983.  On June 2, 2014,
Plaintiff David Gavitt filed a complaint against numerous Defendants, including Defendants
John Fatchett and John Kalman, Jr., two former Michigan State Police Detective/Sergeants
assigned to the Arson Strike Force Unit that investigated suspected arson.  (Compl., ¶¶ 33-
34, 48-49.)  Plaintiff Gavitt (hereinafter "Gavitt")'s § 1983 claims arise from a house fire that
occurred in March 1985 and tragically took the lives of Gavitt's wife and two daughters.
Gavitt survived.  Gavitt was charged, convicted, and sentenced in 1986 to life in prison on
state criminal charges of arson and felony murder.  *See People v. David Lee Gavitt*, Ionia
County Circuit Court Case No. 85-007555.

In September 2011, a motion for relief from judgment was filed on Gavitt's behalf by
the University of Michigan Law School's Innocence Clinic, arguing that there was newly-
discovered evidence of Gavitt's innocence, i.e., newly discovered scientific analysis of the

origin and cause of the fire establishing that there was no arson. (Defs.' Fatchett and Kalman Mot. to Dismiss, Ex. A, Gavitt Mot. for Relief, Supporting Brief at 16-37.) On June 6, 2012, the People of the State of Michigan and Gavitt stipulated that Gavitt's motion for relief from judgment be granted; and that same day, the Ionia County Circuit Court issued an Order granting Gavitt's motion, dismissing all the charges against him, and ordering his immediate release. (Defs.' Ionia County, Gabry, Voet, Schaefer, and Benda Mot. for Sum. Judg., Ex. 15, 6/6/12 Stip., 6/6/12 Order.)

This matter is now before the Court on Defendants Fatchett's and Kalman's motion to dismiss [31], brought pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. For the reasons stated below, Defendants' motion to dismiss is GRANTED.

## I.   Background

### A.  Fire, Investigation, Arrest, Trial, and Conviction

Gavitt survived a March 9, 1985 house fire. His wife and two daughters tragically did not. (Compl., ¶¶ 61-67.) An investigation was initiated by the City of Ionia Police Department and the Michigan State Police Arson Task Force. (*Id.* at ¶¶ 71-101.)

On the morning of March 10, 1985, Defendants Kalman and Fatchett, then-Michigan State Police ("MSP") officers assigned to the MSP Arson Strike Force Unit ("Det./Sgt. Kalman" and "Det./Sgt. Fatchett" respectively), were dispatched to the scene of the house fire to investigate its cause and origin and inspected the home. Based on their initial review of the evidence, they concluded that the fire was incendiary in nature. (*Id.* at ¶¶ 48-49, 101-103.) At 2:30 in the afternoon that same day, Det./Sgts. Kalman and Fatchett summoned Defendant Klein, then-Sergeant with the Ionia Police Department ("Sgt. Klein"), to the burned home, walked him through the evidence at the fire scene that led them to

their initial conclusion that the fire was incendiary in nature, and collected evidence that Sgt. Klein then placed in an Ionia Police Department evidence locker.  (*Id.* at ¶¶ 21, 108-115.)  Sgt. Klein then continued his investigation by obtaining evidence from and interrogating Gavitt, and obtaining more evidence from the burned home.  (*Id.* at ¶¶ 116-121, 125-129.)

On March 12, 1985, as reported in Det./Sgt. Kalman's March 1985 Report, a meeting was held "for the purpose of reviewing the evidence and determining the course of the investigation."  (Defs. Fatchett's and Kalman's Mot., Ex. C, Kalman Rpt. at 10.)  Defendant Prosecutor Gabry is listed as being present.  (*Id.*)  Det./Sgt. Kalman reported that he presented evidence, a discussion was held, and a conclusion reached that Gavitt may have set the fire himself and was unable to save his family once the fire started:

> Undersigned officer explained the burn patterns and also relating [sic] the burn patterns to the burns on the victim.  A formal discussion was held on all the evidence obtained and it is the feeling that there is strong evidence pointing to the fact that MR. DAVID GAVITT may have indeed set the fire himself and was unable to save his family once the fire started.

(*Id.*)  Sgt. Klein's March 20, 1985 Report also discussed the March 12th meeting and calls it a "'skull session' starting at/around 8:30 am, ending a short time later."  (Ionia Cnty. Defs.' Mot., Ex. 2, 3/20/85 Rpt. at 1, "Journal Entry.")  Sgt. Klein does not list Prosecutor Gabry as being present.  Rather, he reports:

> Journal Entry:  It was on TUES, MARCH 12th, 1985 that this investigating officer, Sgt. Wieczorek and Chief Voet met with the following: City Superintendent Allen Housler, Det/Sgt. JOHN KALMAN and Det/Sgt. JOE DeKRACKER of the Arson Strike Force, MSP Rockford Post, this meeting was an "initial assessment of the case".  It should be noted that this meeting was a "skull session" starting at/around 8:30 am, ending a short time later.

(*Id.*)  (*See also* Compl., ¶¶ 122-123, 232-233, 270 for discussion of March 12, 1985

meeting.)

On June 10, 1985, a felony complaint was issued, and state criminal charges were brought against Gavitt – three counts of murder, three counts of felony murder, arson, and arson insured property –  and he was subsequently arrested.  (Ionia Cnty. Defs.' Mot., Ex. 4, 6/10/85 criminal complaint and information.)  Sgt. Klein was the complaining witness on the criminal complaint.  (*Id.*)

On June 21, 1985, a preliminary examination hearing was held on the criminal charges brought against Gavitt.  District Court Judge James Ward was the presiding judge and Defendant Gabry was the prosecutor.  The District Court found that probable cause existed on the charged offenses – murder, felony murder, and arson – but dismissed the insurance fraud charge.  (Compl., ¶¶ 177-178.)

A jury trial was held in the Circuit Court for the County of Ionia.  *See People v. David Lee Gavitt*, Ionia County Circuit Court Case No. 85-007555.  On February 14, 1986, a jury convicted Gavitt on three counts of murder committed in the perpetration of arson (first degree felony murder) and one count of arson to a dwelling place.  (Ionia Cnty. Defs.' Mot., Ex. 6, 2/14/86 Verdict.)  The one count of arson was dismissed by the Court at sentencing.  (*Id.*, Ex. 7, 4/18/86 Sent. Tr. at 2-3.)

On April 18, 1986, Gavitt was sentenced to "imprisonment for life on each of the three counts of murder, to be served concurrently with each other."  (Ionia Cnty. Defs.' Mot, Ex. 5, 5/1/86 Judg. of Sentence.)

**B.  Innocence Clinic's Post-trial Motion for Relief, Stipulation, and Dismissal**

In September 2011, a motion for relief from judgment was filed on Gavitt's behalf by the University of Michigan Law School's Innocence Clinic, arguing that there was newly-

-4-

discovered evidence of Gavitt's innocence, i.e., newly discovered scientific analysis of the origin and cause of the March 1985 fire establishing that there was no arson. (Defs. Fatchett's and Kalman's Mot., Ex. A, Gavitt Mot. for Relief, Brief at 16-37.) That motion explained that evidence of actual innocence was only recently discovered because, beginning in 1992, there has been a complete revolution in the field of fire investigation:

14. The field of fire investigation has undergone a complete revolution since Mr. Gavitt was convicted in 1986. In 1992, the National Fire Protection Association adopted NFPA 921, the current standard of care for fire investigations, which for the first time put the field of fire investigation on a scientific basis.

15. In light of the changes in the field of fire investigation, John Lentini – a world-renowned fire investigator who has reviewed all available testimony and evidence in this case – has concluded that <u>there is no basis to conclude that arson was the cause of the Gavitt fire.</u> Mr. Lentini's affidavit is attached to the brief accompanying this motion.

16. <u>Mr. Lentini's findings are rooted in the crucial concept of "flashover," which was not well understood by the fire investigation community at the time of Mr. Gavitt's trial</u>. During flashover – a phenomenon that takes place when a compartment like the Gavitt living room catches fire – a room becomes so hot that every exposed combustible surface can catch fire.

* * * * *

29. Mr. Lentini's scientific conclusions regarding the origin and cause of the Gavitt fire meet this [newly discovered evidence] test. <u>His findings are based on the new standards of origin and cause investigation, which were not adopted until the early 1990s, at the earliest, years after Mr. Gavitt's trial</u>. The evidence refutes all scientific evidence presented at trial, so it is not cumulative. Further, because the prosecution's case relied wholly on the testimony of fire experts, no rational jury could have found Mr. Gavitt guilty of murder if the findings of Mr. Lentini or any competent fire investigator <u>applying modern standards</u> had been presented. This is particularly true when this evidence is considered alongside the new evidence regarding the absence of gasoline on the carpet samples. . . .

30. Finally, <u>because the field of gas chromatography was much less precise in 1986 than it is today, trial counsel could not have discovered the new evidence that undermines Mr. DeVries's testimony</u> through the exercise of due diligence, and the fourth and final prong for granting a new trial based on newly-discovered

evidence is satisfied.

(*Id.*, Mot. at 3 (emphasis added).)

The supporting brief relied heavily on John Lentini's Affidavit and similarly argued that,

because of "significant advancements in the field of fire science and arson investigation,"

there is newly-discovered evidence that undermines the prosecution's case against Gavitt:

> While the investigation of this case was, perhaps, normal for a fire
> investigation conducted in the mid-1980s, approximately a decade before
> scientific principles were first applied to fire investigation, practically all of the
> investigative methods and conclusions reached by the various fire investigators
> in this case fail to meet modern standards of accuracy and reliability.

> * * * * *

> The field of fire investigation has undergone a complete revolution <u>since Mr.
> Gavitt's conviction</u>. John Lentini Affidavit ¶¶ 15-59. <u>Theories</u> that low-burning,
> alligatoring, pour patterns, depth of char, and temperature and speed of fires can
> serve as indicators of arson <u>were once unquestioned, but have been completely
> and unequivocally repudiated by rigorous scientific testing</u>. *Id.* at ¶¶ 36-59. As
> such, every indicator of arson relied upon by the prosecution's experts at Mr.
> Gavitt's trial has been discredited and is understood to be useless in determining
> the true origin and cause of fires. *Id.* <u>Many factors once thought to be present
> only in accelerated fires are now understood to be present in natural fires that
> have undergone flashover and progressed to full room involvement, a
> phenomenon that was not understood in 1986</u>[.] *Id.* at ¶¶ 29-35.

> * * * * *

> Mr. Lentini's finding that Mr. DeVries's testimony about the carpet flame tests
> was false meets all parts of the standard for newly-discovered evidence. <u>Given
> that the understanding of flashover is a novel concept in arson science and
> certainly was not known outside of a very small subset of the scientific
> community at the time of Mr. Gavitt's trial, the evidence itself and not merely its
> materiality is newly-discovered</u>. For this same reason, <u>it is clear that the
> evidence could not have been discovered with due diligence at the time of trial;
> indeed the concept of flashover would not become widely known and understood
> by fire investigators until at least a decade after Mr. Gavitt's conviction</u>. . . .

(*Id.*, Br. at 7, 13, 36-37 respectively (emphasis added).)

As Mr. Lentini admitted in his Affidavit that, at the time that Sgt. Fatchett and the Ionia

County Prosecutor's expert, Dr. Edwards, considered the impact of flashover, they had no

way of knowing that their generally accepted interpretations of burn patterns would be

refuted years later:

> Neither Sgt. Fatchett nor Dr. Edwards considered the impact of flashover and the impact of the burning curtains when they attempted to discern what caused the patterns they observed on the living room floor in the course of their investigation. <u>Nor would such consideration have been expected in 1986</u>, because the state of the art in fire investigation had not come to fully recognize flashover at that time.

* * * * *

> <u>All of the above testimony</u> [Defendant Fatchett's trial testimony evaluating evidence from the fire and opining that the fire was intentionally set] <u>can be shown by today's standards to have been false and misleading</u>, <u>albeit without malicious intent.</u> . . .

* * * * *

> <u>The State's experts had no way of knowing that their interpretation of the burn patterns at the Gavitt residence was without any scientific validity because, at the time of the trial, those interpretations were, in fact, generally accepted by most fire investigators, including your affiant.</u>  The misinterpretation was bolstered by the incorrect laboratory analysis performed by Mr. DeVries.  The state's fire investigators "expectations" were not properly "calibrated."  They expected the confined fire in the Gavitt residence to behave like an unconfined fire.  Because the fire did not meet their expectations of normal fire behavior, they incorrectly determined the fire to be incendiary.

(Defs. Fatchett's and Kalman's Mot., Ex. A, Gavitt Mot. for Relief, Appendix B, Lentini Aff.

at ¶¶ 66, 70, 100 (emphasis added).)

An affidavit from an experienced fire investigator that Gavitt's defense attorney

consulted with in 1985 in connection with Gavitt's criminal charges also provided an

affidavit which was attached as an exhibit to Gavitt's motion for relief.  (Defs. Fatchett's and

Kalman's Mot., Ex. A, Lentini Aff., Appendix R, Churchwell Aff. at ¶¶ 1-5.)  Mr. Churchwell,

like Mr. Lentini, stressed that "the world of fire science is vastly different today than it was

in 1985;" that the way he "would have viewed the fire scene in 1985 is completely different

-7-

from the way" he "would view the same scene today;" and "the advancements in fire science would enable [him] to have far better insights and be wary of false findings today." (*Id.* at ¶ 6.)  Mr. Churchwell, like Mr. Lentini, stated that he subscribed to the same beliefs that science has now proven to be false; that he can say now that Gavitt was falsely convicted; but could not have reached that conclusion in 1985-86 when he was consulting with defense counsel:

> Well into the 1980's, the arson investigation profession believed that things like floor burn patterns, low burning, deep charring and alligatoring were automatic indicators of arson:  I subscribed to those beliefs at one time as well.  But in the 1990s, with a wider understanding of the concept of flashover and the emergence of NFPA 921, the profession grew up and began to embrace the rigors of actual science.  Upon doing so, the open-minded among us discovered that the old indicators that we thought were automatic markers of arson were in fact not.  This led to the realization that each of us – investigators who had worked in the 1970s and 1980s – had misread many fire scenes, possibly leading to the conviction of innocent people.  I have no doubt in my mind that David Gavitt is one such falsely-convicted person.  I can say this knowing what I know today, but such a conclusion would have been impossible for me to make in 1985-86 (when Mr. Kolenda consulted with me) because the profession had yet to become enlightened to the errors of the old ways of arson investigation at that time.

(*Id.* at ¶ 10 (emphasis added).)

Mr. Churchwell also admitted that he "would likely have made the same mistake" as those investigating the Gavitt home fire by failing to give adequate consideration to possible accidental causes of that fire:

> As I know from having worked many similar fires in the 1980s, the fact that obvious sources of ignition and the presence of various fuels (candles, ashtray, oil lamps, paneling, etc.) went largely ignored at the trial is not all that surprising. In those days, fire investigators would look first for pour patterns, alligatoring and other such things, and upon finding them, we would assume the fire was arson – so much so that we'd ignore far more obvious accidental sources of the fire. I have no doubt that the investigators who looked at the fire scene at the Gavitt home made this mistake.  As cautious and careful as I always try to be, I would likely have made the same mistake upon seeing the Gavitt fire scene in 1986:

-8-

> Fire investigators simply did not have enough knowledge about the true nature of enclosed (compartment) fires at that time.  Today, years later, being wise to the many advancements and the rigors of actual science that have finally come to dominate the arson investigation profession, I can say that the prosecution's experts were blinded by the myths (alligatoring, charred glass, low burning, etc.), and failed to give due deference to far more obvious and likely accidental sources of the fire.

(*Id.* at ¶ 12 (emphasis added).)

The parties stipulated to a stay of Gavitt's motion, allowing the Ionia Prosecutor's Office time for scientific review of Gavitt's claims.  (Ionia Ctny. Defs.' Mot., Ex. 12, 9/15/11 Stip.)   On June 6, 2012, after a thorough investigation, current Ionia County Prosecutor Ronald Schafer, on behalf of the People of the State of Michigan, responded to Gavitt's motion.

Prosecutor Schafer acknowledged that, although "fire investigators" involved in the original investigation "held to a common understanding within fire investigation," it is now known that that "was inaccurate, specifically regarding the recognition and identification of unusual burn patterns in the floor as definitive evidence of ignitable liquid pour patterns.  Unfortunately, during that time period many fire investigators did not understand the phenomena of flashover and post-flashover and their effects on the production of unusual burn patterns in floors within compartments."  (Defs. Fatchett's and Kalman's Mot., Ex. B, People's Resp. at 16.)  Prosecutor Schafer also acknowledged that Gavitt had satisfied the requirements for a new trial.

> [T]he Peoples [sic] recent investigation confirms the 1985 findings which found the presence of accelerants on the carpet samples introduced at trial can no longer be independently verified as having a presence of ignitable liquids, specifically gasoline.  Therefore, the parameters for meeting the legal requirement for a new trial are not disputed.

(*Id.*)

Despite an admission that "three independent analyses of the evidence suggest there was likely no gasoline on the carpet samples taken out of the Gavitt house in 1985," Prosecutor Schafer emphasized that "there are still a great deal of questions surrounding this case which raise significant questions." (*Id.* at 18.) "Still today, these unanswered questions linger when looking at the case on the whole, even in light of the acknowledged findings in this response. In fact, this is the exact type of case that would have remained open had it not been prosecuted earlier; the type of case where justice would demand that it stay open." (*Id.* at 19.) Nonetheless, Prosecutor Schafer acknowledged, "it does not change the fact that fire investigation has advanced in the twenty-seven years since this fire." (*Id.* at 19-20.)

Prosecutor Schafer identified some of those fire investigation advances and explained why, in light of those advances, Gavitt cannot be retried.

> In particular, our understanding of flashover, post-flashover and the production of unusual burn patterns in floors, potentially identified as pour patterns, is different today than in 1985. Testing of materials in fire cases has also advanced, with more sophisticated instrumentation and analysis. Consequently, there is new evidence in this case and [Gavitt] is entitled to a new trial. As outlined, based on today's understanding of fire dynamics and the evolved level of fire investigation, this fire incident would likely be classified as undetermined and consequently the People will not be able to retry [Gavitt] . . . . there is only one thing known with certainty, as of today, this case involves a fire of undetermined origin and cause. Having no laboratory verification of the presence of an accelerant, combined with what the People now know through scientific research and testing regarding flashover and post-flashover compartment fires, and the production of unusual burn patterns in the floor, the determination that an ignitable liquid (gasoline) was used to initiate the fire at the Gavitt residence cannot be verified. As a result, this is a case this office could not charge as arson based on the evidence available today. However, this is also a case that, if it was new today, this office would not close. There are simply too many questions, questions which may never be answered. Ultimately, this remains a case in which the lives of three innocent people were taken by a fire that can only be classified as having an undetermined origin and cause.

-10-

(*Id.* at 20 (emphasis added).)

On June 6, 2012, the People of the State of Michigan and Gavitt stipulated that Gavitt's motion for relief from judgment be granted, that all charges against Gavitt be immediately dismissed, and that the Court order his immediate release from the custody of the Michigan Department of Corrections.  (Ionia Ctny. Defs.'s Mot, Ex. 15, 6/6/12 Stip.) That same day, the Ionia County Circuit Court issued an Order granting Gavitt's motion, dismissing all the charges against him, and ordering his immediate release.  (*Id.* at Ex. 15, 6/6/12 Order.)

### C.  Gavitt's Claims Against Defendants Fatchett and Kalman

On June 2, 2014, Gavitt filed this civil rights action, pursuant to 28 U.S.C. § 1983, against numerous Defendants, including John Fatchett and John Kalman, Jr., two former Michigan State Police Detective/Sergeants assigned to the Arson Strike Force Unit that investigated the March 9, 1985 fire at the Gavitt home.

## II.  Standard of Review - Rule 12(b)(6) Motion to Dismiss

The Sixth Circuit recently noted that under the United States Supreme Court's heightened pleading standard laid out in *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544 (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), "a complaint only survives a motion to dismiss if it contains sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Estate of Barney v. PNC Bank, Nat'l Ass'n,* 714 F.3d 920, 924-25 (6th Cir. 2013) (internal quotation marks and citations omitted). The court in *Estate of Barney* goes on to state that under *Iqbal*, "[a] claim is plausible when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant

-11-

is liable for the misconduct alleged." *Id.* (internal quotation marks and citations omitted). Furthermore, "[w]hile the plausibility standard is not akin to a 'probability requirement,' the plausibility standard does ask for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678.  Finally, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.' " *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2)).  If the plaintiffs do "not nudge[ ] their claims across the line from conceivable to plausible, their complaint must be dismissed."  *Twombly*, 550 U.S. at 570.

## III.   Analysis

### A. No Need to Convert Defendants' Rule 12(b)(6) Motion to Dismiss Into Rule 56 Motion for Summary Judgment

The Court begins its analysis with Gavitt's argument that Defendant Fatchett's and Kalman's Rule 12(b)(6) motion to dismiss must be treated as a Rule 56 motion for summary judgment.  Gavitt's argument is rejected.  In deciding a motion to dismiss, the Court "may consider the Complaint and any exhibits attached thereto, public records, items appearing in the record of the case and exhibits attached to the defendant's motion to dismiss so long as they are referred to in the Complaint and central to the claims contained therein."  *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008). *Accord*, *In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 466 (6th Cir. 2014) (observing that the Sixth Circuit has "recognized that if a plaintiff references or quotes certain documents, or if public records refute a plaintiff's claim, a defendant may attach those documents to its motion to dismiss, and a court can then consider them in resolving the Rule 12(b)(6) motion without converting the motion to dismiss into a Rule 56 motion for summary judgment.");

-12-

*Commercial Money Ctr., Inc. v. Ill. Union Ins. Co.*, 508 F.3d 327, 336 (6th Cir. 2007) (observing that "when a document is referred to in the pleadings and is integral to the claims, it may be considered without converting a motion to dismiss into one for summary judgment."); *Rodic v. Thistledown Racing Club, Inc.*, 615 F.2d 736, 738 (6th Cir. 1980) (observing that "[f]ederal courts may take judicial notice of the proceedings in other courts of record") (internal quotation marks and citation omitted).   Here, Gavitt's Complaint references public records filed in Gavitt's criminal case and also references the following exhibits attached to Defendants' motion that are central to Gavitt's claims:  Gavitt's motion for relief from judgment and supporting brief (with attached Lentini and Churchwell Affidavits), the People's response to Gavitt's motion, the court order granting Gavitt's motion, his preliminary examination hearing, and Defendants Klein's, Kalman's and Fatchett's reports (*see, e.g.*, Compl., ¶¶ 101-126, 177-79, 183-188, 194.)  Defendants' motion is properly considered under Rule 12(b)(6).

## B.  Gavitt's Claims Against Defendants Fatchett and Kalman

The claims Gavitt alleges against Defendants Fatchett and Kalman are all asserted against them in their individual capacity.  (Resp. at 4 n.2.)  These include claims asserted in Counts II through V of Gavitt's Complaint.  The Court analyzes the arguments for and against dismissal in turn.

### 1.  Count II - Intentional Misrepresentation in Testimony and Evidence

In Count II, Gavitt alleges that Defendants Kalman and Fatchett intentionally misrepresented evidence against him thus causing him to be arrested, tried, prosecuted and convicted without due process in violation of the Fourteenth Amendment and caused

him to be wrongfully imprisoned for 26 years.  (Compl., ¶¶ 219-226.)  Specifically, Gavitt alleges that these Defendants violated his due process rights by (1) "creating and submitting reports" and providing testimony that "they had considered and excluded all accidental causes of the house fire, when in fact they had not even attempted to consider and eliminate all accidental causes of the house fire" before concluding that the fire was incendiary in nature; (2) failing "to correct their incomplete and misleading testimony and findings" in 1985 and continuing through Gavitt's trial in February 1986; and (3) failing "to correct the incomplete and misleading testimony" after Gavitt's conviction in 1986 and continuing through 2012.  (Id. at ¶¶ 219, 227-230.)

Despite these allegations that Defendants' misrepresentations were intentional, Gavitt's Complaint also alleges that their failure to consider and eliminate all possible accidental or natural causes for the Gavitt house fire before concluding it was incendiary in nature is attributable to the limited understanding of fire dynamics and flashover that was prevalent in the field of arson investigation in 1985 and 1986:

> Defendants Kalman and Fatchett's training to determine origin by finding the lowest heaviest fire damage and utilization of the negative corpus method of investigation, led them to wrongfully conclude the fire at 515 N Johnson Street was incendiary without considering and eliminating all possible accidental or natural causes.

> Defendants Kalman and Fatchett's limited understanding of fire dynamics and flashover, and their continued utilization of the negative corpus investigation method and antiquated knowledge of fire dynamics caused them to erroneously presume that the 515 N Johnson Street fire was incendiary and intentionally set by David Gavitt without their first exploring and eliminating all accidental or natural causes.

(Compl., ¶¶ 150-151.)

Moreover, it is undisputed that Defendant Kalman's report (referenced in and critical

to Gavitt's claims in his Complaint, *see, e.g.,* Compl., ¶ 106) details that multiple alternative causes for the March 1985 fire were considered and eliminated, i.e., examination of the heating system, electrical service, appliances, exterior and interior of the home. (Defs. Fatchett's and Kalman's Mot., Ex. C, Det./Sgt. Kalman's 3/85 Rpt. at 2-6.)

Construing the allegations in Gavitt's Complaint in his favor, the alleged misrepresentations occurred during three different time periods: (1) during the investigation stage; (2) during Gavitt's criminal prosecution; and (3) after Gavitt's conviction. The Court considers the second time period first.

### a. Absolute Witness Immunity

It is not disputed that Defendants Fatchett and Kalman testified at Gavitt's preliminary examination hearing and criminal trial. (Resp. at 22-23; Defs. Fatchett's and Kalman's Mot., Ex. A, Gavitt Mot. for Relief, Appx. B, Lentini Aff. at ¶¶ 60, 69, 71; Ex. A, Gavitt Br. at 10.) As the Sixth Circuit observed in *Moldowan v. City of Warren*, 578 F.3d 351 (6th Cir. 2009), "'all witnesses – police officers as well as lay witness – are absolutely immune from civil liability based on their trial testimony in judicial proceedings.'" *Id.* at 390 (quoting *Brisco v. LaHue*, 460 U.S. 325, 328 (1983)). In fact, "[a] witness is entitled to testimonial immunity no matter how egregious or perjurious that testimony was alleged to have been." *Id.* (internal quotations marks and citation omitted). "Moreover, the mere fact that plaintiffs may allege a conspiracy to render false testimony, as opposed to simply alleging that one person testified falsely at trial, does not waive absolute testimonial immunity." *Id.* (internal quotation marks and citation omitted). Accordingly, Defendants Fatchett and Kalman are entitled to absolute immunity regarding any testimony they gave during judicial proceedings.

-15-

The Court now addresses the post-conviction time period.

**b.  No Ongoing Post-Conviction *Brady* Obligation**

There is no ongoing constitutional due process obligation post-conviction to provide exculpatory evidence (*Brady* materials) except where state post-conviction procedures are inadequate.  *See Dist. Attorney's Office fo the Third Judicial Dist. v. Osborne*, 557 U.S. 52, 68-69 (2009).   Gavitt does not and cannot allege that Michigan's post-conviction procedures were inadequate.   He successfully used Michigan's post-conviction relief procedures, i.e., filing a motion for relief from judgment under Mich. Ct. Rule 6.502(G)(2), based upon newly-discovered evidence, and obtained his release from prison and the dismissal of the arson and felony murder charges on which he was previously convicted. Gavitt, therefore, cannot state a § 1983 claim against Defendants Fatchett and Kalman for their alleged failure to disclose any exculpatory evidence post-conviction.

As the Supreme Court observed in *Osborne*, although a convicted defendant does "have a liberty interest in demonstrating his innocence with new evidence under state law," and that "state-created right can, in some circumstances, beget yet other rights to procedures essential to the realization of the parent right," the "Due Process Clause" does not require "that certain familiar preconviction trial rights," specifically, the duty to disclose exculpatory evidence, "be extended to protect [the defendant]'s postconviction liberty interest."  *Osborne*, 557 U.S. at 68.

In *Osborne*, the Supreme Court reversed the Ninth Circuit Court of Appeals' decision and explained that there is no ongoing obligation under the Due Process Clause to provide *Brady* materials after a defendant's conviction:

> The Court of Appeals went too far, however, in concluding that the Due

Process Clause requires that certain familiar preconviction trial rights be extended to protect Osborne's postconviction liberty interest. After identifying Osborne's possible liberty interests, the court concluded that the State had an obligation to comply with the principles of *Brady v. Maryland*, 373 U.S. 83 [(1963)]. In that case, we held that due process requires a prosecutor to disclose material exculpatory evidence to the defendant before trial. The Court of Appeals acknowledged that nothing in our precedents suggested that this disclosure obligation continued after the defendant was convicted and the case was closed but it relied on prior Ninth Circuit precedent applying *Brady* as a post-conviction right. Osborne does not claim that *Brady* controls this case, . . . and with good reason.

*Id.* at 68 (internal quotation marks and citations omitted).

So, any § 1983 claims asserted by Gavitt against Defendants Fatchett and Kalman in their individual capacity based upon an alleged failure to disclose exculpatory evidence post-conviction fail to state a claim for relief.

Finally, the Court addresses alleged misrepresentations occurring during the investigation time period.

### c.  Adequacy of Defendants Fatchett's and Kalman's Fire Investigation

Gavitt's remaining claim in Count II challenges the adequacy of Defendants' fire investigation, i.e., the failure to consider and eliminate <u>all</u> possible accidental causes of the house fire. In essence, Gavitt's claim is that Defendants Fatchett and Kalman intentionally misrepresented and/or inferred in their reports that they had thoroughly investigated the origin and nature of the March 1985 house fire before concluding that it was incendiary in nature when in fact they failed to consider and eliminate <u>all</u> possible accidental causes before reaching that conclusion. Here too, Gavitt fails to state a claim for relief.

As the Sixth Circuit observed in *Yancey v. Carroll County, Ky.*, 876 F.2d 1238, 1245 (6th Cir. 1989), "[i]nvestigation, without more, simply does not rise to the level of a constitutional violation cognizable under 42 U.S.C. § 1983." *Accord, Buchanan v. Metz*,

6 F. Supp. 3d 730, 757-58 (E.D. Mich. 2014) (Rosen, J.) (rejecting the plaintiff's § 1983 claim alleging that he had a due process right "in the way the investigation against him was initiated, planned, and executed" because "[t]he Sixth Circuit has not recognized such a claim" and declining "to do so" in that case).   Contrary to Gavitt's arguments in his Response, the Sixth Circuit's decision in *Gardenhire v. Schubert*, 205 F.3d 303 (6th Cir. 2000), does not hold otherwise.   There, the Sixth Circuit clarified that it "is not adding a duty to investigate as a factor for the establishment of probable cause."   *Id.* at 318.   Rather, it recognize[d] that an officer does not have to investigate independently every claim of innocence."   *Id.*   While it is true that "an officer cannot look only at the evidence of guilt while ignoring all exculpatory evidence," that is not what is alleged to have occurred here. *Id.*   Indeed, examination of Defendant Kalman's March 1985 report undisputably shows that that was not what happened here.

In a Seventh Circuit case with facts somewhat similar to those presented here, the court reached the same conclusion that this Court does here.   *See Latta v. Chapala*, 221 F. App'x 443 (7th Cir. 2007).   In *Latta*, a husband and wife were convicted of arson and felony murder after their home burned in 1989, killing their two-year-old son.   Although the convictions were affirmed on direct appeal, after serving 11 years in prison, the Indiana Supreme Court "held that [the Lattas] were entitled to collateral relief because their lawyer had furnished ineffective assistance."   *Id.* at 444.   After the prosecutor decided not to retry the husband and wife, they were freed.   They subsequently filed a § 1983 suit against the prosecutors and everyone associated with the fire investigation and their prosecution.   *Id.* Addressing the Lattas claim that the defendant prosecutors "should have arranged for better investigations and built a more complete record before initiating the prosecution," the

Seventh Circuit held "there is no constitutional duty to 'do a better investigation'; prosecutors may proceed on the basis of probable cause (all that is required for an indictment) and rely on defense counsel to marshal the evidence in defendants' favor." *Id.* Similar to Gavitt here, the Lattas argued that "the investigators, consultants, and experts did not do an adequately thorough investigation, so that the testimony presented was incomplete and misleading." *Id.* at 445.  The court found that argument lacking:

> We acknowledge that the methods that arson investigators used in the 1980s and 1990s have come under challenge; most experts today would use different approaches and therefore could reach different conclusions.  See Sue Russell, *Arson evidence – shot down in flames*, 2565 New Scientist 42 (Nov. 3, 2006). Whether the application of today's tools would exculpate the Lattas is not a subject that can be resolved on this record but also is not material.  Using the methods of the 1980s during the 1980s does not violate the Constitution. The criminal process, like other human endeavors, is imperfect.  Science is imperfect too; techniques of arson investigation and analysis have advanced a good deal in the years since the fire at the Lattas' home.  Perhaps an injustice has been done, as the Lattas ardently maintain.  Section 1983 does not, however, supply money damages for every conviction that with the benefit of hindsight seems weaker to the federal judiciary than it did to the prosecutor, jury, and state judiciary.

*Id.*

Even if a constitutional violation were found to exist under the alleged facts, Defendants Fatchett's and Kalman's investigative conduct would be completely shielded from liability by qualified immunity.  As the Sixth Circuit recognized in *Koubriti v. Convertino*, 593 F.3d 459 (6th Cir. 2010), qualified immunity shields a defendant's conduct from liability "unless 1) he committed a constitutional violation, and 2) the right that was violated was a clearly established right of which a reasonable person would have known."  *Id.* at 471.  "In determining whether a right is clearly established," the court "may rely on decisions of the Supreme Court, decisions of [the Sixth Circuit] and courts within this circuit, and in limited

circumstances, on decisions of other circuits." *Id.* (internal quotation marks and citations omitted). "When evaluating whether the specific right has been recognized, the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. In other words, the unlawfulness must be apparent." *Id.* (internal quotation marks and citations omitted). Here, just as in *Koubriti*, the Court "can find no case law to support the conclusion that a reasonable official [here Defendants Fatchett and Kalman] would have understood that the complained of action" violated Gavitt's due process rights.

### 2. Count III - Gavitt Fails to State a § 1983 Conspiracy Claim Against Defendants Kalman and Fatchett

In Count III, a § 1983 claim is asserted against former Det./Sgts. Kalman and Fatchett, in their individual capacity, alleging that they conspired with former Prosecutor Gabry, former Sgt. Klein, and former Ionia Chief of Police Kenneth Voet, beginning on March 12, 1985 and continuing to the present date, to violate Gavitt's due process rights by (1) agreeing, without adequate investigation, that the March 1985 fire was incendiary in nature and set by Gavitt (Compl., ¶¶ 234-235)[1], and (2) agreeing to allow MSP laboratory

---

[1] Paragraphs 233 through 235 of Gavitt's Complaint state as follows:

233. Beginning on March 12, 1985, and continuing to the present date, Defendants Gabry, Kenneth Voet, Klein, Kalman, and Fatchett acting under color of state law, conspired to violate Gavitt's rights under the due process clause of the Fourteenth Amendment to the United States Constitution.

234. The acts in furtherance of this conspiracy include, by are not limited to, their participation in a "skull session" wherein all mutually agreed, without any judicial review, laboratory analysis, scientific basis, or reasonable belief, and in willful and wanton disregard of the truth, the March 9, 1985 fire at 515 N Johnson Street was incendiary and set by

technician DeVries to present false evidence in the form of his fire-spread test results and to testify about the results of his testing of carpet samples in Gavitt's prosecution "while at the same time concealing exculpatory evidence that MSP regional crime laboratories were experiencing false positives" in arson analysis testing and were experiencing "contamination of fire debris samples within the laboratory setting." (Compl., ¶ 236.)[2] Despite assertions to the contrary in his Response, there are no allegations in Gavitt's Complaint, that Defendants Kalman and Fatchett agreed with Defendants Gabry, Klein and Voet, to "falsif[y] forensic test results" or agreed to misrepresent the results of DeVries's flame spread and gas chromatography tests. (Resp. at 16-17.) The Court thus considers only the facts that are alleged in Gavitt's Complaint and reasonable inferences that can be drawn from the alleged facts.

### a. Alleged Agreement To Use DeVries's Testing Results and Testimony About Those Results Without Disclosure of Exculpatory Evidence

The Court addresses item (2) above first. Construing the allegations in Count III in the

_____

David Gavitt.

235. These Defendants jointly then set about a fire investigation ("arsonist hunt") to prove that David Gavitt intentionally set the fire.

[2]Paragraph 236 of Gavitt's Complaint states that:

236. These Defendants encouraged, condoned, and approved utilization of laboratory technician Defendant DeVries flame spread experimentation and questionable gas chromatograph testing results of carpet samples obtained from a "control sample" which had not been intended to be submitted to scientific analysis and/or subject to evidence preservation protocol while at the same time concealing exculpatory evidence that MSP regional crime laboratories were experiencing false positives and arson analysis testing and contamination of fire debris samples within the laboratory setting.

light most favorable to Plaintiff Gavitt, the only reasonable inference to draw from these allegations is that Prosecutor Gabry was made aware of the alleged exculpatory evidence about problems occurring in the MSP crime laboratory, and all those present at the "skull session" agreed to use DeVries's testing results and testimony as evidence during Gavitt's prosecution without disclosing that exculpatory evidence.   The allegations in Gavitt's Complaint are insufficient to state a *Brady* violation against Defendants Kalman and Fatchett.   Their *Brady* obligation is fulfilled by disclosure of exculpatory evidence to Prosecutor Gabry, not to Gavitt or his defense counsel.   *See D'Ambrosio v. Marino*, 747 F.3d 378 (6th Cir. 2014).

In *D'Ambrosio*, the Sixth Circuit discussed a police officer's *Brady* obligations, examined the allegations in the § 1983 plaintiff's complaint, and concluded that the plaintiff's allegation that the defendant detective was privy to exculpatory evidence but withheld it from the defense was insufficient to state a *Brady* violation.

> Police officers do not disclose evidence to criminal defendants directly.  Instead, police officers fulfill their *Brady* obligations as long as they inform the prosecutor about evidence that undermines the state's preferred theory of the crime.  The prosecutor, by contrast, is the member of the prosecution team that bears the responsibility for actually disclosing exculpatory information to the defense.  The fact that *Brady* may require disclosure of evidence known only to the police and not to the prosecutor means only that it imposes upon prosecutors a duty to learn of any favorable evidence known to the others acting on the government's behalf, including the police.  It does not mean that a police officer must disclose any sort of information – even information known only to the officer – directly to the defense.
>
> Because *Brady* obligates a police officer to disclose material exculpatory evidence only to the prosecutor rather than directly to the defense, prosecutors and police officers are capable of breaching the prosecution team's *Brady* obligations in factually different ways.  And here, that distinction matters. D'Ambrosio's allegations that Detective Allen "was privy to" exculpatory evidence but withheld it "from the defense" and failed to disclose it "to D'Ambrosio" are beside the point.  Detective Allen was never required to do otherwise.

-22-

*Id.* at 389 (internal quotation marks and citations omitted).

Gavitt's Complaint here, like the plaintiff's complaint in *D'Ambrosio*, does not allege that Defendants Fatchett and Kalman withheld the allegedly exculpatory MSP laboratory evidence from Prosecutor Gabry.  There is no allegation that these Defendants "knew about any obviously exculpatory evidence of which the prosecutors were ignorant and failed to apprise them of it." *Id.* at 390. In fact, the only reasonable inference that can be drawn from Gavitt's alleged facts is the opposite.

To the extent Gavitt's § 1983 conspiracy claim is based on Defendant Fatchett's and Kalman's approval of Prosecutor Gabry's use of MSP laboratory technician DeVries as a witness in judicial proceedings to testify about his testing and findings without disclosing exculpatory evidence about false positives in the MSP laboratory and contamination of fire debris samples, that conduct (as discussed in the Court's opinion granting the Ionia County Defendant's motion to dismiss or for summary judgment) is entitled to absolute immunity. "[P]rosecutors have absolute immunity from civil liability for the non-disclosure of exculpatory information at trial." *Koubriti*, 593 F.3d at 467.  And, to the extent Gavitt's § 1983 conspiracy claim is based on Defendant Fatchett's and Kalman's testimony in Gavitt's criminal proceedings, that witness testimony is entitled to absolute immunity.  *See Moldowan*, 578 F.3d at 390.  Moreover, as the Sixth Circuit has long held, "[t]he doctrine enunciated in *Briscoe v. Lahue* also shields from liability alleged conspiracies to give false and incomplete testimony at judicial proceedings." *Alioto v. City of Shively, Ky.*, 835 F.2d 1173, 1174 (6th Cir. 1987).

**b. Alleged Agreement, Without Adequate Investigation, That Fire Was Incendiary in Nature and Set By Gavitt**

-23-

Gavitt's § 1983 conspiracy claim also alleges that his constitutional due process rights were violated when Defendants Fatchett and Kalman and all the other participants at a March 12, 1985 "skull session" agreed, even though their fire investigation was incomplete and inadequate, that the Gavitt house fire was incendiary in nature and continued their investigation with that conclusion in mind. (Compl., ¶¶ 234-235.) These allegations also fail to state a claim for relief.

As discussed above, "[i]nvestigation, without more, simply does not rise to the level of a constitutional violation cognizable under 42 U.S.C. § 1983." *Yancey*, 876 F.2d at 1245 (6th Cir. 1989). *Accord, Buchanan*, 6 F. Supp. 3d at 757-58. *See also Latta*, 221 F. App'x at 445. And, as discussed above, even if a constitutional violation were found to exist under the alleged facts, Defendants Fatchett's and Kalman's investigative conduct would be completely shielded from liability by qualified immunity. *See Koubriti*, 593 F.3d at 471.

### c. No Post-Conviction Obligation to Disclose Exculpatory Evidence

Finally, as discussed above, there is no ongoing constitutional due process obligation post-conviction to provide exculpatory evidence (*Brady* materials) except where state post-conviction procedures are inadequate, *Osborne*, 557 U.S. at 68-69, and Gavitt does not and cannot allege that Michigan's post-conviction procedures were inadequate. Gavitt, therefore, cannot state a § 1983 conspiracy claim against Defendants Fatchett and Kalman for their alleged failure to disclose any exculpatory evidence post-conviction.

### 3. Count IV - Failure to Disclose Exculpatory Evidence to Gavitt and His Counsel

In Count IV, Gavitt asserts that Defendants Fatchett and Kalman and the current and former Directors of the Michigan State Police allowed DeVries to present evidence and to

testify about his testing results during Gavitt's prosecution without disclosing material exculpatory evidence to "Gavitt and his counsel" thus precluding Gavitt's defense counsel from effectively challenging DeVries's testing results and Defendants Kalman's and Fatchett's opinions that the March 9, 1985 fire was incendiary in nature. (Compl., ¶ 244-252.)   The exculpatory evidence allegedly withheld includes:   (1) the MSP crime laboratories were experiencing false positives on gas chromatography analysis of arson debris samples; (2) the regional labs were understaffed and overworked so that reliable scientific failsafes were not occurring which would allow false positive test results to go unchecked; and (3) there was inadequate training and supervision of laboratory technicians and chemists leading to scientifically unreliable test results.   (Compl., ¶¶ 244-252.)   In Count IV, Gavitt further asserts that Defendants Fatchett and Kalman violated his post-conviction constitutional due process rights (from 1986 through 2012) by failing to disclose the above-described exculpatory evidence.   (*Id.* at ¶¶ 253-255.)

Gavitt fails to state a claim for relief in Count IV.   First, as discussed above, Defendants Kalman and Fatchett fulfill their *Brady* obligation by disclosing exculpatory evidence to the prosecutor, not to defense counsel or defendant.   *D'Ambrosio*, 747 F.3d at 389-90.   And, to the extent Gavitt is alleging that Defendants Kalman and Fatchett are constitutionally liable for Prosecutor Garby's conduct in allowing DeVries to testify without disclosing the above-described exculpatory evidence, those allegations fail to state a claim. "[P]rosecutors have absolute immunity from civil liability for the non-disclosure of exculpatory information at trial." *Koubriti*, 593 F.3d at 467.   Second, as discussed above, there is no ongoing, post-conviction constitutional due process obligation to disclose exculpatory evidence.   *See Osborne*, 557 U.S. at 68.

-25-

### 4.  Count V - Failure to Disclose Exculpatory Evidence Post-Conviction

In Count V, Gavitt first "assumes" that Defendants Fatchett and Kalman either (a) intentionally or negligently failed to disclose that they had not eliminated all possible accidental causes of the March 1985 house fire before presuming it was incendiary in nature, or (b) intentionally or negligently failed to eliminate all possible accidental causes before concluding that the March 1985 house fire was incendiary in nature.  Gavitt next alleges that, "as of 2004, arson investigation had advanced to the point where it was scientifically proved that their opinion testimony as to the cause and origin of the fire was erroneous and no longer reliable evidence." (Compl., ¶ 257.)  Based on these allegations, Gavitt then claims that Defendants Fatchett and Kalman violated his Fourteenth Amendment due process rights when they failed to disclose this exculpatory evidence years after his conviction, i.e., from 2004 through 2012.  (*Id.* at ¶¶ 258-268.)  There is no ongoing constitutional due process obligation post-conviction to provide exculpatory evidence (*Brady* materials) except where state post-conviction procedures are inadequate, *Osborne*, 557 U.S. at 68-69, and Gavitt does not and cannot allege that Michigan's post-conviction procedures were inadequate.  Gavitt, therefore, fails to state a claim for relief in Count V against Defendants Fatchett and Kalman for their alleged failure to disclose any exculpatory evidence post-conviction.

## IV.  Conclusion

For the above stated reasons, Defendants Kalman's and Fatchett's motion to dismiss [31] is GRANTED, and Gavitt's claims against Defendants Kalman and Fatchett are DISMISSED.

s/Nancy G. Edmunds
Nancy G. Edmunds
United States District Judge

Dated:  December 15, 2014

I hereby certify that a copy of the foregoing document was served upon counsel of record
on December 15, 2014, by electronic and/or ordinary mail.

s/Carol J. Bethel
Case Manager