UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DAVID L. GAVITT,

        Plaintiff,

v.

IONIA COUNTY, ET AL.,

        Defendants.

_____/

Case No. 14-12164

Honorable Nancy G. Edmunds

**OPINION AND ORDER GRANTING DEFENDANTS HOUGH'S, DAVIS'S, MADDEN'S, STURDIVANT'S, MUNOZ'S, WASHINGTON'S, AND ETUE'S MOTION TO DISMISS [32]**

This is a civil rights case brought pursuant to 42 U.S.C. § 1983. Plaintiff Gavitt (hereinafter "Gavitt")'s § 1983 claims arise from a house fire that occurred in March 1985 and tragically took the lives of Gavitt's wife and two daughters. Gavitt survived. He was charged, convicted, and sentenced in 1986 to life in prison on state criminal charges of arson and felony murder. *See People v. David Lee Gavitt*, Ionia County Circuit Court Case No. 85-007555.

In September 2011, a motion for relief from judgment was filed on Gavitt's behalf by the University of Michigan Law School's Innocence Clinic, arguing that there was newly-discovered evidence of Gavitt's innocence, i.e., newly discovered scientific analysis of the origin and cause of the fire establishing that there was no arson. (Defs. MSP Directors' Mot. to Dismiss, Ex. A, Gavitt Mot. for Relief, Supporting Brief at 16-37.) On June 6, 2012,

-1-

the People of the State of Michigan and Gavitt stipulated that Gavitt's motion for relief from judgment be granted; and that same day, the Ionia County Circuit Court issued an Order granting Gavitt's motion, dismissing all the charges against him, and ordering his immediate release. (Defs.' Ionia County, Gabry, Voet, Schaefer, and Benda Mot. for Sum. Judg., Ex. 15, 6/6/12 Stip. and 6/6/12 Order.)

On June 2, 2014, Plaintiff David Gavitt filed a complaint against numerous Defendants, including the current and former Directors of the Michigan State Police ("MSP Directors"). Gavitt alleges that:

- Defendant Hough was the Director of the Michigan State Police from 1985 through 1987;
- Defendant Davis was the Director from 1987 through 1991;
- Defendant Madden was the Director from 2002 through 2003;
- Defendant Sturdivant was the Director from 2003 through 2006;
- Defendant Munoz was the Director from 2006 through 2010;
- Defendant Washington was the Director from 2010 through 2011; and
- Defendant Etue who succeeded Washington and is the current Director.

and further alleges in Counts IV and V that each is liable to him in their individual capacity under § 1983 for violating his Fourteenth Amendment due process rights (Compl., ¶¶ 41-47, 255, 268). Gavitt also alleges in Count VIII a claim for injunctive relief against these Defendant MSP Directors in their official capacity (*id.*, ¶¶ 257-268).

This matter is now before the Court on Defendant MSP Directors' motion to dismiss [32], brought pursuant to Rules 12(b)(6) of the Federal Rules of Civil Procedure. For the reasons stated below, Defendants' motion is GRANTED.

**I.   Background**

**A. Fire, Investigation, Arrest, Trial, and Conviction**

Gavitt survived a March 9, 1985 house file. His wife and two daughters tragically did

not. (Compl., ¶¶ 61-67.) An investigation was initiated by the City of Ionia Police Department and the Michigan State Police Arson Task Force. (*Id.* at ¶¶ 71-101.)

On the morning of March 10, 1985, Defendants Kalman and MSP Directors, then-Michigan State Police ("MSP") officers assigned to the MSP Arson Strike Force Unit ("Det./Sgt. Kalman" and "Det./Sgt. MSP Directors" respectively), were dispatched to the scene of the house fire to investigate its cause and origin and inspected the home. Based on their initial review of the evidence, they concluded that the fire was incendiary in nature. (*Id.* at ¶¶ 48-49, 101-103.) At 2:30 in the afternoon that same day, Det./Sgts. Kalman and MSP Directors summoned Defendant Klein, then-Sergeant with the Ionia Police Department ("Sgt. Klein"), to the burned home, walked him through the evidence at the fire scene that led them to their initial conclusion that the fire was incendiary in nature, and collected evidence that Sgt. Klein then placed in an Ionia Police Department evidence locker. (*Id.* at ¶¶ 21, 108-115.) Sgt. Klein then continued his investigation by obtaining evidence from and interrogating Gavitt, and obtaining more evidence from the burned home. (*Id.* at ¶¶ 116-121, 125-129.)

On June 10, 1985, a felony complaint was issued, and state criminal charges were brought against Gavitt – three counts of murder, three counts of felony murder, arson, and arson insured property –  and he was subsequently arrested. (Ionia Cnty. Defs.' Mot., Ex. 4, 6/10/85 criminal complaint and information.) Sgt. Klein was the complaining witness on the criminal complaint. (*Id.*)

On June 21, 1985, a preliminary examination hearing was held on the criminal charges brought against Gavitt. District Court Judge James Ward was the presiding judge and Defendant Gabry was the prosecutor. The District Court found that probable cause

existed on the charged offenses – murder, felony murder, and arson – but dismissed the insurance fraud charge.  (Compl., ¶¶ 177-178.)

 A jury trial was held in the Circuit Court for the County of Ionia.  *See People v. David Lee Gavitt*, Ionia County Circuit Court Case No. 85-007555.  On February 14, 1986, a jury convicted Gavitt on three counts of murder committed in the perpetration of arson (first degree felony murder) and one count of arson to a dwelling place.  (Ionia Cnty. Defs.' Mot., Ex. 6, 2/14/86 Verdict.)  The one count of arson was dismissed by the Court at sentencing.  (*Id.*, Ex. 7, 4/18/86 Sent. Tr. at 2-3.)

On April 18, 1986, Gavitt was sentenced to "imprisonment for life on each of the three counts of murder, to be served concurrently with each other."  (Ionia Cnty. Defs.' Mot, Ex. 5, 5/1/86 Judg. of Sentence.)

## B.  Innocence Clinic's Post-trial Motion for Relief, Stipulation, and Dismissal

In September 2011, a motion for relief from judgment was filed on Gavitt's behalf by the University of Michigan Law School's Innocence Clinic, arguing that there was newly-discovered evidence of Gavitt's innocence, i.e., newly discovered scientific analysis of the origin and cause of the March 1985 fire establishing that there was no arson.  (Defs. MSP Directors' Mot., Ex. A, Gavitt Mot. for Relief, Brief at 16-37.)  That motion explained that evidence of actual innocence was only recently discovered because, beginning in 1992, there has been a complete revolution in the field of fire investigation:

14.  The field of fire investigation has undergone a complete revolution since Mr. Gavitt was convicted in 1986.  In 1992, the National Fire Protection Association adopted NFPA 921, the current standard of care for fire investigations, which for the first time put the field of fire investigation on a scientific basis.

15.  In light of the changes in the field of fire investigation, John Lentini – a world-renowned fire investigator who has reviewed all available testimony and

-4-

evidence in this case – has concluded that <u>there is no basis to conclude that arson was the cause of the Gavitt fire.</u>  Mr. Lentini's affidavit is attached to the brief accompanying this motion.

16.  <u>Mr. Lentini's findings are rooted in the crucial concept of "flashover," which was not well understood by the fire investigation community at the time of Mr. Gavitt's trial</u>.  During flashover – a phenomenon that takes place when a compartment like the Gavitt living room catches fire – a room becomes so hot that every exposed combustible surface can catch fire.

* * * * *

29.  Mr. Lentini's scientific conclusions regarding the origin and cause of the Gavitt fire meet this [newly discovered evidence] test.  <u>His findings are based on the new standards of origin and cause investigation, which were not adopted until the early 1990s, at the earliest, years after Mr. Gavitt's trial</u>.  The evidence refutes all scientific evidence presented at trial, so it is not cumulative.  Further, because the prosecution's case relied wholly on the testimony of fire experts, no rational jury could have found Mr. Gavitt guilty of murder if the findings of Mr. Lentini or any competent fire investigator <u>applying modern standards</u> had been presented.  This is particularly true when this evidence is considered alongside the new evidence regarding the absence of gasoline on the carpet samples. . . .

30.  Finally, <u>because the field of gas chromatography was much less precise in 1986 than it is today, trial counsel could not have discovered the new evidence that undermines Mr. DeVries's testimony</u> through the exercise of due diligence, and the fourth and final prong for granting a new trial based on newly-discovered evidence is satisfied.

(*Id.*, Mot. at 3 (emphasis added).)

The supporting brief relied heavily on John Lentini's Affidavit and similarly argued that,

because of "significant advancements in the field of fire science and arson investigation,"

there is newly-discovered evidence that undermines the prosecution's case against Gavitt:

While the investigation of this case was, perhaps, normal for a fire investigation conducted in the mid-1980s, approximately a decade before scientific principles were first applied to fire investigation, practically all of the investigative methods and conclusions reached by the various fire investigators in this case fail to meet modern standards of accuracy and reliability.

* * * * *

The field of fire investigation has undergone a complete revolution <u>since Mr. Gavitt's conviction</u>.  John Lentini Affidavit ¶¶ 15-59.  <u>Theories</u> that low-burning, alligatoring, pour patterns, depth of char, and temperature and speed of fires can serve as indicators of arson <u>were once unquestioned, but have been completely and unequivocally repudiated by rigorous scientific testing</u>.  *Id.* at ¶¶ 36-59.  As such, every indicator of arson relied upon by the prosecution's experts at Mr. Gavitt's trial has been discredited and is understood to be useless in determining the true origin and cause of fires.  *Id.*  <u>Many factors once thought to be present only in accelerated fires are now understood to be present in natural fires that have undergone flashover and progressed to full room involvement, a phenomenon that was not understood in 1986</u>[.]  *Id.* at ¶¶ 29-35.

* * * * *

Mr. Lentini's finding that Mr. DeVries's testimony about the carpet flame tests was false meets all parts of the standard for newly-discovered evidence.  <u>Given that the understanding of flashover is a novel concept in arson science and certainly was not known outside of a very small subset of the scientific community at the time of Mr. Gavitt's trial, the evidence itself and not merely its materiality is newly-discovered.</u>  For this same reason, <u>it is clear that the evidence could not have been discovered with due diligence at the time of trial; indeed the concept of flashover would not become widely known and understood by fire investigators until at least a decade after Mr. Gavitt's conviction</u>. . . .

(*Id.*, Br. at 7, 13, 36-37 respectively (emphasis added).)

As Mr. Lentini admitted in his Affidavit that, at the time that Sgt. MSP Directors and the Ionia County Prosecutor's expert, Dr. Edwards, considered the impact of flashover, they had no way of knowing that their generally accepted interpretations of burn patterns would be refuted years later:

Neither Sgt. MSP Directors nor Dr. Edwards considered the impact of flashover and the impact of the burning curtains when they attempted to discern what caused the patterns they observed on the living room floor in the course of their investigation.  <u>Nor would such consideration have been expected in 1986</u>, because the state of the art in fire investigation had not come to fully recognize flashover at that time.

* * * * *

<u>All of the above testimony</u> [Defendant MSP Directors's trial testimony evaluating evidence from the fire and opining that the fire was intentionally set] <u>can be shown by today's standards to have been false and misleading, albeit</u>

-6-

<u>without malicious intent.</u> . . .

* * * * *

   <u>The State's experts had no way of knowing that their interpretation of the burn patterns at the Gavitt residence was without any scientific validity because, at the time of the trial, those interpretations were, in fact, generally accepted by most fire investigators, including your affiant.</u>  The misinterpretation was bolstered by the incorrect laboratory analysis performed by Mr. DeVries.  The state's fire investigators "expectations" were not properly "calibrated."  They expected the confined fire in the Gavitt residence to behave like an unconfined fire.  Because the fire did not meet their expectations of normal fire behavior, they incorrectly determined the fire to be incendiary.

(Defs. MSP Directors's and Kalman's Mot., Ex. A, Gavitt Mot. for Relief, Appendix B, Lentini Aff. at ¶¶ 66, 70, 100 (emphasis added).)

     An affidavit from an experienced fire investigator that Gavitt's defense attorney consulted with in 1985 in connection with Gavitt's criminal charges also provided an affidavit which was attached as an exhibit to Gavitt's motion for relief.  (Defs. MSP Directors's and Kalman's Mot., Ex. A, Lentini Aff., Appendix R, Churchwell Aff. at ¶¶ 1-5.)  Mr. Churchwell, like Mr. Lentini, stressed that "the world of fire science is vastly different today than it was in 1985;" that the way he "would have viewed the fire scene in 1985 is completely different from the way" he "would view the same scene today;" and "the advancements in fire science would enable [him] to have far better insights and be wary of false findings today."  (*Id.* at ¶ 6.)  Mr. Churchwell, like Mr. Lentini, stated that he subscribed to the same beliefs that science has now proven to be false; that he can say now that Gavitt was falsely convicted; but could not have reached that conclusion in 1985-86 when he was consulting with defense counsel:

     Well into the 1980's, the arson investigation profession believed that things like floor burn patterns, low burning, deep charring and alligatoring were automatic indicators of arson:  <u>I subscribed to those beliefs at one time as well.</u>  <u>But in the 1990s</u>, with a wider understanding of the concept of flashover and the

-7-

emergence of NFPA 921, <u>the profession grew up and began to embrace the</u> <u>rigors of actual science.</u> Upon doing so, the open-minded among us <u>discovered</u> <u>that the old indicators that we thought were automatic markers of arson were in</u> <u>fact not</u>. This led to the realization that each of us – investigators who had worked in the 1970s and 1980s – had misread many fire scenes, possibly leading to the conviction of innocent people. I have no doubt in my mind that David Gavitt is one such falsely-convicted person. <u>I can say this knowing what</u> <u>I know today, but such a conclusion would have been impossible for me to make</u> <u>in 1985-86 (when Mr. Kolenda consulted with me) because the profession had</u> <u>yet to become enlightened to the errors of the old ways of arson investigation at</u> <u>that time.</u>

(*Id.* at ¶ 10 (emphasis added).)

Mr. Churchwell also admitted that he "would likely have made the same mistake" as

those investigating the Gavitt home fire by failing to give adequate consideration to possible

accidental causes of that fire:

As I know from having worked many similar fires in the 1980s, the fact that obvious sources of ignition and the presence of various fuels (candles, ashtray, oil lamps, paneling, etc.) went largely ignored at the trial is not all that surprising. In those days, fire investigators would look first for pour patterns, alligatoring and other such things, and upon finding them, we would assume the fire was arson – so much so that we'd ignore far more obvious accidental sources of the fire. I have no doubt that the investigators who looked at the fire scene at the Gavitt home made this mistake. <u>As cautious and careful as I always try to be, I would</u> <u>likely have made the same mistake upon seeing the Gavitt fire scene in 1986:</u> <u>Fire investigators simply did not have enough knowledge about the true nature</u> <u>of enclosed (compartment) fires at that time.</u> <u>Today, years later, being wise to</u> <u>the many advancements</u> and the rigors of actual science <u>that have</u> <u>finally come</u> <u>to dominate the arson investigation profession</u>, I can say that the prosecution's experts were blinded by the myths (alligatoring, charred glass, low burning, etc.), and failed to give due deference to far more obvious and likely accidental sources of the fire.

(*Id.* at ¶ 12 (emphasis added).)

The parties stipulated to a stay of Gavitt's motion, allowing the Ionia Prosecutor's

Office time for scientific review of Gavitt's claims. (Ionia Ctny. Defs.' Mot., Ex. 12, 9/15/11

Stip.)  On June 6, 2012, after a thorough investigation, current Ionia County Prosecutor

Ronald Schafer, on behalf of the People of the State of Michigan, responded to Gavitt's motion.

Prosecutor Schafer acknowledged that, although "fire investigators" involved in the original investigation "held to a common understanding within fire investigation," it is now known that that "was inaccurate, specifically regarding the recognition and identification of unusual burn patterns in the floor as definitive evidence of ignitable liquid pour patterns. Unfortunately, during that time period many fire investigators did not understand the phenomena of flashover and post-flashover and their effects on the production of unusual burn patterns in floors within compartments."  (Defs. MSP Directors' Mot., Ex. B, People's Resp. at 16.)   Prosecutor Schafer also acknowledged that Gavitt had satisfied the requirements for a new trial.

> [T]he Peoples [sic] recent investigation confirms the 1985 findings which found the presence of accelerants on the carpet samples introduced at trial can no longer be independently verified as having a presence of ignitable liquids, specifically gasoline.   Therefore, the parameters for meeting the legal requirement for a new trial are not disputed.

(*Id.*)

Despite an admission that "three independent analyses of the evidence suggest there was likely no gasoline on the carpet samples taken out of the Gavitt house in 1985," Prosecutor Schafer emphasized that "there are still a great deal of questions surrounding this case which raise significant questions."  (*Id.* at 18.)  "Still today, these unanswered questions linger when looking at the case on the whole, even in light of the acknowledged findings in this response.  In fact, this is the exact type of case that would have remained open had it not been prosecuted earlier; the type of case where justice would demand that it stay open."  (*Id.* at 19.)  Nonetheless, Prosecutor Schafer acknowledged, "it does not

change the fact that fire investigation has advanced in the twenty-seven years since this fire." (*Id.* at 19-20.)

Prosecutor Schafer identified some of those fire investigation advances and explained why, in light of those advances, Gavitt cannot be retried.

> In particular, our understanding of flashover, post-flashover and the production of unusual burn patterns in floors, potentially identified as pour patterns, is different today than in 1985. <u>Testing of materials in fire cases has also advanced, with more sophisticated instrumentation and analysis.</u> Consequently, there is new evidence in this case and [Gavitt] is entitled to a new trial. As outlined, based on today's understanding of fire dynamics and the evolved level of fire investigation, this fire incident would likely be classified as undetermined and consequently the People will not be able to retry [Gavitt] . . . . there is only one thing known with certainty, as of today, this case involves a fire of undetermined origin and cause. Having no laboratory verification of the presence of an accelerant, combined with what the People now know through scientific research and testing regarding flashover and post-flashover compartment fires, and the production of unusual burn patterns in the floor, the determination that an ignitable liquid (gasoline) was used to initiate the fire at the Gavitt residence cannot be verified. As a result, this is a case this office could not charge as arson based on the evidence available today. However, this is also a case that, if it was new today, this office would not close. There are simply too many questions, questions which may never be answered. Ultimately, this remains a case in which the lives of three innocent people were taken by a fire that can only be classified as having an undetermined origin and cause.

(*Id.* at 20 (emphasis added).)

On June 6, 2012, the People of the State of Michigan and Gavitt stipulated that Gavitt's motion for relief from judgment be granted, that all charges against Gavitt be immediately dismissed, and that the Court order his immediate release from the custody of the Michigan Department of Corrections. (Ionia Ctny. Defs.'s Mot, Ex. 15, 6/6/12 Stip.) That same day, the Ionia County Circuit Court issued an Order granting Gavitt's motion, dismissing all the charges against him, and ordering his immediate release. (*Id.* at Ex. 15, 6/6/12 Order.)

-10-

### C.  Gavitt's Claims Against Defendants MSP Directors

On June 2, 2014, Gavitt filed this civil rights action, pursuant to 28 U.S.C. § 1983, against numerous Defendants, including the current and former Directors of the Michigan State Police ("MSP Directors").

## II.   Standard of Review - Rule 12(b)(6) Motion to Dismiss

The Sixth Circuit recently noted that under the United States Supreme Court's heightened pleading standard laid out in *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544 (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), "a complaint only survives a motion to dismiss if it contains sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Estate of Barney v. PNC Bank, Nat'l Ass'n,* 714 F.3d 920, 924-25 (6th Cir. 2013) (internal quotation marks and citations omitted). The court in *Estate of Barney* goes on to state that under *Iqbal*, "[a] claim is plausible when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (internal quotation marks and citations omitted). Furthermore, "[w]hile the plausibility standard is not akin to a 'probability requirement,' the plausibility standard does ask for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678.  Finally, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.' " *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2)).  If the plaintiffs do "not nudge[ ] their claims across the line from conceivable to plausible, their complaint must be dismissed." *Twombly*, 550 U.S. at 570.

## III.   Analysis

### A. No Need to Convert Defendants' Rule 12(b)(6) into Rule 56 Motion for Summary Judgment

The Court begins its analysis with Gavitt's argument that Defendant MSP Directors' Rule 12(b)(6) motion to dismiss must be treated as a Rule 56 motion for summary judgment. Gavitt's argument is rejected. In deciding a motion to dismiss, the Court "may consider the Complaint and any exhibits attached thereto, public records, items appearing in the record of the case and exhibits attached to the defendant's motion to dismiss so long as they are referred to in the Complaint and central to the claims contained therein." *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008). *Accord*, *In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 466 (6th Cir. 2014) (observing that the Sixth Circuit has "recognized that if a plaintiff references or quotes certain documents, or if public records refute a plaintiff's claim, a defendant may attach those documents to its motion to dismiss, and a court can then consider them in resolving the Rule 12(b)(6) motion without converting the motion to dismiss into a Rule 56 motion for summary judgment."); *Commercial Money Ctr., Inc. v. Ill. Union Ins. Co.*, 508 F.3d 327, 336 (6th Cir. 2007) (observing that "when a document is referred to in the pleadings and is integral to the claims, it may be considered without converting a motion to dismiss into one for summary judgment."); *Rodic v. Thistledown Racing Club, Inc.*, 615 F.2d 736, 738 (6th Cir. 1980) (observing that "[f]ederal courts may take judicial notice of the proceedings in other courts of record") (internal quotation marks and citation omitted). Here, Gavitt's Complaint references public records filed in Gavitt's criminal case and also references the following exhibits attached to Defendants' motion that are central to Gavitt's claims: Gavitt's motion for relief from judgment and supporting brief (with attached Lentini and Churchwell

-12-

Affidavits), the People's response to Gavitt's motion, the court order granting Gavitt's motion for relief, his preliminary examination hearing, and Defendants Klein's, Kalman's and MSP Directors's reports (*see, e.g.*, Compl., ¶¶ 101-126, 177-79, 183-188, 194.) Defendants' motion is properly considered under Rule 12(b)(6).

## B. Gavitt's Claims Against Defendant MSP Directors

Gavitt concedes that in Counts IV and V, he alleges § 1983 claims against Defendant MSP Directors in their individual capacity only.  (Resp. at 15-16; Compl., ¶¶ 255, 268.) Thus, there is no need to address Eleventh Amendment immunity as to those claims.  In Count VIII, Gavitt seeks injunctive relief against Defendant MSP Directors in their official capacity.  Defendant MSP Directors' motion to dismiss addresses each of these claims. The Court begins its analysis with Gavitt's individual capacity claims against Defendant MSP Directors in Count IV.

### 1. Count IV - Failure to Disclose Exculpatory Evidence to Gavitt and His Counsel

In Count IV, Gavitt asserts that the current and former Directors of the Michigan State Police and Defendants Fatchett and Kalman allowed DeVries to present evidence and to testify about his testing results during Gavitt's prosecution without disclosing material exculpatory evidence to "Gavitt and his counsel" thus precluding Gavitt's defense counsel from effectively challenging DeVries's testing results and Defendants Kalman's and MSP Directors's opinions that the March 9, 1985 fire was incendiary in nature.  (Compl., ¶ 244-252.)   The exculpatory evidence allegedly withheld includes:   (1) the MSP crime laboratories were experiencing false positives on gas chromatography analysis of arson debris samples; (2) the regional labs were understaffed and overworked so that reliable

-13-

scientific failsafes were not occurring which would allow false positive test results to go unchecked; and (3) there was inadequate training and supervision of laboratory technicians and chemists leading to scientifically unreliable test results.   (Compl., ¶¶ 244-252.)  In Count IV, Gavitt further asserts that Defendant MSP Directors violated his post-conviction constitutional due process rights (from 1986 through 2012) by failing to disclose the above-described exculpatory evidence.  (*Id.* at ¶¶ 253-255.)

Gavitt fails to state a claim for relief in Count IV for numerous reasons.  First, he fails to cite any authority holding that state officials like Defendant MSP Directors can be sued in their individual capacities for failing to disclose exculpatory evidence to the defense simply because Defendant MSP Directors supervise the fire investigative activities of the State Fire Marshal Bureau ("SFMB").  More importantly, Gavitt fails to allege that former Director Hough, who was the MSP Director in 1985 through Gavitt's trial in February 1986, had any personal involvement in DeVries's fire investigation or Gavitt's prosecution. (Compl., ¶¶ 23-47, 157-173.)   Finally, Gavitt's claims in Count IV alleging a failure to disclose exculpatory evidence post-conviction fail as a matter of law.  *See Dist. Atty's Office for the Third Judicial Dist. v. Osborne*, 557 U.S. 52, 68-69 (2009).

There is no allegation that Director Hough and any of the Defendant MSP Directors who succeeded him had personal knowledge of Gavitt, the circumstances of the MSP's involvement in the Gavitt 1985 fire investigation, of Gavitt's prosecution, or his conviction and sentence.  Rather, Gavitt broadly alleges that Defendant MSP Directors were tasked with creating, staffing, and overseeing an arson task force and allowed errors, mistakes, and lapses in oversight to occur:

Despite knowing that scientific principles and procedures were necessary in the

-14-

design operation of regional crime labs, . . . routinely allowed errors, mistakes, lapses and oversight <u>in supervision</u> to occur without correction, modification of policy or procedure, or the increase of supervision and oversight to ensure that scientifically reliable results were being produced.

(Compl., ¶ 161 (emphasis added).)  Gavitt further alleges that Defendant MSP Directors:

<u>knew, but never disclosed</u>, <u>to Plaintiff David Gavitt or his attorneys</u> that that [sic] MSP regional crime laboratories from 1980-1985 . . . were experiencing contamination of fire debris samples which resulted in false positive findings of accelerants in the gas chromatography analysis and that the laboratories were understaffed, which made it impossible that tests were independently verified at a scientifically acceptable rate.

\* \* \* \* \*

<u>knew</u> that the MSP laboratory protocols were deficient and "false positive" tests results for accelerants were being discovered contemporaneously to its analysis of the evidence submitted regarding [the] investigation of David Gavitt, but these Defendants have <u>never disclosed this exculpatory information</u> <u>to Gavitt</u>, even to this day.

(*Id.* at ¶¶ 163, 173 (emphasis added).)

As revealed by the allegations in his Complaint, Gavitt merely speculates that Defendant MSP Directors must have been aware of "institutional deficiencies associated with MSP arson investigations and the MSP crime labs" and thus can be held <u>individually</u> liable under § 1983 for their failure to disclose those "institutional deficiencies" to defense counsel.  (Resp. at 20-21.)  Gavitt is mistaken.

It is well established in the Sixth Circuit that "[d]efendants who are sued, not because of any personal involvement in the case, but because of the positions they held at the time cannot be held liable under the theory of vicarious liability or *respondeat superior*."  *Alioto v. City of Shively, Ky.*, 835 F.2d 1173, 1175 (6th Cir. 1987) (internal quotation marks and citation omitted).  "At a minimum, a . . . plaintiff must show that a supervisory official at least implicitly authorized, approved or knowingly acquiesced in the unconstitutional conduct of

-15-

the offending subordinate." *Id.* (internal quotation marks and citations omitted).  Here, Gavitt makes no allegation of Defendant MSP Directors' personal involvement in the failure to disclose exculpatory evidence, and they cannot be held liable absent the allegation of any facts allowing a reasonable inference (not speculation) that they authorized, approved or knowingly acquiesced in a subordinate's unconstitutional conduct.  *See id.*

Gavitt fails to state a claim in Count IV against these Defendants for additional reasons.  First, he seeks to hold them individually liable for failing to make disclosures to him or his counsel long after Gavitt was convicted about evolving scientific principles and other allegedly exculpatory evidence.  As the Supreme Court observed in *Osborne*, there is no ongoing constitutional due process obligation post-conviction to provide exculpatory evidence (*Brady* materials) except where state post-conviction procedures are inadequate. *Osborne*, 557 U.S. at 68-69.  Gavitt does not and cannot allege that Michigan's post-conviction procedures were inadequate.  He successfully used Michigan's post-relief procedures, i.e., filing a motion for relief from judgment under Mich. Ct. Rule 6.500, *et seq.*, based upon newly-discovered evidence.  Gavitt, therefore, cannot state a § 1983 claim against Defendant MSP Directors for their alleged failure to disclose exculpatory evidence post-conviction.

Second, as the Sixth Circuit recently observed, albeit in an action brought against a police officer, the *Brady* obligation to disclose exculpatory evidence is fulfilled by disclosure to the prosecutor, not to defense counsel or the defendant.  *See D'Ambrosio v. Marino*, 747 F.3d 378 (6th Cir. 2014).  In *D'Ambrosio*, the court discussed a police officer's *Brady* obligations, examined the allegations in the § 1983 plaintiff's complaint, and concluded that the plaintiff's allegation that the defendant detective was privy to exculpatory evidence but

withheld it from the defense was insufficient to state a *Brady* violation.

> Police officers do not disclose evidence to criminal defendants directly. Instead, police officers fulfill their *Brady* obligations as long as they inform the prosecutor about evidence that undermines the state's preferred theory of the crime. The prosecutor, by contrast, is the member of the prosecution team that bears the responsibility for actually disclosing exculpatory information to the defense. The fact that *Brady* may require disclosure of evidence known only to the police and not to the prosecutor means only that it imposes upon prosecutors a duty to learn of any favorable evidence known to the others acting on the government's behalf, including the police. It does not mean that a police officer must disclose any sort of information – even information known only to the officer – directly to the defense.
>
> Because *Brady* obligates a police officer to disclose material exculpatory evidence only to the prosecutor rather than directly to the defense, prosecutors and police officers are capable of breaching the prosecution team's *Brady* obligations in factually different ways. And here, that distinction matters. D'Ambrosio's allegations that Detective Allen "was privy to" exculpatory evidence but withheld it "from the defense" and failed to disclose it "to D'Ambrosio" are beside the point. Detective Allen was never required to do otherwise.

*Id.* at 389 (internal quotation marks and citations omitted).

Gavitt's Complaint here, like the plaintiff's complaint in *D'Ambrosio*, does not allege that Defendant MSP Directors withheld the allegedly exculpatory MSP laboratory evidence from Prosecutor Gabry. There is no allegation that these Defendants "knew about any obviously exculpatory evidence of which the prosecutors were ignorant and failed to apprise them of it." *Id.* at 390. As a result, Gavitt cannot plausibly state a § 1983 claim against these Defendants based upon an alleged failure to disclose exculpatory evidence to him or his defense counsel.

Finally, to the extent Gavitt is alleging that Defendant MSP Directors are constitutionally liable for Prosecutor Garby's conduct in allowing DeVries to testify without disclosing the above-described exculpatory evidence, those allegations likewise fail to state a claim. "[P]rosecutors have absolute immunity from civil liability for the non-disclosure of

exculpatory information at trial." *Koubriti*, 593 F.3d at 467.

### 2.   Count V - Failure to Disclose Exculpatory Evidence Post-Conviction

In Count V, Gavitt first "assumes" that Defendants MSP Directors and Kalman either (a) intentionally or negligently failed to disclose that they had not eliminated all possible accidental causes of the March 1985 house fire before presuming it was incendiary in nature, or (b) intentionally or negligently failed to eliminate all possible accidental causes before concluding that the March 1985 house fire was incendiary in nature.  Gavitt next alleges that, "as of 2004, arson investigation had advanced to the point where it was scientifically proved that their opinion testimony as to the cause and origin of the fire was erroneous and no longer reliable evidence." (Compl., ¶ 257.)  Based on these allegations, Gavitt then claims that  Defendant MSP Directors violated his Fourteenth Amendment due process rights when they failed to disclose this exculpatory evidence years after his conviction, i.e., from 2004 through 2012.  (*Id.* at ¶¶ 258-268.)   There is no ongoing constitutional due process obligation post-conviction to provide exculpatory evidence (*Brady* materials) except where state post-conviction procedures are inadequate, *Osborne*, 557 U.S. at 68-69, and Gavitt does not and cannot allege that Michigan's post-convictions procedures were inadequate.  Gavitt thus fails to state a § 1983 claim for relief in Count V against Defendant MSP Directors for their alleged failure to disclose exculpatory evidence post-conviction.

### 3.   Count VIII  - Failure to State a Claim for Injunctive Relief

In Count VIII, Gavitt asserts a claim for injunctive relief against Defendant MSP Directors, in their official capacities, for creating or allowing "policies and procedures which

result in the nondisclosure of material exculpatory evidence, the occurrence of mistakes at the MSP crime laboratories, and/or the intentional fabrication of evidence by members of the Michigan Arson Strike Force Unit, the State Fire Marshall [sic] Bureau, and the MSP crime laboratories division." Gavitt alleges that he suffered constitutional harm as a result of Defendant MSP Directors' policies and procedures, and it is likely other individuals have already or will in the future suffer similar constitutional harms. (Compl., ¶¶ 290-294.) Gavitt is seeking an order compelling the current MSP Director, Defendant Etue, to: (1) "undertake the necessary analysis to identify other individuals similarly harmed by the Defendant[s'] policies and procedures," and (2) disclose "any and all discovered exculpatory evidence" that "would marginally impact others who may have been convicted of the crime of arson under circumstances similar to [Gavitt]." (Compl., ¶¶ 288-295.)

Defendant MSP Directors argue that because Gavitt fails to allege that he is currently suffering or will in the future suffer from a continuing constitutional harm, he lacks standing to state a claim for the injunctive relief he seeks. These Defendants further argue that Gavitt lacks standing to assert a § 1983 claim for injunctive relief on behalf of others who are not a party to this lawsuit. This Court agrees.

Gavitt concedes that "[s]tanding requires plaintiff to demonstrate actual present harm or a significant possibility of future harm." *Savage v. Gee*, 665 F.3d 732, 740 (6th Cir. 2012) (internal quotation marks and citation omitted). *See also Daubenmire v. City of Columbus*, 507 F.3d 383, 388 (6th Cir. 2007) (same). "[A]llegation of past injury is not sufficient to confer standing for . . . injunctive relief." *Cohn v. Brown*, 161 F. App'x 450, 455 (6th Cir. 2005). *Accord, Grendell v. Ohio Supreme Court*, 252 F.3d 828, 832 (6th Cir. 2001) (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983), "'past exposure to

-19-

illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects.'"). The Supreme Court's decision in *Lyons* illustrates this point.

In *Lyons*, the respondent sought an injunction against the City of Los Angeles barring the "use of chokeholds absent the threat of immediate use of deadly force." *Lyons*, 461 U.S. at 98. The Supreme Court held that Lyons failed to satisfy the prerequisites for injunctive relief. It explained why past conduct is insufficient to supply standing:

> Lyons' standing to seek the injunction requested depended on whether he was likely to suffer future injury from the use of the chokeholds by police officers. Count V of the complaint alleged the traffic stop and choking incident five months before. That Lyons may have been illegally choked by the police on October 6, 1976, while presumably affording Lyons standing to claim damages against the individual officers and perhaps against the City, does nothing to establish a real and immediate threat that he would again be stopped for a traffic violation, or for any other offense, by an officer or officers who would illegally choke him into unconsciousness without any provocation or resistance on his past.

*Id.* at 105.

The *Lyons* Court then addressed and rejected the respondent's claim that he had standing to obtain the injunctive relief he sought because "the police in Los Angeles routinely apply chokeholds in situations where they are not threatened by the use of deadly force." *Id.* It explained:

> In order to establish an actual controversy in this case, Lyons would have had not only to allege that he would have another encounter with the police but also to make the incredible assertion either (1) that *all* police officers in Los Angeles *always* choke any citizen with whom they happen to have an encounter, whether for the purpose of arrest, issuing a citation, or for questioning, or (2) that the City ordered or authorized police officers to act in such manner.

*Id.* at 106. As the Court observed, Lyons made no such allegations nor could he credibly do so.

-20-

Of course, it may be that among the countless encounters between the police and the citizens of a great city such as Los Angeles, there will be certain instances in which strangleholds will be illegally applied and injury and death unconstitutionally inflicted on the victim.  As we have said, however, it is no more than conjecture to suggest that in every instance of a traffic stop, arrest, or other encounter between the police and a citizen, the police will act unconstitutionally and inflict injury without provocation or legal excuse.  And it is surely no more than speculation to assert either that Lyons himself will again be involved in one of those unfortunate instances, or that he will be arrested in the future and provoke the use of a chokehold by resisting arrest, attempting to escape, or threatening deadly force or serious bodily injury.

*Id.* at 108.  The *Lyons* Court thus held that "[a]bsent a sufficient likelihood that he will again be wronged in a similar way, Lyons is no more entitled to an injunction than any other citizen of Los Angeles; and a federal court may not entertain a claim by and or all citizens who no more than assert that certain practices of law enforcement officers are unconstitutional."  *Id.* at 111.  Gavitt's claim for injunctive relief against Defendant MSP Directors fail for the same reasons.

Here, Gavitt's claim for injunctive relief does not allege either actual present harm or a significant possibility of future harm to him.  Rather, he attempts to obtain discovery on behalf of third parties who may wish to assert claims similar to those rejected here.  Gavitt lacks standing to assert any claim for injunctive relief on behalf of unnamed third parties. *See, e.g., Kowalski v. Tanner*, 543 U.S. 125, 130, 134 (2004) (holding that "attorneys do not have third-party standing to assert the rights of Michigan indigent defendants denied appellate counsel" and observing that third-party standing has been limited only to those circumstances where (1) the party seeking third-party standing "has a 'close' relationship with the person who possess the right;" and (2) "there is a 'hinderance' to the possessor's ability to protect his own interests.").

For all these reasons, Gavitt fails to state a claim for the injunctive relief he seeks.

-21-

**IV.   Conclusion**

For the above-stated reasons, Defendant MSP Directors' motion to dismiss [32] is

GRANTED; and Gavitt's claims against these Defendants are DISMISSED.


          s/Nancy G. Edmunds
          Nancy G. Edmunds
          United States District Judge

Dated:  December 15, 2014

I hereby certify that a copy of the foregoing document was served upon counsel of record
on December 15, 2014, by electronic and/or ordinary mail.

          s/Carol J. Bethel
          Case Manager