UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DAVID L. GAVITT,

        Plaintiff,

v.

IONIA COUNTY, ET AL.,

        Defendants.

_____/

Case No. 14-12164

Honorable Nancy G. Edmunds

**OPINION AND ORDER GRANTING MOTION TO DISMISS OR FOR SUMMARY JUDGMENT FILED BY DEFENDANTS IONIA COUNTY, GARY M GABRY, RAYMOND P. VOET, RONALD J. SCHAFER, AND GAIL BENDA [39]**

This is a civil rights case brought pursuant to 42 U.S.C. § 1983.  On June 2, 2014, Plaintiff David Gavitt filed a complaint against numerous Defendants, including Ionia County; former Ionia County Prosecutors Gary Gabry, Raymond Voet, and Gail Benda; and current Ionia County Prosecutor Ronald Schaefer (hereinafter "Ionia County Defendants"). Plaintiff Gavitt (hereinafter "Gavitt")'s § 1983 claims arise from a house fire that occurred in March 1985 and tragically took the lives of Gavitt's wife and two daughters.  Gavitt survived.  Gavitt was charged, convicted, and sentenced in 1986 to life in prison on state criminal charges of arson and felony murder.  *See People v. David Lee Gavitt*, Ionia County Circuit Court Case No. 85-007555.

In September 2011, a motion for relief from judgment was filed on Gavitt's behalf by the University of Michigan Law School's Innocence Clinic, arguing that there was newly-

-1-

discovered evidence of Gavitt's innocence, i.e., newly discovered scientific analysis of the origin and cause of the fire establishing that there was no arson.   (Defs.' Ionia County, Gabry, Voet, Schaefer, and Benda Mot. for Sum. Judg., Ex. 10, Brief at 16-37.)  On June 6, 2012, the People of the State of Michigan and Gavitt stipulated that Gavitt's motion for relief from judgment be granted; and that same day, the Ionia County Circuit Court issued an Order granting Gavitt's motion, dismissing all the charges against him, and ordering his immediate release.  (*Id.* at Ex. 15, 6/6/12 Stip. and Order.)

This matter is now before the Court on the Ionia County Defendants' motion to dismiss or for summary judgment [39], brought pursuant to Rules 12(b)(6) and 56 of the Federal Rules of Civil Procedure.  Defendants argue that "Plaintiff's allegations are insufficient to state a claim" for relief and are thus subject to dismissal under Rule 12(b)(6).  Defendants argue, in the alternative, that "[t]o the extent the Court may be required to rely on materials outside the pleadings," Defendants are entitled to summary judgment under Rule 56. (Defs.' Mot. at 1, Defs.' Br. at 11.)  The Ionia County Defendants' motion is considered under Rule 12(b)(6) and is GRANTED.

Gavitt's claims seeking money damages against former Ionia County Prosecutor Gabry in his individual capacity are shielded by absolute immunity or fail to state a claim for relief.  *See Koubriti v. Convertino*, 593 F.3d 459 (6th Cir. 2010); *see also District Attorney's Office for the Third Judicial District v. Osborne*, 557 U.S. 52 (2009).  Gavitt's claims seeking money damages against the Defendant Ionia County prosecutors in their official capacity are barred because, under Michigan law, they act as agents of the State when prosecuting state criminal offenses and are thus entitled to Eleventh Amendment immunity.  *See Cady v. Aernac County*, 574 F.3d 334 (6th Cir. 2009).  Gavitt's  municipal

liability claims seeking money damages against Defendant Ionia County focus solely on the conduct of Defendant Ionia County prosecutors and are thus barred by the Eleventh Amendment. *See D'Ambrosio v. Marino*, 747 F.3d 378 (6th Cir. 2014). Finally, as discussed below, Gavitt's claim for injunctive relief against the Ionia County Defendants fails to state a claim for relief. *See* Fed. R. Civ. P. 12(b)(6).

## I.   Background

### A.  Fire, Investigation, Arrest, Trial, and Conviction

Gavitt survived a March 9, 1985 house fire. His wife and two daughters tragically did not. (Compl., ¶¶ 61-67.) An investigation was initiated by the City of Ionia Police Department and the Michigan State Police Arson Task Force. (*Id.* at ¶¶ 71-101.)

On the morning of March 10, 1985, Defendants Kalman and Fatchett, then-Michigan State Police ("MSP") officers assigned to the MSP Arson Strike Force Unit ("Det./Sgt. Kalman" and "Det./Sgt. Fatchett" respectively), were dispatched to the scene of the house fire to investigate its cause and origin and inspected the home. Based on their initial review of the evidence, they concluded that the fire was incendiary in nature. (*Id.* at ¶¶ 48-49, 101-103.) At 2:30 in the afternoon that same day, Det./Sgts. Kalman and Fatchett summoned Defendant Klein, then-Sergeant with the Ionia Police Department ("Sgt. Klein"), to the burned home, walked him through the evidence at the fire scene that led them to their initial conclusion that the fire was incendiary in nature, and collected evidence that Sgt. Klein then placed in an Ionia Police Department evidence locker. (*Id.* at ¶¶ 21, 108-115.) Sgt. Klein then continued his investigation by obtaining evidence from and interrogating Gavitt, and obtaining more evidence from the burned home. (*Id.* at ¶¶ 116-121, 125-129.)

On March 12, 1985, as reported in Det./Sgt. Kalman's March 1985 Report, a meeting was held "for the purpose of reviewing the evidence and determining the course of the investigation." (Ionia Cnty. Defs.' Mot., Ex. 2, Kalman Rpt. at 10.) Defendant Prosecutor Gabry is listed as being present. (*Id.*) Det./Sgt. Kalman reported that he presented evidence, a discussion was held, and a conclusion reached that Gavitt may have set the fire himself and was unable to save his family once the fire started:

> Undersigned officer explained the burn patterns and also relating [sic] the burn patterns to the burns on the victim. A formal discussion was held on all the evidence obtained and it is the feeling that there is strong evidence pointing to the fact that MR. DAVID GAVITT may have indeed set the fire himself and was unable to save his family once the fire started.

(*Id.*) Sgt. Klein's March 20, 1985 Report also discussed the March 12th meeting and calls it a "'skull session' starting at/around 8:30 am, ending a short time later." (Ionia Cnty. Defs.' Mot., Ex. 2, 3/20/85 Rpt. at 1, "Journal Entry.") Sgt. Klein does not list Prosecutor Gabry as being present. Rather, he reports:

> Journal Entry: It was on TUES, MARCH 12th, 1985 that this investigating officer, Sgt. Wieczorek and Chief Voet met with the following: City Superintendent Allen Housler, Det/Sgt. JOHN KALMAN and Det/Sgt. JOE DeKRACKER of the Arson Strike Force, MSP Rockford Post, this meeting was an "initial assessment of the case". It should be noted that this meeting was a "skull session" starting at/around 8:30 am, ending a short time later.

(*Id.*) (*See also* Compl., ¶¶ 122-123, 232-233, 270 for discussion of March 12, 1985 meeting.)

On June 10, 1985, a felony complaint was issued, and state criminal charges were brought against Gavitt – three counts of murder, three counts of felony murder, arson, and arson insured property – and he was subsequently arrested. (Ionia Cnty. Defs.' Mot., Ex. 4, 6/10/85 criminal complaint and information.) Sgt. Klein was the complaining witness on

-4-

the criminal complaint.  (*Id.*)

On June 21, 1985, a preliminary examination hearing was held on the criminal charges brought against Gavitt.  District Court Judge James Ward was the presiding judge and Defendant Gabry was the prosecutor.  The District Court found that probable cause existed on the charged offenses – murder, felony murder, and arson – but dismissed the insurance fraud charge.  (Compl., ¶¶ 177-178.)

A jury trial was held in the Circuit Court for the County of Ionia.  *See People v. David Lee Gavitt*, Ionia County Circuit Court Case No. 85-007555.  On February 14, 1986, a jury convicted Gavitt on three counts of murder committed in the perpetration of arson (first degree felony murder) and one count of arson to a dwelling place.  (Ionia Cnty. Defs.' Mot., Ex. 6, 2/14/86 Verdict.)  The one count of arson was dismissed by the Court at sentencing.  (*Id.*, Ex. 7, 4/18/86 Sent. Tr. at 2-3.)

On April 18, 1986, Gavitt was sentenced to "imprisonment for life on each of the three counts of murder, to be served concurrently with each other."  (Ionia Cnty. Defs.' Mot, Ex. 5, 5/1/86 Judg. of Sentence.)

### B. Innocence Clinic's Post-trial Motion for Relief, Stipulation, and Dismissal

In September 2011, a motion for relief from judgment was filed on Gavitt's behalf by the University of Michigan Law School's Innocence Clinic, arguing that there was newly-discovered evidence of Gavitt's innocence, i.e., newly discovered scientific analysis of the origin and cause of the March 1985 fire establishing that there was no arson.  (*Id.* at Ex. 10, Brief at 16-37.)  That motion explained that evidence of actual innocence was only recently discovered because, beginning in 1992, there has been a complete revolution in the field of fire investigation:

-5-

14.  The field of fire investigation has undergone a complete revolution since Mr. Gavitt was convicted in 1986.  In 1992, the National Fire Protection Association adopted NFPA 921, the current standard of care for fire investigations, which for the first time put the field of fire investigation on a scientific basis.

15.  In light of the changes in the field of fire investigation, John Lentini – a world-renowned fire investigator who has reviewed all available testimony and evidence in this case – has concluded that <u>there is no basis to conclude that arson was the cause of the Gavitt fire.</u>  Mr. Lentini's affidavit is attached to the brief accompanying this motion.

16.  <u>Mr. Lentini's findings are rooted in the crucial concept of "flashover," which was not well understood by the fire investigation community at the time of Mr. Gavitt's trial</u>.  During flashover – a phenomenon that takes place when a compartment like the Gavitt living room catches fire – a room becomes so hot that every exposed combustible surface can catch fire.

* * * * *

29.  Mr. Lentini's scientific conclusions regarding the origin and cause of the Gavitt fire meet this [newly discovered evidence] test.  <u>His findings are based on the new standards of origin and cause investigation, which were not adopted until the early 1990s, at the earliest, years after Mr. Gavitt's trial.</u>  The evidence refutes all scientific evidence presented at trial, so it is not cumulative.  Further, because the prosecution's case relied wholly on the testimony of fire experts, no rational jury could have found Mr. Gavitt guilty of murder if the findings of Mr. Lentini or any competent fire investigator <u>applying modern standards</u> had been presented.  This is particularly true when this evidence is considered alongside the new evidence regarding the absence of gasoline on the carpet samples. . . .

30.  Finally, <u>because the field of gas chromatography was much less precise in 1986 than it is today, trial counsel could not have discovered the new evidence that undermines Mr. DeVries's testimony</u> through the exercise of due diligence, and the fourth and final prong for granting a new trial based on newly-discovered evidence is satisfied.

(*Id.*, Mot. at 3 (emphasis added).)

The supporting brief relied heavily on John Lentini's Affidavit and similarly argued that, because of "significant advancements in the field of fire science and arson investigation," there is newly-discovered evidence that undermines the prosecution's case against Gavitt:

While the investigation of this case was, perhaps, normal for a fire investigation conducted in the mid-1980s, approximately a decade before scientific principles were first applied to fire investigation, practically all of the investigative methods and conclusions reached by the various fire investigators in this case fail to meet modern standards of accuracy and reliability.

* * * * *

The field of fire investigation has undergone a complete revolution <u>since Mr. Gavitt's conviction</u>. John Lentini Affidavit ¶¶ 15-59. <u>Theories</u> that low-burning, alligatoring, pour patterns, depth of char, and temperature and speed of fires can serve as indicators of arson <u>were once unquestioned, but have been completely and unequivocally repudiated by rigorous scientific testing</u>. *Id.* at ¶¶ 36-59. As such, every indicator of arson relied upon by the prosecution's experts at Mr. Gavitt's trial has been discredited and is understood to be useless in determining the true origin and cause of fires. *Id.* <u>Many factors once thought to be present only in accelerated fires are now understood to be present in natural fires that have undergone flashover and progressed to full room involvement, a phenomenon that was not understood in 1986</u>[.] *Id.* at ¶¶ 29-35.

* * * * *

Mr. Lentini's finding that Mr. DeVries's testimony about the carpet flame tests was false meets all parts of the standard for newly-discovered evidence. <u>Given that the understanding of flashover is a novel concept in arson science and certainly was not known outside of a very small subset of the scientific community at the time of Mr. Gavitt's trial, the evidence itself and not merely its materiality is newly-discovered.</u> For this same reason, <u>it is clear that the evidence could not have been discovered with due diligence at the time of trial; indeed the concept of flashover would not become widely known and understood by fire investigators until at least a decade after Mr. Gavitt's conviction</u>. . . .

(*Id.*, Br. at 7, 13, 36-37 respectively (emphasis added).)

As Mr. Lentini admitted in his Affidavit that, at the time that Sgt. Fatchett and the Ionia County Prosecutor's expert, Dr. Edwards, considered the impact of flashover, they had no way of knowing that their generally accepted interpretations of burn patterns would be refuted years later:

Neither Sgt. Fatchett nor Dr. Edwards considered the impact of flashover and the impact of the burning curtains when they attempted to discern what caused the patterns they observed on the living room floor in the course of their

-7-

investigation.   <u>Nor would such consideration have been expected in 1986</u>, because the state of the art in fire investigation had not come to fully recognize flashover at that time.

* * * * *

    <u>All of the above testimony</u> [Defendant Fatchett's trial testimony evaluating evidence from the fire and opining that the fire was intentionally set] <u>can be shown by today's standards to have been false and misleading, albeit without malicious intent.</u> . . .

* * * * *

    <u>The State's experts had no way of knowing that their interpretation of the burn patterns at the Gavitt residence was without any scientific validity because, at the time of the trial, those interpretations were, in fact, generally accepted by most fire investigators, including your affiant.</u>   The misinterpretation was bolstered by the incorrect laboratory analysis performed by Mr. DeVries.   The state's fire investigators "expectations" were not properly "calibrated."   They expected the confined fire in the Gavitt residence to behave like an unconfined fire.   Because the fire did not meet their expectations of normal fire behavior, they incorrectly determined the fire to be incendiary.

(Ionia Ctny. Defs.' Mot., Ex. 11, Lentini Aff. at ¶¶ 66, 70, 100 (emphasis added).)

An affidavit from an experienced fire investigator that Gavitt's defense attorney consulted with in 1985 in connection with Gavitt's criminal charges also provided an affidavit which was attached as an exhibit to Gavitt's motion for relief.   (Defs. Fatchett's and Kalman's Mot., Ex. A, Lentini Aff., Appendix R, Churchwell Aff. at ¶¶ 1-5.)   Mr. Churchwell, like Mr. Lentini, stressed that "the world of fire science is vastly different today than it was in 1985;" that the way he "would have viewed the fire scene in 1985 is completely different from the way" he "would view the same scene today;" and "the advancements in fire science would enable [him] to have far better insights and be wary of false findings today." (*Id.* at ¶ 6.)   Mr. Churchwell, like Mr. Lentini, stated that he subscribed to the same beliefs that science has now proven to be false; that he can say now that Gavitt was falsely convicted; but could not have reached that conclusion in 1985-86 when he was consulting

-8-

with defense counsel:

> Well into the 1980's, the arson investigation profession believed that things like floor burn patterns, low burning, deep charring and alligatoring were automatic indicators of arson:  I suscribed to those beliefs at one time as well.  But in the 1990s, with a wider understanding of the concept of flashover and the emergence of NFPA 921, the profession grew up and began to embrace the rigors of actual science.  Upon doing so, the open-minded among us discovered that the old indicators that we thought were automatic markers of arson were in fact not.  This led to the realization that each of us – investigators who had worked in the 1970s and 1980s – had misread many fire scenes, possibly leading to the conviction of innocent people.  I have no doubt in my mind that David Gavitt is one such falsely-convicted person.  I can say this knowing what I know today, but such a conclusion would have been impossible for me to make in 1985-86 (when Mr. Kolenda consulted with me) because the profession had yet to become enlightened to the errors of the old ways of arson investigation at that time.

(*Id.* at ¶ 10 (emphasis added).)

Mr. Churchwell also admitted that he "would likely have made the same mistake" as those investigating the Gavitt home fire by failing to give adequate consideration to possible accidental causes of that fire:

> As I know from having worked many similar fires in the 1980s, the fact that obvious sources of ignition and the presence of various fuels (candles, ashtray, oil lamps, paneling, etc.) went largely ignored at the trial is not all that surprising. In those days, fire investigators would look first for pour patterns, alligatoring and other such things, and upon finding them, we would assume the fire was arson – so much so that we'd ignore far more obvious accidental sources of the fire. I have no doubt that the investigators who looked at the fire scene at the Gavitt home made this mistake.  As cautious and careful as I always try to be, I would likely have made the same mistake upon seeing the Gavitt fire scene in 1986:  Fire investigators simply did not have enough knowledge about the true nature of enclosed (compartment) fires at that time.  Today, years later, being wise to the many advancements and the rigors of actual science that have finally come to dominate the arson investigation profession, I can say that the prosecution's experts were blinded by the myths (alligatoring, charred glass, low burning, etc.), and failed to give due deference to far more obvious and likely accidental sources of the fire.

(*Id.* at ¶ 12 (emphasis added).)

-9-

The parties stipulated to a stay of Gavitt's motion, allowing the Ionia Prosecutor's Office time for scientific review of Gavitt's claims. (*Id.* at Ex. 12, 9/15/11 Stip.)  On June 6, 2012, after a thorough investigation, current Ionia County Prosecutor Ronald Schafer, on behalf of the People of the State of Michigan, responded to Gavitt's motion.

Prosecutor Schafer acknowledged that, although "fire investigators" involved in the original investigation "held to a common understanding within fire investigation," it is now known that that "was inaccurate, specifically regarding the recognition and identification of unusual burn patterns in the floor as definitive evidence of ignitable liquid pour patterns. Unfortunately, during that time period many fire investigators did not understand the phenomena of flashover and post-flashover and their effects on the production of unusual burn patterns in floors within compartments." (*Id.* at Ex. 14, People's Resp. at 16.) Prosecutor Schafer also acknowledged that Gavitt had satisfied the requirements for a new trial.

> [T]he Peoples [sic] recent investigation confirms the 1985 findings which found the presence of accelerants on the carpet samples introduced at trial can no longer be independently verified as having a presence of ignitable liquids, specifically gasoline.  Therefore, the parameters for meeting the legal requirement for a new trial are not disputed.

(*Id.*)

Despite an admission that "three independent analyses of the evidence suggest there was likely no gasoline on the carpet samples taken out of the Gavitt house in 1985," Prosecutor Schafer emphasized that "there are still a great deal of questions surrounding this case which raise significant questions." (*Id.* at 18.)  "Still today, these unanswered questions linger when looking at the case on the whole, even in light of the acknowledged findings in this response.  In fact, this is the exact type of case that would have remained

open had it not been prosecuted earlier; the type of case where justice would demand that

it stay open." (*Id.* at 19.)  Nonetheless, Prosecutor Schafer acknowledged, "it does not

change the fact that fire investigation has advanced in the twenty-seven years since this

fire." (*Id.* at 19-20.)

Prosecutor Schafer identified some of those fire investigation advances and explained

why, in light of those advances, Gavitt cannot be retried.

> In particular, our understanding of flashover, post-flashover and the production
> of unusual burn patterns in floors, potentially identified as pour patterns, is
> different today than in 1985.  <u>Testing of materials in fire cases has also
> advanced, with more sophisticated instrumentation and analysis</u>. Consequently,
> there is new evidence in this case and [Gavitt] is entitled to a new trial.  As
> outlined, based on today's understanding of fire dynamics and the evolved level
> of fire investigation, this fire incident would likely be classified as undetermined
> and consequently the People will not be able to retry [Gavitt] . . . .  there is only
> one thing known with certainty, as of today, this case involves a fire of
> undetermined origin and cause.  Having no laboratory verification of the
> presence of an accelerant, combined with what the People now know through
> scientific research and testing regarding flashover and post-flashover
> compartment fires, and the production of unusual burn patterns in the floor, the
> determination that an ignitable liquid (gasoline) was used to initiate the fire at the
> Gavitt residence cannot be verified.  As a result, this is a case this office could
> not charge as arson based on the evidence available today.  However, this is
> also a case that, if it was new today, this office would not close.  There are
> simply too many questions, questions which may never be answered.
> Ultimately, this remains a case in which the lives of three innocent people were
> taken by a fire that can only be classified as having an undetermined origin and
> cause.

(*Id.* at 20 (emphasis added).)

On June 6, 2012, the People of the State of Michigan and Gavitt stipulated that

Gavitt's motion for relief from judgment be granted, that all charges against Gavitt be

immediately dismissed, and that the Court order his immediate release from the custody

of the Michigan Department of Corrections.  (*Id.* at Ex. 15, 6/6/12 Stip.)  That same day, the

Ionia County Circuit Court issued an Order granting Gavitt's motion, dismissing all the

-11-

charges against him, and ordering his immediate release.  (*Id.* at Ex. 15, 6/6/12 Order.)

### C.  Gavitt's Claims Against the Ionia County Defendants

On June 2, 2014, Gavitt filed this civil rights action, pursuant to 28 U.S.C. § 1983, against numerous Defendants, including Ionia County, current Ionia County Prosecutor Schafer, and former Ionia County Prosecutors Gary Gabry, Raymond Voet, and Gail Benda.

## II.  Standard of Review

### A.  Rule 12(b)(6) Motion to Dismiss

The Sixth Circuit recently noted that under the United States Supreme Court's heightened pleading standard laid out in *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544 (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), "a complaint only survives a motion to dismiss if it contains sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Estate of Barney v. PNC Bank, Nat'l Ass'n,* 714 F.3d 920, 924-25 (6th Cir. 2013) (internal quotation marks and citations omitted). The court in *Estate of Barney* goes on to state that under *Iqbal*, "[a] claim is plausible when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (internal quotation marks and citations omitted). Furthermore, "[w]hile the plausibility standard is not akin to a 'probability requirement,' the plausibility standard does ask for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678.  Finally, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.' " *Id.* at 679 (quoting Fed. R. Civ.

P. 8(a)(2).  If the plaintiffs do "not nudge[ ] their claims across the line from conceivable to plausible, their complaint must be dismissed."  *Twombly*, 550 U.S. at 570.

### B.  Summary Judgment Standard

It is well established that summary judgment under Federal Rule of Civil Procedure 56 is proper when the movant "shows that there is no genuine dispute as to any material fact, and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *S.E.C. v. Sierra Brokerage Servs., Inc.*, 712 F.3d 321, 326-27 (6th Cir. 2013) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986)) (quotations omitted). When reviewing the record, "the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *Id.* Furthermore, the "substantive law will identify which facts are material, and summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

When considering the material facts on the record, a court must bear in mind that "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*,  477 U.S. at 252.

### III.  Analysis

#### A.  No Need to Convert Defendants' Rule 12(b)(6) Motion Into Rule 56 Motion for Summary Judgment

The Court begins its analysis with Gavitt's argument that Ionia County Defendants' motion, brought pursuant to Rule 12(b)(6) and in the alternative Rule 56,  must be treated as a Rule 56 motion for summary judgment.  Gavitt's argument is rejected.  In their motion

and supporting brief, Defendants argue that "Plaintiff's allegations are insufficient to state a claim" for relief and are thus subject to dismissal under Rule 12(b)(6). Defendants argue, in the alternative, that "[t]o the extent the Court may be required to rely on materials outside the pleadings," Defendants are entitled to summary judgment under Rule 56. (Defs.' Mot. at 1, Defs.' Br. at 11.) Because the Court does not rely on materials that may not be considered on a Rule 12(b)(6) motion, Defendants' motion is considered under Rule 12(b)(6).

In deciding a Rule 12(b)(6) motion to dismiss, the Court "may consider the Complaint and any exhibits attached thereto, public records, items appearing in the record of the case and exhibits attached to the defendant's motion to dismiss so long as they are referred to in the Complaint and central to the claims contained therein." *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008). *Accord*, *In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 466 (6th Cir. 2014) (observing that the Sixth Circuit has "recognized that if a plaintiff references or quotes certain documents, or if public records refute a plaintiff's claim, a defendant may attach those documents to its motion to dismiss, and a court can then consider them in resolving the Rule 12(b)(6) motion without converting the motion to dismiss into a Rule 56 motion for summary judgment."); *Commercial Money Ctr., Inc. v. Ill. Union Ins. Co.*, 508 F.3d 327, 336 (6th Cir. 2007) (observing that "when a document is referred to in the pleadings and is integral to the claims, it may be considered without converting a motion to dismiss into one for summary judgment."); *Rodic v. Thistledown Racing Club, Inc.*, 615 F.2d 736, 738 (6th Cir. 1980) (observing that "[f]ederal courts may take judicial notice of the proceedings in other courts of record") (internal quotation marks and citation omitted). Here, Gavitt's Complaint references public records filed in Gavitt's

criminal case and also references the following exhibits attached to Defendants' motion that are central to Gavitt's claims:  Gavitt's motion for relief from judgment and supporting brief (with attached Lentini and Churchwell Affidavits), the People's response to Gavitt's motion, the court order granting Gavitt's motion, his preliminary examination hearing, and Defendants Klein's, Kalman's and Fatchett's reports (*see, e.g.*, Compl., ¶¶ 101-126, 177-79, 183-188, 194.)  Defendants' motion is properly considered under Rule 12(c), which requires the same analysis as under Rule 12(b)(6).

## B.  Gavitt's Claims Against Ionia County Defendants

Gavitt alleges the following claims against the Ionia County Defendants:

In Count III, a § 1983 claim is asserted against former Prosecutor Gabry, in his individual capacity, alleging that he conspired with former Sgt. Klein, Det./Sgts. Kalman and Fatchett, and former Ionia Chief of Police Kenneth Voet, beginning on March 12, 1985 and continuing to the present date, to violate Gavitt's due process rights by (1) agreeing, without adequate investigation, that the March 1985 fire was incendiary in nature and set by Gavitt (Compl., ¶¶ 234-235)[1], and (2) agreeing to the use of MSP laboratory technician

---

[1]Paragraphs 233 through 235 of Gavitt's Complaint state as follows:

233.  Beginning on March 12, 1985, and continuing to the present date, Defendants Gabry, Kenneth Voet, Klein, Kalman, and Fatchett acting under color of state law, conspired to violate Gavitt's rights under the due process clause of the Fourteenth Amendment to the United States Constitution.

234.  The acts in furtherance of this conspiracy include, by are not limited to, their participation in a "skull session" wherein all mutually agreed, without any judicial review, laboratory analysis, scientific basis, or reasonable belief, and in willful and wanton disregard of the truth, the March 9, 1985 fire at 515 N Johnson Street was incendiary and set by David Gavitt.

DeVries's testing results of carpet samples in Gavitt's prosecution "while at the same time concealing exculpatory evidence that MSP regional crime laboratories were experiencing false positives" in arson analysis testing and were experiencing "contamination of fire debris samples within the laboratory setting." (Compl., ¶ 236.)[2]

In Count VI, a municipal liability claim is asserted against Ionia County and the former and current Ionia County Prosecutors, in their official capacities, for creating and maintaining official County policies, practices, and/or customs that violated Gavitt's due process rights by failing to adequately train and supervise Ionia County prosecutors to adequately investigate scientific evidence in a manner that ensured that the constitutional rights of criminal defendants were not violated and by failing to discover and disclose newly-discovered and now-generally-accepted scientific evidence that would be exculpatory to previously convicted defendants like Gavitt. (Compl., ¶¶ 270-277.)

In Count VIII, a claim for injunctive relief is asserted against Ionia County and the former and current Ionia County Prosecutors, in their official capacities, seeking an order

---

235. These Defendants jointly then set about a fire investigation ("arsonist hunt") to prove that David Gavitt intentionally set the fire.

[2]Paragraph 236 of Gavitt's Complaint states that:

236. These Defendants encouraged, condoned, and approved utilization of laboratory technician Defendant DeVries flame spread experimentation and questionable gas chromatograph testing results of carpet samples obtained from a "control sample" which had not been intended to be submitted to scientific analysis and/or subject to evidence preservation protocol while at the same time concealing exculpatory evidence that MSP regional crime laboratories were experiencing false positives and arson analysis testing and contamination of fire debris samples within the laboratory setting.

compelling Ionia County and the Ionia County Prosecutors Office to: (1) "undertake the necessary analysis to identify other individuals similarly harmed by the Defendant[s'] policies and procedures," and (2) disclose "any and all discovered exculpatory evidence" that "would marginally impact others who may have been convicted of the crime of arson under circumstances similar to [Gavitt]." (Compl., ¶¶ 288-295.)

The Court begins its analysis with the only claim brought against any of the Ionia County Defendants in their individual capacity, i.e., the § 1983 conspiracy claim alleged against former Ionia County Prosecutor Gabry.[3]

### 1. § 1983 Conspiracy Claims Against Defendant Gabry in his Individual Capacity Are Barred by Absolute Immunity or Fail to State A Claim for Relief

In Count III, Gavitt alleges that former Prosecutor Gabry conspired with former Sgt. Klein, Det./Sgts. Kalman and Fatchett, and former Ionia Chief of Police Kenneth Voet, beginning on March 12, 1985 and continuing to the present date, to violate Gavitt's due process rights by (1) agreeing, without adequate investigation, that the March 1985 fire was incendiary in nature and set by Gavitt (Compl., ¶¶ 234-235)[4], and (2) agreeing to the use

---

[3]Plaintiff Gavitt concedes that Count IV alleges that former Prosecutor Gabry, as well as former Prosecutors Voet and Benda, and current Prosecutor Schafer, are alleged to be liable in their official capacity for their actions as final policymakers. (Gavitt Resp. at 6.)

[4]Paragraphs 233 through 235 of Gavitt's Complaint state as follows:

233. Beginning on March 12, 1985, and continuing to the present date, Defendants Gabry, Kenneth Voet, Klein, Kalman, and Fatchett acting under color of state law, conspired to violate Gavitt's rights under the due process clause of the Fourteenth Amendment to the United States Constitution.

234. The acts in furtherance of this conspiracy include, by are not limited

of MSP laboratory technician DeVries's testing results of carpet samples in Gavitt's prosecution "while at the same time concealing exculpatory evidence that MSP regional crime laboratories were experiencing false positives" in arson analysis testing and were experiencing "contamination of fire debris samples within the laboratory setting." (Compl., ¶ 236.)[5]   In response to the Ionia County Defendants' motion, Gavitt argues that Prosecutor Gabry is not entitled to absolute immunity for his involvement at the March 12, 1985 "skull session" or "initial assessment of the case" because this occurred at the investigatory stage before any determination of probable cause.   For the reasons stated below, this Court concludes that Gavitt's claims in Count III against Prosecutor Gabry in his individual capacity are either barred by absolute immunity or fail to state a claim for relief.

a. **Legal Principles**

---

to, their participation in a "skull session" wherein all mutually agreed, without any judicial review, laboratory analysis, scientific basis, or reasonable belief, and in willful and wanton disregard of the truth, the March 9, 1985 fire at 515 N Johnson Street was incendiary and set by David Gavitt.

235.  These Defendants jointly then set about a fire investigation ("arsonist hunt") to prove that David Gavitt intentionally set the fire.

[5]Paragraph 236 of Gavitt's Complaint states that:

236.  These Defendants encouraged, condoned, and approved utilization of laboratory technician Defendant DeVries flame spread experimentation and questionable gas chromatograph testing results of carpet samples obtained from a "control sample" which had not been intended to be submitted to scientific analysis and/or subject to evidence preservation protocol while at the same time concealing exculpatory evidence that MSP regional crime laboratories were experiencing false positives and arson analysis testing and contamination of fire debris samples within the laboratory setting.

-18-

Absolute prosecutorial immunity is a "doctrine that protects prosecutors from claims brought under 42 U.S.C. § 1983." *Cady v. Arenac County*, 574 F.3d 334, 339 (6th Cir. 2009). The question whether absolute immunity protects a defendant prosecutor from liability presents a legal question that the Court decides as a matter of law. *Id.* at 339. For this reason, additional discovery is unnecessary.

"An absolute immunity defeats a suit at the outset, so long as the official's actions were within the scope of the immunity." *Imbler v. Pachtman*, 424 U.S. 409, 419 n. 13 (1976). In *Imbler*, the Supreme Court held that "a state prosecuting attorney who acted within the scope of his duties in initiating and pursuing a criminal prosecution" was entitled to absolute immunity. *Id.* at 410. The Court left open the issue whether absolute immunity extends to a prosecutor's actions "in the role of an administrator or investigative officer rather than that of advocate." *Id.* at 430-31, 431 n. 33. In *Burns v. Reed*, 500 U.S. 483, 486 (1991), the Supreme Court acknowledged that it left that issue open in *Imbler* but clarified that *Imbler* recognized that "'the duties of the prosecutor in his role as advocate for the State involve actions preliminary to the initiation of a prosecution and actions apart from the courtroom.'" *Id.* (quoting *Imbler*, 424 U.S. at 431, n. 33).

In *Burns*, two separate instances of prosecutorial misconduct were challenged: (1) the prosecutor's role in obtaining a search warrant, and (2) the prosecutor's giving advice to the police. The *Burns* Court applied the functional approach announced in *Imbler* to both instances to determine whether absolute immunity applied to bar civil liability. It found that absolute immunity applied to the first instance but not the second.

As to the first, the *Burns* Court reasoned that the prosecutor's actions were "protected by absolute immunity" because the prosecutor's appearance "before a judge and

-19-

presenting evidence in support of a motion for a search warrant" involved "the prosecutor's role as an advocate for the State, rather than his role as administrator or investigative officer." *Id.* at 492 (internal quotation marks and citations omitted). The Court reached the opposite conclusion with respect to the prosecutor's "acts of providing legal advice to the police." *Id.* at 492. It disagreed with the Seventh Circuit's conclusion that "advising the police in the investigative phase of a criminal case is so intimately associated with the judicial phase of the criminal process that it qualifies for absolute immunity." *Id.* at 493 (internal quotation marks and citation omitted). It reasoned that "[a]bsolute immunity is designed to free the *judicial process* from the harassment and intimidation associated with litigation. That concern therefore justifies absolute prosecutorial immunity only for actions that are connected with the prosecutor's role in judicial proceedings, not for every litigation-inducing conduct." *Id.* at 494 (internal citation omitted). Here, the *Burns* Court concluded, advising the police was not part of the judicial process and thus was not entitled to absolute immunity.

Since *Imbler*, the federal courts have similarly adopted a functional approach to determine whether absolute immunity applies to bar civil liability. *See Spurlock v. Thompson*, 330 F.3d 791, 797 (6th Cir. 2003) (citing cases). "Using this approach, courts must look to the nature of the function performed, not the identity of the actor who performed it." *Koubriti v. Convertino*, 593 F.3d 459, 467 (6th Cir. 2010) (internal quotation marks and citation omitted). "Functions that serve as an integral part of the judicial process or that are intimately associated with the judicial process are absolutely immune from civil suits. Meanwhile, functions which are more investigative or administrative in nature, because they are more removed from the judicial process, are subject only to qualified

-20-

immunity." *Id.* (internal quotation marks and citations omitted).

In *Buckley v. Fitzsimmons*, 509 U.S. 259, 271 (1993), the Supreme Court clarified that "the *Imbler* [functional] approach focuses on the conduct for which immunity is claimed, not on the harm that the conduct may have caused or the question whether it was lawful." In *Buckley*, two instances of prosecutorial conduct were also challenged: (1) that prosecutors allegedly "conspired to manufacture false evidence that would link [the petitioner's] boot with the bootprint the murdered left on the front door," i.e., "shopped for experts until they found one who would provide the opinion they sought;" and (2) that Prosecutor Fitzsimmons allegedly made false statements in a public announcement of the indictment charging petitioner with murder. *Id.* at 272, 276.

The petitioner in *Buckley* argued that *Imber* held that absolute immunity protection for a prosecutor's conduct "extends only to the act of initiation [of a prosecution] itself and to conduct occurring in the courtroom." *Id.* at 272. The Supreme Court rejected that argument. "We expressly stated that the duties of the prosecutor in his role as advocate for the State involve actions preliminary to the initiation of a prosecution and actions apart from the courtroom, and are nonetheless entitled to absolute immunity." *Id.* at 272 (internal quotation marks and citation omitted).

The *Buckley* Court then clarified the distinction between those prosecutorial functions that are entitled to absolute immunity and those that are not:

> A prosecutor's administrative duties and those investigatory functions that do not relate to an advocate's preparation for the initiation of a prosecution or for judicial proceedings are not entitled to absolute immunity. We have not retreated, however, from the principle that acts undertaken by a prosecutor in preparing for the initiation of judicial proceedings or for trial, and which occur in the course of his role as an advocate of the State, are entitled to the protections of absolute immunity. Those acts must include the professional evaluation of the evidence

-21-

assembled by the police and appropriate preparation for its presentation at trial or before a grand jury after a decision to seek an indictment has been made.

*Id.* at 273 (internal quotation marks and citations omitted).  The Court further explained:

There is a difference between the advocate's role in evaluating evidence and interviewing witnesses as he prepares for trial, on the one hand, and the detective's role in searching for the clues and corroboration that might give him probable cause to recommend that a suspect be arrested, on the other hand.  When a prosecutor performs the investigative functions normally performed by a detective or police officer, it is neither appropriate nor justifiable that, for the same act, immunity should protect one and not the other.  Thus, if a prosecutor plans and executes a raid on a suspected weapons cache, he has no greater claim to complete immunity than activities of police officers allegedly acting under his direction.

*Id.* at 273-74 (internal quotation marks and citations omitted).

Applying these principles to the petitioner's claims, the Court first examined "whether the prosecutors [had] carried their burden of establishing that they were functioning as 'advocates' when they were endeavoring to determine whether the bootprint at the scene of the crime had been made by petitioner's foot."  *Id.* at 274.  It held that they did not.

A careful examination of the allegations concerning the conduct of the prosecutors during the period before they convened a special grand jury to investigate the crime provides the answer.  The prosecutors do not contend that they had probable cause to arrest petitioner or to initiate judicial proceedings during that period.  Their mission at that time was entirely investigative in character.  A prosecutor neither is, nor should consider himself to be, an advocate before he has probable cause to have anyone arrested.

*Id.* (internal citation omitted).  Thus, the challenged prosecutorial conduct "remain[ed] protected only by qualified immunity."  *Id.* at 275.  "When the functions of prosecutors and detectives are the same, as they were here, the immunity that protects them is also the same."  *Id.* at 276.

The *Buckley* Court then considered the "petitioner's claims regarding [prosecutor] Fitzsimmons' statements to the press."  *Id.*  The petitioner claimed that the prosecutor's

-22-

allegedly false statements to the media when announcing the indictment defamed him and inflamed the public against him thus "resulting in deprivation of his right to a fair trial, and causing the jury to deadlock rather than acquit." *Id.* at 277. The *Buckley* Court held that the prosecutor's challenged conduct was not entitled to absolute immunity. It reasoned that, although historically "prosecutors, like all attorneys, were entitled to absolute immunity from defamation liability for statements made during the course of judicial proceedings and relevant to them," the same was not true for "most statements made out of court." *Id.* Applying the functional approach of *Imbler*, the *Buckley* Court concluded that "[c]omments to the media have no functional tie to the judicial process just because they are made by a prosecutor." *Id.* Moreover, "[t]he conduct of a press conference does not involve the initiation of a prosecution, the presentation of the State's case in court, or actions preparatory for these functions." *Id.* at 278.

### b. Application of Functional Approach to Prosecutor Gabry's Challenged Conduct

Because "the *Imbler* [functional] approach focuses on the conduct for which immunity is claimed, not on the harm that the conduct may have caused or the question whether it was lawful," this Court follows *Buckley* and focuses on the instances of prosecutorial conduct that Gavitt challenges. *Id.* at 271. In Count III, Gavitt alleges that Prosecutor Gabry, beginning at a March 12, 1985 "skull session" and continuing to the present date, conspired with other attendees to violate Gavitt's Fourteenth Amendment due process rights by (1) agreeing, without adequate investigation, that the March 9, 1985 fire was incendiary in nature and set by Gavitt; and (2) agreeing to allow MSP laboratory technician DeVries to present false evidence in the form of his fire-spread test during Gavitt's criminal

prosecution without disclosing exculpatory evidence about problems with false positives and contamination occurring in the MSP crime laboratories.[6]  Despite assertions to the contrary in Gavitt's Response, there are no allegations in Gavitt's Complaint that the Defendants in Count III agreed to fabricate evidence or agreed to falsify DeVries's test results.  (Resp. at 17-20.)  The Court thus considers only those instances of prosecutorial misconduct that are alleged in Gavitt's Complaint and reasonable inferences that can be drawn from the alleged facts.

### (i)  Prosecutorial Conduct With Functional Tie to the Judicial Process

This Court first examines item (2) above – Prosecutor Gabry's alleged misconduct in judicial proceedings, i.e., agreeing to allow MSP laboratory technician DeVries to present false evidence in the form of his fire-spread test during Gavitt's criminal prosecution without disclosing exculpatory evidence about problems with false positives and contamination occurring in the MSP crime laboratories.  Applying the functional approach announced in *Imbler*, this challenged conduct is protected by absolute immunity.

As the Sixth Circuit observed in *Koubriti*, "prosecutors have absolute immunity from 'suits for malicious prosecution and for defamation, and . . . this immunity extend[s] to the

---

[6]Paragraph 236 of Gavitt's Complaint states that:

236.  These Defendants encouraged, condoned, and approved utilization of laboratory technician Defendant DeVries flame spread experimentation and questionable gas chromatograph testing results of carpet samples obtained from a "control sample" which had not been intended to be submitted to scientific analysis and/or subject to evidence preservation protocol while at the same time concealing exculpatory evidence that MSP regional crime laboratories were experiencing false positives and arson analysis testing and contamination of fire debris samples within the laboratory setting.

-24-

knowing use of false testimony before the grand jury and at trial.'" *Koubriti*, 593 F.3d at 467 (quoting *Burns* 500 U.S. at 484).  Likewise, "prosecutors have absolute immunity from civil liability for the non-disclosure of exculpatory information at trial." *Id.* at 467-68 (citing and discussing *Imbler* and *Jones v. Shankland*, 800 F.2d 77, 80 (6th Cir. 1986)).

Moreover, it is well-established that "witnesses in judicial proceedings are absolutely immune from civil liability under 42 U.S.C. § 1983 based on their testimony, even if they knowingly gave perjured testimony." *Macko v. Byron*, 760 F.2d 95, 97 (6th Cir. 1985) (relying on the Supreme Court's decision in *Briscoe v. Lahue*, 460 U.S. 325 (1983)).  And, as the Sixth Circuit has held, "[t]he doctrine enunciated in *Briscoe v. Lahue* also shields from liability alleged conspiracies to give false and incomplete testimony at judicial proceedings." *Alioto v. City of Shively, Ky.*, 835 F.2d 1173, 1174 (6th Cir. 1987). Accordingly, Defendant Ionia County Prosecutor Gabry is shielded from liability on Gavitt's § 1983 conspiracy claim.

### (ii) No Due Process Obligation to Provide Exculpatory Evidence Post-Conviction

The Court next examines Gavitt's claim that Prosecutor Gabry's conspired with others to violate his Fourteenth Amendment due process rights by not disclosing exculpatory evidence related to Gavitt's arson and felony-murder convictions <u>after</u> his conviction. (Compl., ¶ 233, "[b]eginning on March 12, 1985 and continuing to the present date").  There is no ongoing obligation post-conviction to provide exculpatory (*Brady* materials) except where state post-conviction procedures are inadequate. *Osborne*, 557 U.S. at 68-69. Gavitt does not and cannot allege that Michigan's post-conviction procedures are inadequate.  He successfully used Michigan's post-conviction relief procedures, i.e., filing

a motion for relief from judgment under Mich. Ct. Rule 6.502(G)(2), based upon newly-discovered evidence, and obtained his release from prison and the dismissal of the arson and felony-murder charges on which he was previously convicted.  Gavitt, therefore, cannot state a § 1983 claim against Prosecutor Gabry based on the failure to disclose exculpatory evidence post-conviction.

As the Supreme Court observed in *Osborne*, although a convicted defendant does "have a liberty interest in demonstrating his innocence with new evidence under state law," and that "state-created right can, in some circumstances, beget yet other rights to procedures essential to the realization of the parent right," the "Due Process Clause" does not require "that certain familiar preconviction trial rights," specifically, the duty to disclose exculpatory evidence, "be extended to protect [the defendant]'s postconviction liberty interest."  *Osborne*, 557 U.S. at 68.

In *Osborne*, the Supreme Court reversed the Ninth Circuit Court of Appeals' decision and explained that there is no ongoing obligation under the Due Process Clause to provide *Brady* materials after a defendant's conviction:

> The Court of Appeals went too far, however, in concluding that the Due Process Clause requires that certain familiar preconviction trial rights be extended to protect Osborne's postconviction liberty interest.  After identifying Osborne's possible liberty interests, the court concluded that the State had an obligation to comply with the principles of *Brady v. Maryland*, 373 U.S. 83 [(1963)].  In that case, we held that due process requires a prosecutor to disclose material exculpatory evidence to the defendant before trial.  The Court of Appeals acknowledged that nothing in our precedents suggested that this disclosure obligation continued after the defendant was convicted and the case was closed but it relied on prior Ninth Circuit precedent applying *Brady* as a post-conviction right.  Osborne does not claim that *Brady* controls this case, . . . and with good reason.

*Id.* at 68 (internal quotation marks and citations omitted).

-26-

So, any § 1983 claims asserted by Gavitt against Prosecutor Gabry in his individual capacity, and any that he may assert against the Ionia County Defendant Prosecutors that succeeded Gabry, based upon an alleged failure to disclose exculpatory evidence post-conviction fail to state a claim for relief. There can be no conspiracy to violate constitutional rights that Gavitt does not have.

### (iii)   Gavitt Fails to State a Claim for Relief Regarding Prosecutor Gabry's Investigatory Conduct

Applying the *Imbler* functional approach, this Court determines that Prosecutor Gabry has not established that he was functioning as an advocate during the March 12, 1985 skull session and during any investigation that preceded Prosecutor Gabry's evaluation of the evidence assembled by the police and determination that there was sufficient evidence to establish that probable cause existed and charges should be brought against Gavitt. That, however, does not mean that Gavitt's § 1983 claim – alleging that Prosecutor Gabry conspired to violate Gavitt's due process rights by agreeing with other attendees at the March 12, 1985 "skull session", without adequate investigation, that the March 9, 1985 fire was incendiary in nature and set by Gavitt – survives Defendants' motion to dismiss. (Compl., ¶¶ 232-235; Resp. at 18-19.) For the following reasons, it does not.

As the Sixth Circuit observed in *Yancey v. Carroll County, Ky.*, 876 F.2d 1238, 1245 (6th Cir. 1989), "[i]nvestigation, without more, simply does not rise to the level of a constitutional violation cognizable under 42 U.S.C. § 1983." *Accord, Buchanan v. Metz*, 6 F. Supp. 3d 730, 757-58 (E.D. Mich. 2014) (Rosen, J.) (rejecting the plaintiff's § 1983 claim alleging that he had a due process right "in the way the investigation against him was initiated, planned, and executed" because "[t]he Sixth Circuit has not recognized such a

claim" and declining "to do so" in that case).  Contrary to Gavitt's arguments in his Response, the Sixth Circuit's decision in *Gardenhire v. Schubert*, 205 F.3d 303 (6th Cir. 2000), does not hold otherwise.  There, the Sixth Circuit clarified that it "is not adding a duty to investigate as a factor for the establishment of probable cause."  *Id.* at 318.  Rather, it recognize[d] that an officer does not have to investigate independently every claim of innocence."  *Id.*  While it is true that "an officer cannot look only at the evidence of guilt while ignoring all exculpatory evidence," that is not what is alleged to have occurred here. *Id.*  Indeed, examination of Defendant Kalman's March 1985 report undisputably shows that that was not what happened here.

Moreover, Prosecutor Gabry's conduct in "[d]eciding when the evidence is sufficient to stop investigating and seek an indictment" or to formally pursue criminal charges "is a standard prosecutorial function and covered by absolute immunity because – unlike searches, seizures, interrogations, and other out-of-court-activity – a decision not to extend a probe does not invade the accused's extra-judicial entitlements."  *Latta v. Chapala*, 221 F. App'x 443, 445 (7th Cir. 2007).

In *Latta*, a husband and wife were convicted of arson and felony murder after their home burned in 1989, killing their two-year-old son.  Although the convictions were affirmed on direct appeal, after serving 11 years in prison, the Indiana Supreme Court "held that [the Lattas] were entitled to collateral relief because their lawyer had furnished ineffective assistance."  *Id.* at 444.  After the prosecutor decided not to retry the husband and wife, they were freed.  They subsequently filed a § 1983 suit against the prosecutors and everyone associated with the fire investigation and their prosecution.  *Id.*  Addressing the Lattas' claim that the prosecutors "should have arranged for better investigations and built

a more complete record before initiating the prosecution," the Seventh Circuit held "there

is no constitutional duty to 'do a better investigation'; prosecutors may proceed on the basis

of probable cause (all that is required for an indictment) and rely on defense counsel to

marshal the evidence in defendants' favor." *Id.* Similar to Gavitt here, the Lattas argued

that "the investigators, consultants, and experts did not do an adequately thorough

investigation, so that the testimony presented was incomplete and misleading." *Id.* at 445.

The court found that argument lacking:

> We acknowledge that the methods that arson investigators used in the 1980s
> and 1990s have come under challenge; most experts today would use different
> approaches and therefore could reach different conclusions. See Sue Russell,
> *Arson evidence – shot down in flames*, 2565 New Scientist 42 (Nov. 3, 2006).
> Whether the application of today's tools would exculpate the Lattas is not a
> subject that can be resolved on this record but also is not material. Using the
> methods of the 1980s during the 1980s does not violate the Constitution. The
> criminal process, like other human endeavors, is imperfect. Science is imperfect
> too; techniques of arson investigation and analysis have advanced a good deal
> in the years since the fire at the Lattas' home. Perhaps an injustice has been
> done, as the Lattas ardently maintain. Section 1983 does not, however, supply
> money damages for every conviction that with the benefit of hindsight seems
> weaker to the federal judiciary than it did to the prosecutor, jury, and state
> judiciary.

*Id.*

Even if a constitutional violation were found to exist under the alleged facts,

Prosecutor Gabry's investigative conduct would be completely shielded from liability by

qualified immunity. As the *Koubriti* court recognized, qualified immunity shields a

prosecutor's administrative or investigatory conduct from liability "unless 1) he committed

a constitutional violation, and 2) the right that was violated was a clearly established right

of which a reasonable person would have known." *Koubriti*, 593 F.3d at 471. "In

determining whether a right is clearly established," the court "may rely on decisions of the

Supreme Court, decisions of [the Sixth Circuit] and courts within this circuit, and in limited circumstances, on decisions of other circuits." *Id.* at 471 (internal quotation marks and citations omitted). "When evaluating whether the specific right has been recognized, the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. In other words, the unlawfulness must be apparent." *Id.* (internal quotation marks and citations omitted). Here, just as in *Koubriti*, the Court "can find no case law to support the conclusion that a reasonable official [here Prosecutor Gabry] would have understood that the complained of action" violated Gavitt's due process rights.

### 2. Claims Against Ionia County and Ionia County Prosecutors in their Official Capacity

In Count VI, a municipal liability claim is asserted against Ionia County and the former and current Ionia County Prosecutors in their official capacities. Gavitt alleges that the Ionia County Defendants created and maintained official County policies, practices, and/or customs of the Ionia County Prosecutor's office that violated Gavitt's due process rights by: (1) failing to adequately train and supervise Ionia County prosecutors on how to adequately investigate scientific evidence in a manner that ensured that the constitutional rights of criminal defendants were not violated, and (2) by failing to discover and disclose newly-discovered and now-generally-accepted scientific evidence that would be exculpatory to previously convicted defendants like Gavitt. (Compl., ¶¶ 270-277.)

### a. Claims Against Ionia County Prosecutors in Their Official Capacity Are Barred By Eleventh Amendment Immunity

Defendant Ionia County Prosecutors first argue that Gavitt's municipal liability claims alleged against them are barred by Eleventh Amendment immunity. This Court agrees.

-30-

Sixth Circuit precedent establishes that, under Michigan law, county prosecuting attorneys "are responsible for enforcing criminal laws on behalf of the state" and are thus entitled Eleventh Amendment immunity when suit is brought against them in their official capacity. *See Cady v. Arenac Cnty.*, 574 F.3d 334, 342-43 (6th Cir. 2009).

The issue whether Eleventh Amendment immunity applies, presents a question of law for the Court to decide.  *See MacDonald v. Village of Newport, Mich.*, 164 F.3d 964, 970 (6th Cir. 1999).  For this reason, additional discovery is unnecessary.

As the Sixth Circuit observed in *Cady*, "[t]he Eleventh Amendment bars § 1983 suits against a state, its agencies, and its officials sued in their official capacities for damages." *Id.* at 342. Moreover, "[w]hether a county prosecutor is deemed a 'state official' depends, at least in part, on state law."  *Id.*  For example, in *Pusey v. City of Youngstown*, 11 F.3d 652, 657 (6th Cir. 1993), the Sixth Circuit "held that city prosecutors are considered state officials under Ohio law when they 'are responsible for prosecuting state criminal charges.'"

In *Cady*, the Sixth Circuit observed that, under Michigan law, "county prosecuting attorneys are charged with the duty of 'appear[ing] for the state or county, and prosecute or defend . . . all prosecutions, suits, applications and motions, whether civil or criminal, in which the state or county may be a party or interested.'"  *Id.* at 343 (quoting Mich. Comp. Laws § 49.153 (2008)).  It construed Michigan's statute to mean that "county attorneys in Michigan, like their counterparts in Ohio, are responsible for enforcing criminal laws on behalf of the state."  *Id.*

Similar to the plaintiff in *Cady*, Plaintiff Gavitt was charged with, prosecuted, and convicted for violating parts of Michigan's penal code.  *See id.*  And, as the *Cady* court observed, the Sixth Circuit has determined that "state criminal law represents the policy of

the state." *Id.* Thus, consistent with the Sixth Circuit's decisions in *Pusey* and *Cady*, this Court concludes that Defendant Gabry, the county prosecutor who prosecuted Gavitt, "was acting 'as a state agent when prosecuting state criminal charges.'" *Id.* (quoting *Pusey*, 11 F.3d at 657). Accordingly, just as in *Cady*, Gavitt's claims against Defendant Gabry in his official capacity "should therefore be treated as a suit against the state." *Id.* And, "an official-capacity suit against a state official is deemed to be a suit against the state and is thus barred by the Eleventh Amendment . . . ." *Id.* at 344.

The same result applies to Plaintiff Gavitt's claims against the Ionia County Prosecutors who succeeded Gabry. Gavitt's official capacity claims against these Defendants are similarly based on their prosecutions for violations of Michigan's penal code; specifically, arson and felony murder. Accordingly, the claims asserted against each of the Ionia County Prosecutors in their official capacity are deemed to be claims against the state and are thus barred by the Eleventh Amendment. *See Cady*. Gavitt's attempts to distinguish *Cady* are not persuasive. The rationale and holding in *Cady* govern the result here. This Court declines Gavitt's invitation to ignore prevailing Sixth Circuit precedent. (Resp. at 22.)

### b. Gavitt Fails to State a Municipal Liability Claim Against Ionia County

The Court next considers Gavitt's claims against Ionia County. While it is true that Ionia County is a unit of local government "not entitled to sovereign immunity under the Eleventh Amendment," Gavitt's municipal liability claim against Defendant Ionia County in Count VI also fails. *See Cady*, 574 F.3d at 345.

In *D'Ambrosio v. Marino*, 747 F.3d 378 (6th Cir. 2014), the Sixth Circuit rejected municipal liability claims similar to those Gavitt alleges here. It first observed that "under

§ 1983, local governments are responsible only for their own illegal acts. They are not vicariously liable under § 1983 for their employees' actions." *Id.* at 386. Rather, "a municipality is liable under § 1983 only if the challenged conduct occurs pursuant to a municipality's 'official policy,' such that the municipality's promulgation or adoption of the policy can be said to have 'cause[d]' one of its employees to violate the plaintiff's constitutional rights." *Id.* (quoting *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 692 (1978)). Thus, "[t]o properly allege a municipal liability claim, a plaintiff must adequately allege (1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance [of] or acquiescience [to] federal rights violations." *Id.* (internal quotation marks and citation omitted).

The *D'Ambrosio* court then addressed the plaintiff's claim that the defendant prosecutor was a "'policymaking official' of Cuyahoga County" thus making Cuyahoga County "liable for the decisions that [the defendant prosecutor] made with respect to [the plaintiff]'s prosecution." *Id.* Rejecting the plaintiff's argument, the Sixth Circuit reasoned that "[b]ecause he was acting as an agent of the state when prosecuting [the plaintiff], [the defendant prosecutor]'s conduct cannot have established a county policy, unconstitutional or otherwise." *Id.* The same rationale and result apply here. Defendant Gabry was acting as an agent of the state when he prosecuted Gavitt. Accordingly, his conduct could not have established a county policy, unconstitutional or otherwise. *See also Cady*, 574 F.3d at 345 (rejecting an argument similar to Gavitt's here and holding that, when the county prosecutor made decisions "related to the issuance of state charges against Cady, the

-33-

entry of [the Deferred Prosecution Agreement], and the prosecution of Cady, he was acting as an agent of the state rather than Arenac County" and thus the prosecutor's actions could not be "attributed to Arenac County" for purposes of municipal liability).

Gavitt's additional argument – that his allegations in Count VI against the Ionia County Prosecutors in their official capacity do not relate to their actions in a single prosecution – was also rejected by the Sixth Circuit in *D'Ambrosio*.  Gavitt argues here that his complaint alleges that the prosecutors, *as policymakers*, exercised their discretion to craft policies that resulted in continued constitutional deprivations by failing to adequately evaluate scientific evidence in prosecutions and by failing to disclose newly-discovered exculpatory scientific evidence postconviction to defendants they previously prosecuted.   (Resp. at 21-22; Compl., ¶¶ 271-277.)  Similar to the allegations found insufficient in *D'Ambrosio*, Gavitt's allegations here "are insufficient to plausibly allege the existence of an official county policy of violating criminal defendant's constitutional rights."  *D'Ambrosio*, 747 F.3d at 387.  The Sixth Circuit's observations there apply equally as well here:

> The thrust of the complaint is that [the defendant prosecutor] – and perhaps one or two other members of the Prosecutor's Office – instigated and implemented habitually unconstitutional policies, not that they were following municipal policy in doing so.  Municipal liability attaches only where the policy or practice in question is attributable to the municipality, but D'Ambrosio's complaint contains no allegations that the practice at issue here was acquiesced to or informed by municipal actors rather than by prosecutors who had adopted the strategy in order to win criminal convictions. . . .  Again, state prosecutors' actions in prosecuting state crimes cannot themselves establish municipal policy.

*Id.* (internal quotation marks and citations omitted).

Similar to the plaintiff's complaint in *D'Ambrosio*, Gavitt's complaint here "amounts to an attempt to hold the county liable" for what Gavitt alleges Prosecutor Gabry and his successor Defendant Ionia Prosecutors "did wrong.  And this is insufficient to state a claim

under *Monell.*"  *Id.* at 388.  "A municipality may not be held liable under § 1983 on a *respondeat superior* theory. . . ."  *Id.*  Rather, "a municipality is liable under § 1983 where, through its deliberate conduct, it was the moving force behind the injury alleged."  *Id.* at 389 (internal quotation marks and citations omitted).  Like the plaintiffs in *Cady* and *D'Ambrosio*, Gavitt does not and cannot complain about any separate policy or practice attributable to Ionia County that led to a deprivation of his constitutionally protected liberty interests.[7]

### 3.  Gavitt Fails to State a Claim for Injunctive Relief

In Count VIII, Gavitt asserts a claim for injunctive relief against Ionia County and the former and current Ionia County Prosecutors, in their official capacities, seeking an order compelling Ionia County and the Ionia County Prosecutors Office to:  (1) "undertake the necessary analysis to identify other individuals similarly harmed by the Defendant[s'] policies and procedures," and (2) disclose "any and all discovered exculpatory evidence" that "would marginally impact others who may have been convicted of the crime of arson under circumstances similar to [Gavitt]."  (Compl., ¶¶ 288-295.)  The Ionia County Defendants argue that Gavitt has not shown that he is entitled to the injunctive relief he

---

[7]Moreover, as discussed above, Eleventh Amendment immunity applies to each of the allegedly unconstitutional policies asserted in Count VI that address Defendant Ionia County Prosecutors' role as an advocate in enforcing Michigan's criminal laws of arson and felony-murder, i.e., their evaluation and presentation of evidence after a probable cause determination has been made.  Further, as the Seventh Circuit observed in *Latta* when addressing similar arson-based, scientific evidence claims, "there is no constitutional duty to 'do a better investigation.'"  *Latta*, 221 F. App'x at 444.  Rather, "prosecutors may proceed on the basis of probable cause (all that is required for an indictment) and rely on defense counsel to marshal the evidence in defendants' favor."  *Id.*  Finally, as the Supreme Court observed in *Osborne*, there is no ongoing due process obligation owed by state prosecutors to convicted defendants to produce potentially exculpatory evidence post-trial.  *Osborne*, 557 U.S. at 68-69.

seeks.  This Court agrees.

Gavitt concedes that "[s]tanding requires plaintiff to demonstrate actual present harm or a significant possibility of future harm."  *Savage v. Gee*, 665 F.3d 732, 740 (6th Cir. 2012) (internal quotation marks and citation omitted).  *See also Daubenmire v. City of Columbus*, 507 F.3d 383, 388 (6th Cir. 2007) (same).  "[A]llegation of past injury is not sufficient to confer standing for . . . injunctive relief."  *Cohn v. Brown*, 161 F. App'x 450, 455 (6th Cir. 2005).  *Accord, Grendell v. Ohio Supreme Court*, 252 F.3d 828, 832 (6th Cir. 2001) (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983), "'past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects.'").  The Supreme Court's decision in *Lyons* illustrates this point.

In *Lyons*, the respondent sought an injunction against the City of Los Angeles barring the "use of chokeholds absent the threat of immediate use of deadly force."  *Lyons*, 461 U.S. at 98.  The Supreme Court held that Lyons failed to satisfy the prerequisites for injunctive relief.  It explained why past conduct is insufficient to supply standing:

> Lyons' standing to seek the injunction requested depended on whether he was likely to suffer future injury from the use of the chokeholds by police officers. Count V of the complaint alleged the traffic stop and choking incident five months before.  That Lyons may have been illegally choked by the police on October 6, 1976, while presumably affording Lyons standing to claim damages against the individual officers and perhaps against the City, does nothing to establish a real and immediate threat that he would again be stopped for a traffic violation, or for any other offense, by an officer or officers who would illegally choke him into unconsciousness without any provocation or resistance on his past.

*Id.* at 105.

The *Lyons* Court then addressed and rejected the respondent's claim that he had standing to obtain the injunctive relief he sought because "the police in Los Angeles

routinely apply chokeholds in situations where they are not threatened by the use of deadly force." *Id.* It explained:

> In order to establish an actual controversy in this case, Lyons would have had not only to allege that he would have another encounter with the police but also to make the incredible assertion either (1) that *all* police officers in Los Angeles *always* choke any citizen with whom they happen to have an encounter, whether for the purpose of arrest, issuing a citation, or for questioning, or (2) that the City ordered or authorized police officers to act in such manner.

*Id.* at 106. As the Court observed, Lyons made no such allegations nor could he credibly do so.

> Of course, it may be that among the countless encounters between the police and the citizens of a great city such as Los Angeles, there will be certain instances in which strangleholds will be illegally applied and injury and death unconstitutionally inflicted on the victim. As we have said, however, it is no more than conjecture to suggest that in every instance of a traffic stop, arrest, or other encounter between the police and a citizen, the police will act unconstitutionally and inflict injury without provocation or legal excuse. And it is surely no more than speculation to assert either that Lyons himself will again be involved in one of those unfortunate instances, or that he will be arrested in the future and provoke the use of a chokehold by resisting arrest, attempting to escape, or threatening deadly force or serious bodily injury.

*Id.* at 108. The *Lyons* Court thus held that "[a]bsent a sufficient likelihood that he will again be wronged in a similar way, Lyons is no more entitled to an injunction than any other citizen of Los Angeles; and a federal court may not entertain a claim by and or all citizens who no more than assert that certain practices of law enforcement officers are unconstitutional." *Id.* at 111. Gavitt's claim for injunctive relief against Ionia County Defendants fail for the same reasons.

Here, Gavitt's claim for injunctive relief does not allege either actual present harm or a significant possibility of future harm to him. Rather, he attempts to obtain discovery on behalf of third parties who may wish to assert claims similar to those rejected here. Gavitt

lacks standing to assert any claim for injunctive relief on behalf of unnamed third parties. *See, e.g., Kowalski v. Tanner*, 543 U.S. 125, 130, 134 (2004) (holding that "attorneys do not have third-party standing to assert the rights of Michigan indigent defendants denied appellate counsel" and observing that third-party standing has been limited only to those circumstances where (1) the party seeking third-party standing "has a 'close' relationship with the person who possess the right;" and (2) "there is a 'hinderance' to the possessor's ability to protect his own interests.").

For all these reasons, Gavitt fails to state a claim for the injunctive relief he seeks.

## IV.   Conclusion

For the above stated reasons, Ionia County Defendants' motion to dismiss or for summary judgment is GRANTED.  Gavitt's claims against Defendants Ionia County and Prosecutors Gabry, Voet, Schafer and Benda in their individual and official capacity are DISMISSED.


                    s/Nancy G. Edmunds
                    Nancy G. Edmunds
                    United States District Judge

Dated:  December 15, 2014

I hereby certify that a copy of the foregoing document was served upon counsel of record on December 15, 2014, by electronic and/or ordinary mail.

                    s/Carol J. Bethel
                    Case Manager