UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DAVID L. GAVITT,

        Plaintiff,

v.

IONIA COUNTY, ET AL.,

        Defendants.

_____/

Case No. 14-12164

Honorable Nancy G. Edmunds

**OPINION AND ORDER GRANTING DEFENDANTS CITY OF IONIA'S, KENNETH VOET'S, AND RANDALL KLEIN'S MOTION FOR JUDGMENT ON THE PLEADINGS OR IN THE ALTERNATIVE FOR SUMMARY JUDGMENT [44]**

This is a civil rights case brought pursuant to 42 U.S.C. § 1983.  On June 2, 2014, Plaintiff David Gavitt filed a complaint against numerous Defendants, including Defendants City of Ionia, Randall Klein, a former Sergeant with the Ionia Police Department, and Kenneth Voet, the former Chief of Police for the Ionia Police Department.  (Compl., ¶¶ 19-22.)  Plaintiff Gavitt (hereinafter "Gavitt")'s § 1983 claims arise from a house fire that occurred in March 1985 and tragically took the lives of Gavitt's wife and two daughters.  Gavitt survived.  Gavitt was charged, convicted, and sentenced in 1986 to life in prison on state criminal charges of arson and felony murder.  *See People v. David Lee Gavitt*, Ionia County Circuit Court Case No. 85-007555.

In September 2011, a motion for relief from judgment was filed on Gavitt's behalf by the University of Michigan Law School's Innocence Clinic, arguing that there was newly-

-1-

discovered evidence of Gavitt's innocence, i.e., newly discovered scientific analysis of the origin and cause of the fire establishing that there was no arson. (Defs.' Fatchett and Kalman Mot. to Dismiss, Ex. A, Gavitt Mot. for Relief, Supporting Brief at 16-37.) On June 6, 2012, the People of the State of Michigan and Gavitt stipulated that Gavitt's motion for relief from judgment be granted; and that same day, the Ionia County Circuit Court issued an Order granting Gavitt's motion, dismissing all the charges against him, and ordering his immediate release. (Defs.' Ionia County, Gabry, Voet, Schaefer, and Benda Mot. for Sum. Judg., Ex. 15, 6/6/12 Stip., 6/6/12 Order.)

This matter is now before the Court on Defendants City of Ionia's, Randall Klein's, and Kenneth Voet's motion for judgment on the pleadings or in the alternative motion for summary judgment [44], brought pursuant to Rule 12(c), or in the alternative Rule 56, of the Federal Rules of Civil Procedure. For the reasons stated below, Defendants' motion for judgment on the pleadings is GRANTED.

## I.   Background

### A.  Fire, Investigation, Arrest, Trial, and Conviction

Gavitt survived a March 9, 1985 house fire. His wife and two daughters tragically did not. (Compl., ¶¶ 61-67.) An investigation was initiated by the City of Ionia Police Department and the Michigan State Police Arson Task Force. (*Id.* at ¶¶ 71-101.)

On the morning of March 10, 1985, Defendants Kalman and Fatchett, then-Michigan State Police ("MSP") officers assigned to the MSP Arson Strike Force Unit ("Det./Sgt. Kalman" and "Det./Sgt. Fatchett" respectively), were dispatched to the scene of the house fire to investigate its cause and origin and inspected the home. Based on their initial review of the evidence, they concluded that the fire was incendiary in nature. (*Id.* at ¶¶ 48-49,

-2-

101-103.)   At 2:30 in the afternoon that same day, Det./Sgts. Kalman and Fatchett summoned Defendant Klein, then-Sergeant with the Ionia Police Department ("Sgt. Klein"), to the burned home, walked him through the evidence at the fire scene that led them to their initial conclusion that the fire was incendiary in nature, and collected evidence that Sgt. Klein then placed in an Ionia Police Department evidence locker.   (*Id.* at ¶¶ 21, 108-115.)   Sgt. Klein then continued his investigation by obtaining evidence from and interrogating Gavitt, and obtaining more evidence from the burned home.   (*Id.* at ¶¶ 116-121, 125-129.)

On March 12, 1985, as reported in Det./Sgt. Kalman's March 1985 Report, a meeting was held "for the purpose of reviewing the evidence and determining the course of the investigation."  (Defs. Fatchett's and Kalman's Mot., Ex. C, Kalman Rpt. at 10.)  Det./Sgt. Kalman reported that he presented evidence, a discussion was held, and a conclusion reached that Gavitt may have set the fire himself and was unable to save his family once the fire started:

> Undersigned officer explained the burn patterns and also relating [sic] the burn patterns to the burns on the victim.  A formal discussion was held on all the evidence obtained and it is the feeling that there is strong evidence pointing to the fact that MR. DAVID GAVITT may have indeed set the fire himself and was unable to save his family once the fire started.

(*Id.*)  Sgt. Klein's March 20, 1985 Report also discussed the March 12th meeting and calls it a "'skull session' starting at/around 8:30 am, ending a short time later." (Ionia Cnty. Defs.' Mot., Ex. 2, 3/20/85 Rpt. at 1, "Journal Entry.")  Sgt. Klein lists Defendant Voet as being present.  He reports:

> <u>Journal Entry</u>:  It was on TUES, MARCH 12th, 1985 that this investigating officer, Sgt. Wieczorek and Chief Voet met with the following:  City Superintendent Allen Housler, Det/Sgt. JOHN KALMAN and Det/Sgt. JOE DeKRACKER of the Arson

> Strike Force, MSP Rockford Post, this meeting was an "initial assessment of the case". It should be noted that this meeting was a "skull session" starting at/around 8:30 am, ending a short time later.

(*Id.*) (*See also* Compl., ¶¶ 122-123, 232-233, 270 for discussion of March 12, 1985 meeting.)

On June 10, 1985, a felony complaint was issued, and state criminal charges were brought against Gavitt – three counts of murder, three counts of felony murder, arson, and arson insured property –  and he was subsequently arrested.  (Ionia Cnty. Defs.' Mot., Ex. 4, 6/10/85 criminal complaint and information.)  Sgt. Klein was the complaining witness on the criminal complaint.  (*Id.*)

On June 21, 1985, a preliminary examination hearing was held on the criminal charges brought against Gavitt.  District Court Judge James Ward was the presiding judge and Defendant Gabry was the prosecutor.  The District Court found that probable cause existed on the charged offenses – murder, felony murder, and arson – but dismissed the insurance fraud charge.  (Compl., ¶¶ 177-178.)

A jury trial was held in the Circuit Court for the County of Ionia.  *See People v. David Lee Gavitt*, Ionia County Circuit Court Case No. 85-007555.  On February 14, 1986, a jury convicted Gavitt on three counts of murder committed in the perpetration of arson (first degree felony murder) and one count of arson to a dwelling place.  (Ionia Cnty. Defs.' Mot., Ex. 6, 2/14/86 Verdict.)  The one count of arson was dismissed by the Court at sentencing. (*Id.*, Ex. 7, 4/18/86 Sent. Tr. at 2-3.)

On April 18, 1986, Gavitt was sentenced to "imprisonment for life on each of the three counts of murder, to be served concurrently with each other."  (Ionia Cnty. Defs.' Mot, Ex. 5, 5/1/86 Judg. of Sentence.)

-4-

**B. Innocence Clinic's Post-trial Motion for Relief, Stipulation, and Dismissal**

In September 2011, a motion for relief from judgment was filed on Gavitt's behalf by the University of Michigan Law School's Innocence Clinic, arguing that there was newly-discovered evidence of Gavitt's innocence, i.e., newly discovered scientific analysis of the origin and cause of the March 1985 fire establishing that there was no arson. (Defs. Fatchett's and Kalman's Mot., Ex. A, Gavitt Mot. for Relief, Brief at 16-37.) That motion explained that evidence of actual innocence was only recently discovered because, beginning in 1992, there has been a complete revolution in the field of fire investigation:

> 14. The field of fire investigation has undergone a complete revolution since Mr. Gavitt was convicted in 1986. In 1992, the National Fire Protection Association adopted NFPA 921, the current standard of care for fire investigations, which for the first time put the field of fire investigation on a scientific basis.

> 15. In light of the changes in the field of fire investigation, John Lentini – a world-renowned fire investigator who has reviewed all available testimony and evidence in this case – has concluded that <u>there is no basis to conclude that arson was the cause of the Gavitt fire.</u> Mr. Lentini's affidavit is attached to the brief accompanying this motion.

> 16. <u>Mr. Lentini's findings are rooted in the crucial concept of "flashover," which was not well understood by the fire investigation community at the time of Mr. Gavitt's trial</u>. During flashover – a phenomenon that takes place when a compartment like the Gavitt living room catches fire – a room becomes so hot that every exposed combustible surface can catch fire.

> * * * * *

> 29. Mr. Lentini's scientific conclusions regarding the origin and cause of the Gavitt fire meet this [newly discovered evidence] test. <u>His findings are based on the new standards of origin and cause investigation, which were not adopted until the early 1990s, at the earliest, years after Mr. Gavitt's trial</u>. The evidence refutes all scientific evidence presented at trial, so it is not cumulative. Further, because the prosecution's case relied wholly on the testimony of fire experts, no rational jury could have found Mr. Gavitt guilty of murder if the findings of Mr. Lentini or any competent fire investigator <u>applying modern standards</u> had been presented. This is particularly true when this evidence is considered alongside the new evidence regarding the absence of gasoline on the carpet samples. . .

.

> 30. Finally, <u>because the field of gas chromatography was much less precise in 1986 than it is today, trial counsel could not have discovered the new evidence that undermines Mr. DeVries's testimony</u> through the exercise of due diligence, and the fourth and final prong for granting a new trial based on newly-discovered evidence is satisfied.

(*Id.*, Mot. at 3 (emphasis added).)

The supporting brief relied heavily on John Lentini's Affidavit and similarly argued that, because of "significant advancements in the field of fire science and arson investigation," there is newly-discovered evidence that undermines the prosecution's case against Gavitt:

> While the investigation of this case was, perhaps, normal for a fire investigation conducted in the mid-1980s, approximately a decade before scientific principles were first applied to fire investigation, practically all of the investigative methods and conclusions reached by the various fire investigators in this case fail to meet modern standards of accuracy and reliability.

> * * * * *

> The field of fire investigation has undergone a complete revolution <u>since Mr. Gavitt's conviction</u>. John Lentini Affidavit ¶¶ 15-59. <u>Theories</u> that low-burning, alligatoring, pour patterns, depth of char, and temperature and speed of fires can serve as indicators of arson <u>were once unquestioned, but have been completely and unequivocally repudiated by rigorous scientific testing</u>. *Id.* at ¶¶ 36-59. As such, every indicator of arson relied upon by the prosecution's experts at Mr. Gavitt's trial has been discredited and is understood to be useless in determining the true origin and cause of fires. *Id.* <u>Many factors once thought to be present only in accelerated fires are now understood to be present in natural fires that have undergone flashover and progressed to full room involvement, a phenomenon that was not understood in 1986</u>[.] *Id.* at ¶¶ 29-35.

> * * * * *

> Mr. Lentini's finding that Mr. DeVries's testimony about the carpet flame tests was false meets all parts of the standard for newly-discovered evidence. <u>Given that the understanding of flashover is a novel concept in arson science and certainly was not known outside of a very small subset of the scientific community at the time of Mr. Gavitt's trial, the evidence itself and not merely its materiality is newly-discovered.</u> For this same reason, <u>it is clear that the evidence could not have been discovered with due diligence at the time of trial;</u>

indeed the concept of flashover would not become widely known and understood by fire investigators until at least a decade after Mr. Gavitt's conviction. . . .

(*Id.*, Br. at 7, 13, 36-37 respectively (emphasis added).)

As Mr. Lentini admitted in his Affidavit that, at the time that Sgt. Fatchett and the Ionia County Prosecutor's expert, Dr. Edwards, considered the impact of flashover, they had no way of knowing that their generally accepted interpretations of burn patterns would be refuted years later:

Neither Sgt. Fatchett nor Dr. Edwards considered the impact of flashover and the impact of the burning curtains when they attempted to discern what caused the patterns they observed on the living room floor in the course of their investigation.  Nor would such consideration have been expected in 1986, because the state of the art in fire investigation had not come to fully recognize flashover at that time.

* * * * *

All of the above testimony [Defendant Fatchett's trial testimony evaluating evidence from the fire and opining that the fire was intentionally set] can be shown by today's standards to have been false and misleading, albeit without malicious intent. . . .

* * * * *

The State's experts had no way of knowing that their interpretation of the burn patterns at the Gavitt residence was without any scientific validity because, at the time of the trial, those interpretations were, in fact, generally accepted by most fire investigators, including your affiant.  The misinterpretation was bolstered by the incorrect laboratory analysis performed by Mr. DeVries.  The state's fire investigators "expectations" were not properly "calibrated."  They expected the confined fire in the Gavitt residence to behave like an unconfined fire.  Because the fire did not meet their expectations of normal fire behavior, they incorrectly determined the fire to be incendiary.

(Defs. Fatchett's and Kalman's Mot., Ex. A, Gavitt Mot. for Relief, Appendix B, Lentini Aff. at ¶¶ 66, 70, 100 (emphasis added).)

An affidavit from an experienced fire investigator that Gavitt's defense attorney consulted with in 1985 in connection with Gavitt's criminal charges also provided an

affidavit which was attached as an exhibit to Gavitt's motion for relief. (Defs. Fatchett's and Kalman's Mot., Ex. A, Lentini Aff., Appendix R, Churchwell Aff. at ¶¶ 1-5.) Mr. Churchwell, like Mr. Lentini, stressed that "the world of fire science is vastly different today than it was in 1985;" that the way he "would have viewed the fire scene in 1985 is completely different from the way" he "would view the same scene today;" and "the advancements in fire science would enable [him] to have far better insights and be wary of false findings today." (*Id.* at ¶ 6.) Mr. Churchwell, like Mr. Lentini, stated that he subscribed to the same beliefs that science has now proven to be false; that he can say now that Gavitt was falsely convicted; but could not have reached that conclusion in 1985-86 when he was consulting with defense counsel:

> Well into the 1980's, the arson investigation profession believed that things like floor burn patterns, low burning, deep charring and alligatoring were automatic indicators of arson: I subscribed to those beliefs at one time as well. But in the 1990s, with a wider understanding of the concept of flashover and the emergence of NFPA 921, the profession grew up and began to embrace the rigors of actual science. Upon doing so, the open-minded among us discovered that the old indicators that we thought were automatic markers of arson were in fact not. This led to the realization that each of us – investigators who had worked in the 1970s and 1980s – had misread many fire scenes, possibly leading to the conviction of innocent people. I have no doubt in my mind that David Gavitt is one such falsely-convicted person. I can say this knowing what I know today, but such a conclusion would have been impossible for me to make in 1985-86 (when Mr. Kolenda consulted with me) because the profession had yet to become enlightened to the errors of the old ways of arson investigation at that time.

(*Id.* at ¶ 10 (emphasis added).)

Mr. Churchwell also admitted that he "would likely have made the same mistake" as those investigating the Gavitt home fire by failing to give adequate consideration to possible accidental causes of that fire:

> As I know from having worked many similar fires in the 1980s, the fact that

-8-

obvious sources of ignition and the presence of various fuels (candles, ashtray, oil lamps, paneling, etc.) went largely ignored at the trial is not all that surprising. In those days, fire investigators would look first for pour patterns, alligatoring and other such things, and upon finding them, we would assume the fire was arson – so much so that we'd ignore far more obvious accidental sources of the fire. I have no doubt that the investigators who looked at the fire scene at the Gavitt home made this mistake.  As cautious and careful as I always try to be, I would likely have made the same mistake upon seeing the Gavitt fire scene in 1986: Fire investigators simply did not have enough knowledge about the true nature of enclosed (compartment) fires at that time.  Today, years later, being wise to the many advancements and the rigors of actual science that have finally come to dominate the arson investigation profession, I can say that the prosecution's experts were blinded by the myths (alligatoring, charred glass, low burning, etc.), and failed to give due deference to far more obvious and likely accidental sources of the fire.

(*Id.* at ¶ 12 (emphasis added).)

The parties stipulated to a stay of Gavitt's motion, allowing the Ionia Prosecutor's Office time for scientific review of Gavitt's claims.  (Ionia Ctny. Defs.' Mot., Ex. 12, 9/15/11 Stip.)   On June 6, 2012, after a thorough investigation, current Ionia County Prosecutor Ronald Schafer, on behalf of the People of the State of Michigan, responded to Gavitt's motion.

Prosecutor Schafer acknowledged that, although "fire investigators" involved in the original investigation "held to a common understanding within fire investigation," it is now known that that "was inaccurate, specifically regarding the recognition and identification of unusual burn patterns in the floor as definitive evidence of ignitable liquid pour patterns. Unfortunately, during that time period many fire investigators did not understand the phenomena of flashover and post-flashover and their effects on the production of unusual burn patterns in floors within compartments."  (Defs. Fatchett's and Kalman's Mot., Ex. B, People's Resp. at 16.)  Prosecutor Schafer also acknowledged that Gavitt had satisfied the requirements for a new trial.

[T]he Peoples [sic] recent investigation confirms the 1985 findings which found the presence of accelerants on the carpet samples introduced at trial can no longer be independently verified as having a presence of ignitable liquids, specifically gasoline.  Therefore, the parameters for meeting the legal requirement for a new trial are not disputed.

(*Id*.)

Despite an admission that "three independent analyses of the evidence suggest there was likely no gasoline on the carpet samples taken out of the Gavitt house in 1985," Prosecutor Schafer emphasized that "there are still a great deal of questions surrounding this case which raise significant questions."  (*Id*. at 18.)  "Still today, these unanswered questions linger when looking at the case on the whole, even in light of the acknowledged findings in this response.  In fact, this is the exact type of case that would have remained open had it not been prosecuted earlier; the type of case where justice would demand that it stay open."  (*Id*. at 19.)  Nonetheless, Prosecutor Schafer acknowledged, "it does not change the fact that fire investigation has advanced in the twenty-seven years since this fire."  (*Id*. at 19-20.)

Prosecutor Schafer identified some of those fire investigation advances and explained why, in light of those advances, Gavitt cannot be retried.

In particular, our understanding of flashover, post-flashover and the production of unusual burn patterns in floors, potentially identified as pour patterns, is different today than in 1985.  Testing of materials in fire cases has also advanced, with more sophisticated instrumentation and analysis. Consequently, there is new evidence in this case and [Gavitt] is entitled to a new trial.  As outlined, based on today's understanding of fire dynamics and the evolved level of fire investigation, this fire incident would likely be classified as undetermined and consequently the People will not be able to retry [Gavitt] . . . .  there is only one thing known with certainty, as of today, this case involves a fire of undetermined origin and cause.   Having no laboratory verification of the presence of an accelerant, combined with what the People now know through scientific research and testing regarding flashover and post-flashover compartment fires, and the production of unusual burn patterns in the floor, the

determination that an ignitable liquid (gasoline) was used to initiate the fire at the Gavitt residence cannot be verified. As a result, this is a case this office could not charge as arson based on the evidence available today. However, this is also a case that, if it was new today, this office would not close. There are simply too many questions, questions which may never be answered. Ultimately, this remains a case in which the lives of three innocent people were taken by a fire that can only be classified as having an undetermined origin and cause.

(*Id.* at 20 (emphasis added).)

On June 6, 2012, the People of the State of Michigan and Gavitt stipulated that Gavitt's motion for relief from judgment be granted, that all charges against Gavitt be immediately dismissed, and that the Court order his immediate release from the custody of the Michigan Department of Corrections. (Ionia Ctny. Defs.'s Mot, Ex. 15, 6/6/12 Stip.) That same day, the Ionia County Circuit Court issued an Order granting Gavitt's motion, dismissing all the charges against him, and ordering his immediate release. (*Id.* at Ex. 15, 6/6/12 Order.)

### C. Gavitt's Claims Against City of Ionia Defendants

On June 2, 2014, Gavitt filed this civil rights action, pursuant to 28 U.S.C. § 1983, against numerous Defendants, including Defendants Ionia City, former Ionia Chief of Police Kenneth Voet, and former Ionia Police Sgt. Randall Klein (hereinafter "City of Ionia Defendants").

## II. Standard of Review - Rule 12(c) Motion for Judgment on the Pleadings

A Rule 12(c) motion on the pleadings is reviewed in the same manner as a Rule 12(b)(6) motion to dismiss. "To survive the Rule 12(c) motion, 'a complaint must contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face.'" *Daily Servs., LLC v. Valentino*, 756 F.3d 893, 898 (6th Cir. 2014) (quoting *Ashcroft*

*v. Iqbal*, 556 U.S. 662, 678 (2009)).

The Sixth Circuit recently noted that under the United States Supreme Court's heightened pleading standard laid out in *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544 (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), "a complaint only survives a motion to dismiss if it contains sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Estate of Barney v. PNC Bank, Nat'l Ass'n,* 714 F.3d 920, 924-25 (6th Cir. 2013) (internal quotation marks and citations omitted). The court in *Estate of Barney* goes on to state that under *Iqbal*, "[a] claim is plausible when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (internal quotation marks and citations omitted). Furthermore, "[w]hile the plausibility standard is not akin to a 'probability requirement,' the plausibility standard does ask for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678. Finally, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.' " *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2)). If the plaintiffs do "not nudge[ ] their claims across the line from conceivable to plausible, their complaint must be dismissed." *Twombly*, 550 U.S. at 570.

## III.  Analysis

### A.  No Need to Convert Defendants' Rule 12(b)(6) Motion to Dismiss Into Rule 56 Motion for Summary Judgment

The Court begins its analysis with Gavitt's argument that City of Ionia Defendants' Rule 12(c) motion for judgment on the pleadings must be treated as a Rule 56 motion for summary judgment. Gavitt's argument is rejected. As stated above, Rule 12(c) motions

are decided by the same standard as Rule 12(b)(6) motions to dismiss. In deciding a Rule 12(b)(6) motion to dismiss, the Court "may consider the Complaint and any exhibits attached thereto, public records, items appearing in the record of the case and exhibits attached to the defendant's motion to dismiss so long as they are referred to in the Complaint and central to the claims contained therein." *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008). *Accord*, *In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 466 (6th Cir. 2014) (observing that the Sixth Circuit has "recognized that if a plaintiff references or quotes certain documents, or if public records refute a plaintiff's claim, a defendant may attach those documents to its motion to dismiss, and a court can then consider them in resolving the Rule 12(b)(6) motion without converting the motion to dismiss into a Rule 56 motion for summary judgment."); *Commercial Money Ctr., Inc. v. Ill. Union Ins. Co.*, 508 F.3d 327, 336 (6th Cir. 2007) (observing that "when a document is referred to in the pleadings and is integral to the claims, it may be considered without converting a motion to dismiss into one for summary judgment."); *Rodic v. Thistledown Racing Club, Inc.*, 615 F.2d 736, 738 (6th Cir. 1980) (observing that "[f]ederal courts may take judicial notice of the proceedings in other courts of record") (internal quotation marks and citation omitted). Here, Gavitt's Complaint references public records filed in Gavitt's criminal case and also references the following exhibits attached to Defendants' motion that are central to Gavitt's claims: Gavitt's motion for relief from judgment and supporting brief (with attached Lentini and Churchwell Affidavits), the People's response to Gavitt's motion, the court order granting Gavitt's motion, his preliminary examination hearing, and Defendants Klein's, Kalman's and Fatchett's reports (*see, e.g.*, Compl., ¶¶ 101-126, 177-79, 183-188, 194.) Defendants' motion is properly considered under Rule 12(c), which

requires the same analysis as under Rule 12(b)(6).

## B. Gavitt's Claims Against City of Ionia Defendants

The only claims Gavitt alleges against Defendants Klein and Voet in their individual capacity are contained in Count III of his Complaint, alleging a § 1983 conspiracy. The Court now considers those claims.

### 1. Count III - Gavitt Fails to State a § 1983 Conspiracy Claim Against Defendants Klein and Voet

"A civil conspiracy under § 1983 is an agreement between two or more persons to injure another by unlawful action." *Bazzi v. City of Dearborn*, 658 F.3d 598, 602 (6th Cir. 2011) (internal quotation marks and citation omitted). To prevail on a § 1983 conspiracy claim, a plaintiff must establish that: (1) the existence of "a single plan," (2) the defendant "shared in the general conspiratorial objective to deprive [the plaintiff] of his constitutional (or federal statutory) rights, and (3) an overt act was committed in furtherance of the conspiracy that caused injury to [the plaintiff]." *Id.* (internal quotations marks and citations omitted). Mere speculation and conjecture are insufficient to establish the existence of an agreement, an essential element of a § 1983 conspiracy claim. *See Moore v. City of Paducah*, 890 F.2d 831, 834 (6th Cir. 1989) (affirming the district court's decision to direct a verdict for the defendant on a § 1983 conspiracy claim because there was "no evidence beyond mere conjecture and speculation that an agreement existed, thus, precluding a finding of a conspiracy.").

Defendant Kenneth Voet, the former Ionia Chief of Police, is alleged to have taken part in the Gavitt fire investigation, including his attendance a March 12, 1985 "skull session" where Defendant Kalman, a former Michigan State Police Sgt./Det. who was

-14-

investigating the March 9, 1985 Gavitt house fire, reviewed and explained the burn patterns in the house and on Gavitt himself and expressed his conclusions "of very 'strong evidence pointing to the fact that MR. DAVID GAVITT may have indeed set the fire himself and was unable to save his family once the fire started.'" (*Id.* at ¶¶ 81-82, 122-123.)  Defendant Klein is alleged to have investigated the March 1985 house fire to determine whether any criminal activity was involved (Compl., ¶¶ 21, 75-100, 108-131, 133, 136-137, 139), to have attended the March 12, 1985 "skull session," and was the complaining witness on Gavitt's June 10, 1986 felony complaint (*id.* at ¶¶ 122-123, 175).

In Count III of Gavitt's Complaint, a § 1983 conspiracy claim is asserted against former Sgt. Klein and former Ionia Chief of Police Kenneth Voet, in their individual capacity, alleging that they conspired with former Prosecutor Gabry, and former Det./Sgts. Kalman and Fatchett, beginning on March 12, 1985 and continuing to the present date, to violate Gavitt's Fourteenth Amendment due process rights by (1) agreeing, without adequate investigation, that the March 1985 fire was incendiary in nature and set by Gavitt (Compl., ¶¶ 234-235; Resp. at 9-11)[1], and (2) agreeing to allow MSP laboratory technician DeVries

_____

[1]Paragraphs 233 through 235 of Gavitt's Complaint state as follows:

233.  Beginning on March 12, 1985, and continuing to the present date, Defendants Gabry, Kenneth Voet, Klein, Kalman, and Fatchett acting under color of state law, conspired to violate Gavitt's rights under the due process clause of the Fourteenth Amendment to the United States Constitution.

234.  The acts in furtherance of this conspiracy include, by are not limited to, their participation in a "skull session" wherein all mutually agreed, without any judicial review, laboratory analysis, scientific basis, or reasonable belief, and in willful and wanton disregard of the truth, the March 9, 1985 fire at 515 N Johnson Street was incendiary and set by David Gavitt.

-15-

to present false evidence in the form of his fire-spread test results and to testify about the results of his testing of carpet samples in Gavitt's prosecution "while at the same time concealing exculpatory evidence that MSP regional crime laboratories were experiencing false positives" in arson analysis testing and were experiencing "contamination of fire debris samples within the laboratory setting." (Compl., ¶ 236.)[2]  Despite assertions to the contrary in his Response, there are no allegations in Gavitt's Complaint, that Defendants Klein and Voet agreed with Defendants Gabry, Kalman and Fatchett to improperly conduct forensic arson testing or to falsify forensic test results.  (Resp. at 10-11.)  The Court thus considers only the facts that are alleged in Gavitt's Complaint and reasonable inferences that can be drawn from the alleged facts.

### a.  Alleged Agreement To Use DeVries's Testing Results and Testimony About Those Results Without Disclosure of Exculpatory Evidence

The Court addresses item (2) above first.  Construing the allegations in Count III in the light most favorable to Plaintiff Gavitt, the only reasonable inference to draw from these allegations is that Prosecutor Gabry was made aware of the alleged exculpatory evidence

---

235.  These Defendants jointly then set about a fire investigation ("arsonist hunt") to prove that David Gavitt intentionally set the fire.

[2]Paragraph 236 of Gavitt's Complaint states that:

236.  These Defendants encouraged, condoned, and approved utilization of laboratory technician Defendant DeVries flame spread experimentation and questionable gas chromatography testing results of carpet samples obtained from a "control sample" which had not been intended to be submitted to scientific analysis and/or subject to evidence preservation protocol while at the same time concealing exculpatory evidence that MSP regional crime laboratories were experiencing false positives and arson analysis testing and contamination of fire debris samples within the laboratory setting.

-16-

about problems occurring in the MSP crime laboratory; and that Prosecutor Gabry, along with Defendants Klein, Voet, Kalman and Fatchett all agreed to use DeVries's testing results and testimony as evidence during Gavitt's prosecution without disclosing the exculpatory MSP laboratory evidence. As pled by Gavitt, he cannot establish a § 1983 conspiracy claim asserting that these Defendants violated any constitutional obligation to disclose exculpatory evidence; their *Brady* obligation is fulfilled by disclosure of exculpatory evidence to Prosecutor Gabry, not to Gavitt or his defense counsel.

The Sixth Circuit recently addressed the issue presented here. *See D'Ambrosio v. Marino*, 747 F.3d 378 (6th Cir. 2014). In *D'Ambrosio*, the court discussed a police officer's *Brady* obligations, examined the allegations in the § 1983 plaintiff's complaint, and concluded that the plaintiff's allegation that the defendant detective was privy to exculpatory evidence but withheld it from the defense was insufficient to state a *Brady* violation.

> Police officers do not disclose evidence to criminal defendants directly. Instead, police officers fulfill their *Brady* obligations as long as they inform the prosecutor about evidence that undermines the state's preferred theory of the crime. The prosecutor, by contrast, is the member of the prosecution team that bears the responsibility for actually disclosing exculpatory information to the defense. The fact that *Brady* may require disclosure of evidence known only to the police and not to the prosecutor means only that it imposes upon prosecutors a duty to learn of any favorable evidence known to the others acting on the government's behalf, including the police. It does not mean that a police officer must disclose any sort of information – even information known only to the officer – directly to the defense.
>
> Because *Brady* obligates a police officer to disclose material exculpatory evidence only to the prosecutor rather than directly to the defense, prosecutors and police officers are capable of breaching the prosecution team's *Brady* obligations in factually different ways. And here, that distinction matters. D'Ambrosio's allegations that Detective Allen "was privy to" exculpatory evidence but withheld it "from the defense" and failed to disclose it "to D'Ambrosio" are beside the point. Detective Allen was never required to do otherwise.

*Id.* at 389 (internal quotation marks and citations omitted).

-17-

Gavitt's Complaint here, like the plaintiff's complaint in *D'Ambrosio*, does not allege that Defendants Klein or Voet withheld the allegedly exculpatory MSP laboratory evidence from Prosecutor Gabry. There is no allegation that these Defendants "knew about any obviously exculpatory evidence of which the prosecutors were ignorant and failed to apprise them of it." *Id.* at 390. In fact, the only reasonable inference that can be drawn from Gavitt's alleged facts is the opposite.

To the extent Gavitt's § 1983 conspiracy claim is based on Defendant Klein's and Voet's approval of Prosecutor Gabry's use of MSP laboratory technician DeVries as a witness in judicial proceedings to testify about his testing and findings but not disclose exculpatory evidence about false positives in the MSP laboratory and contamination of fire debris samples, that conduct (as discussed in the Court's opinion granting the Ionia County Defendant's motion to dismiss or for summary judgment) is entitled to absolute immunity. "[P]rosecutors have absolute immunity from civil liability for the non-disclosure of exculpatory information at trial." *Koubriti v. Convertino*, 593 F.3d 459, 467 (6th Cir. 2010). And, as the Sixth Circuit has long held, "[t]he doctrine enunciated in *Briscoe v. Lahue*[, 460 U.S. 325 (1983)] also shields from liability alleged conspiracies to give false and incomplete testimony at judicial proceedings." *Alioto v. City of Shively, Ky.*, 835 F.2d 1173, 1174 (6th Cir. 1987).

### b. Alleged Agreement, Without Adequate Investigation, That Fire Was Incendiary in Nature and Set By Gavitt

Gavitt's § 1983 conspiracy claim also alleges that his constitutional due process rights were violated when Defendants Klein and Voet and all the other participants at a March 12, 1985 "skull session" agreed, even though their fire investigation was incomplete and

-18-

inadequate, that the Gavitt house fire was incendiary in nature and continued their investigation with that conclusion in mind.  (Compl., ¶¶ 234-235.) These allegations also fail to state a claim for relief.

As the Sixth Circuit observed in *Yancey v. Carroll County, Ky.*, 876 F.2d 1238, 1245 (6th Cir. 1989), "[i]nvestigation, without more, simply does not rise to the level of a constitutional violation cognizable under 42 U.S.C. § 1983."  *Accord, Buchanan v. Metz*, 6 F. Supp. 3d 730, 757-58 (E.D. Mich. 2014) (Rosen, J.) (rejecting the plaintiff's § 1983 claim alleging that he had a due process right "in the way the investigation against him was initiated, planned, and executed" because "[t]he Sixth Circuit has not recognized such a claim" and declining "to do so" in that case).

Even if a constitutional violation were found to exist under the alleged facts, Defendants Klein's and Voet's investigative conduct would be completely shielded from liability by qualified immunity.  As the *Koubriti* court recognized, qualified immunity shields a defendant's conduct from liability "unless 1) he committed a constitutional violation, and 2) the right that was violated was a clearly established right of which a reasonable person would have known."  *Koubriti*, 593 F.3d at 471.  "In determining whether a right is clearly established," the court "may rely on decisions of the Supreme Court, decisions of [the Sixth Circuit] and courts within this circuit, and in limited circumstances, on decisions of other circuits."  *Id.* at 471 (internal quotation marks and citations omitted).  "When evaluating whether the specific right has been recognized, the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. In other words, the unlawfulness must be apparent."  *Id.* (internal quotation marks and citations omitted).  Here, just as in *Koubriti*, the Court "can find no case law to support the

-19-

conclusion that a reasonable official [here Defendants Klein and Voet] would have understood that the complained of action," i.e., conducting a more complete investigation before concluding that the Gavitt house fire was incendiary in nature, violated Gavitt's due process rights.

### c. No Post-Conviction Obligation to Disclose Exculpatory Evidence

Finally, there is no ongoing constitutional due process obligation post-conviction to provide exculpatory evidence (*Brady* materials) except where state post-conviction procedures are inadequate. *See Dist. Attorney's Office for the Third Judicial Dist. v. Osborne*, 557 U.S. 52, 68-69 (2009). Gavitt does not and cannot allege that Michigan's post-conviction procedures were inadequate. He successfully used Michigan's post-conviction relief procedures, i.e., filing a motion for relief from judgment under Mich. Ct. Rule 6.502(G)(2), based upon newly-discovered evidence, and obtained his release from prison and the dismissal of the arson and felony murder charges on which he was previously convicted. Gavitt, therefore, cannot state a § 1983 conspiracy claim against Defendants Klein or Voet for their alleged failure to disclose any exculpatory evidence post-conviction.

As the Supreme Court observed in *Osborne*, although a convicted defendant does "have a liberty interest in demonstrating his innocence with new evidence under state law," and that "state-created right can, in some circumstances, beget yet other rights to procedures essential to the realization of the parent right," the "Due Process Clause" does not require "that certain familiar preconviction trial rights," specifically, the duty to disclose exculpatory evidence, "be extended to protect [the defendant]'s postconviction liberty interest." *Osborne*, 557 U.S. at 68.

In *Osborne*, the Supreme Court reversed the Ninth Circuit Court of Appeals' decision and explained that there is no ongoing obligation under the Due Process Clause to provide *Brady* materials after a defendant's conviction:

> The Court of Appeals went too far, however, in concluding that the Due Process Clause requires that certain familiar preconviction trial rights be extended to protect Osborne's postconviction liberty interest. After identifying Osborne's possible liberty interests, the court concluded that the State had an obligation to comply with the principles of *Brady v. Maryland*, 373 U.S. 83 [(1963]). In that case, we held that due process requires a prosecutor to disclose material exculpatory evidence to the defendant before trial. The Court of Appeals acknowledged that nothing in our precedents suggested that this disclosure obligation continued after the defendant was convicted and the case was closed but it relied on prior Ninth Circuit precedent applying *Brady* as a post-conviction right. Osborne does not claim that *Brady* controls this case, . . . and with good reason.

*Id.* at 68 (internal quotation marks and citations omitted).

So, any § 1983 claims asserted by Gavitt against Defendants Klein and Voet in their individual capacity based upon an alleged failure to disclose exculpatory evidence post-conviction fail to state a claim for relief.

## 2. Count VII - Municipal Liability - Failure to State a Claim

"To establish municipal liability pursuant to § 1983, a plaintiff must allege an unconstitutional action that implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers or a constitutional deprivation [ ] visited pursuant to governmental custom even though such a custom has not received formal approval through the body's official decisionmaking channels." *Bright v. Gallia Cnty., Ohio*, 753 F.3d 639, 660 (6th Cir. 2014) (internal quotation marks and citations omitted). "'[A] municipality cannot be held liable *solely* because it employs a tortfeasor – or, in other words, a municipality cannot be held liable

-21-

under § 1983 on a *respondeat superior* theory.'" *Id.* (quoting *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 691 (1978)).   "Accordingly, to survive a motion to dismiss under Rule 12(b)(6), a plaintiff must adequately plead (1) that a violation of a federal right took place, (2) that the defendants acted under color of state law, and (3) that a municipality's policy or custom caused that violation to happen."   *Id.*

As to Defendant City of Ionia, Gavitt alleges that the City has state authority to operate and did operate the City's Police Department from 1985 to the present (Compl., ¶¶ 19-20), and that both Defendant City and Defendant Voet (former Ionia Chief of Police), in his official capacity: (1) prior to March 12, 1985, "developed and maintained policies or customs which exhibited a deliberate indifference to the constitutional rights of persons within the constituent's jurisdiction" by allowing political and non-law enforcement City personnel to participate in police investigation meetings" (*id.* at ¶ 281); (2) failed to adequately train and supervise police officers to discover and disclose exculpatory evidence "to the accused" (*id.* at ¶ 282); (3) failed to adequately train and supervise police officers on how to protect evidence gathered in a fire investigation from contamination prior to it being submitted to a crime laboratory for scientific testing for accelerants (*id.* at ¶¶ 280, 284.a); (4) failed to create a custom, policy, or practice detailing adequate evidence preservation protocols and *Brady* obligations to disclose exculpatory evidence to the Ionia County Prosecutor's Office if protocols are not followed (*id.* at ¶¶ 284.b, 284.c); and (5) failed to adequately train and supervise police officers as to their "duty to disclose evidence which was exculpatory to those individuals previously convicted, specifically David Gavitt" (*id.* at ¶¶ 283, 286 (emphasis added)).

Ionia City Defendants' arguments for dismissal contend that Gavitt has not adequately

-22-

pled that Defendant City of Ionia's policy or custom caused a violation of Gavitt's Fourteenth Amendment due process rights.  This Court agrees with Defendants.

First, Gavitt fails to allege any facts establishing a plausible causal link between the alleged violation of his Fourteenth Amendment due process rights and Defendants' alleged policy, practice or custom to allow political and non-law enforcement City personnel to participate in police investigation meetings.  As the Sixth Circuit observed in *Bright*, to survive a motion to dismiss under Rule 12(b)(6), a plaintiff must adequately plead (1) that a violation of a federal right took place, (2) that the defendants acted under color of state law, and (3) that a municipality's policy or custom caused that violation to happen."  *Bright*, 753 F.3d at 660.  Gavitt has not alleged any facts that plausibly explain how Defendants' policy, practice, or custom of allowing political and non-law enforcement City personnel to participate in police investigative meetings caused a violation of his Fourteenth Amendment due process rights to happen.  Thus, he fails to state a claim for municipal liability based upon that alleged policy, practice, or custom.

Second, Gavitt cannot state a claim for municipal liability based upon an alleged failure to adequately train and supervise police officers regarding to their "duty to disclose evidence which was exculpatory to those individuals previously convicted, specifically David Gavitt (*id.* at ¶ 286 (emphasis added)).  As discussed above, there is no ongoing constitutional due process obligation post-conviction to provide exculpatory evidence (*Brady* materials) except where state post-conviction procedures are inadequate.  *Osborne*, 557 U.S. at 68-69.  Gavitt does not and cannot allege that Michigan's post-conviction procedures were inadequate.  He successfully used Michigan's post-conviction relief procedures, i.e., filing a motion for relief from judgment under Mich. Ct. Rule 6.502(G)(2),

based upon newly-discovered evidence, and obtained his release from prison and the dismissal of the arson and felony murder charges on which he was previously convicted. Gavitt, therefore, cannot plead that Defendants caused a violation of his Fourteenth Amendment due process rights when there is no ongoing constitutional due process obligation to provide exculpatory evidence.

Third, as to Gavitt's claim that Defendants failed to adequately train and supervise police officers to discover and disclose exculpatory evidence "to the accused" (Compl., ¶ 282), a police officer's *Brady* obligation to disclose exculpatory evidence is fulfilled when that evidence is disclosed to the prosecutor, not the accused. *See D'Ambrosio v. Marino*, 747 F.3d 378, 389 (6th Cir. 2014) (discussed above). Applying the rationale and result in *D'Ambrosio* here, Gavitt cannot state a claim for municipal liability based upon an alleged failure to train police officers to disclose exculpatory evidence "to the accused."

Finally, Gavitt fails to allege any facts establishing a plausible causal link between the alleged violation of his Fourteenth Amendment due process rights – deprivation of fair trial due to Defendants' failure to disclose *Brady* materials pre- and post-conviction (Compl., ¶¶ 201-204) and deprivation of liberty (wrongful incarceration and imprisonment) due to prosecution and conviction without probable cause (*id.* at ¶ 196.a) – and Ionia City Defendants' challenged conduct, i.e.,

- the failure to adequately train and supervise police officers on how to protect evidence gathered in a fire investigation from contamination prior to it being submitted to a crime laboratory for scientific testing for accelerants (*id.* at ¶¶ 280, 284.a); and

- the failure to create a custom, policy, or practice detailing adequate evidence preservation protocols and *Brady* obligations to disclose exculpatory evidence to the Ionia County Prosecutor's Office if protocols are not followed (*id.* at ¶¶ 284.b, 284.c).

-24-

In his Complaint, Gavitt does not allege that Defendant Klein failed to follow established evidence protocols.  He does not allege that Klein, Voet, or any Ionia City Defendant mishandled seized evidence or would have better preserved that evidence if more adequate protocols or training were in place. (*See, e.g.*, Compl., ¶¶ 115, 119, 124, 128-133, 138, 141.)   In fact, Gavitt alleges the opposite; that Defendant Klein preserved evidence submitted to the Michigan State Police crime laboratory for gas chromatographic analysis in accordance with evidence preservation protocol but it was Michigan State Police crime laboratory technician DeVries's failure to follow known and established operating protocols for performing gas chromatographic analysis of fire debris and inadequate policies and procedures in the Michigan State Police crime laboratory that led Michigan State Police Defendants Kalman and Fatchett to erroneously conclude that the Gavitt home fire was incendiary in nature:

119.   As of March 11, 1985, Defendant Klein intended that all evidence seized would be sent to the MSP laboratories for analysis of the presence of trace evidence of gas or other accelerants.

\* \* \* \* \*

128.   On March 20, 1985, at 9:45 a.m., Defendant Kalman contacted Defendant Klein and requested that he obtain a "control sample" of the living room carpet for a "flame spread test."

129.   On March 20, 1985, Defendant Klein, along with IPD Officer Wieczorek, went to the fire scene and obtained a 2' by 2' section of carpeting which they found in the front yard of the home along with other disposed of fire debris.

130.   Defendant Klein did not undertake any evidence preservation measures because the carpet section was a "control sample" for the "flame spread test"; not evidence to be submitted for analysis of the presence of gasoline.

131.   On March 22, 1985, Defendants Klein, Kalman, and DeVries conducted a "flame spread test" on carpet sections cut from the 2 foot control sample which had been retrieved from the front lawn two days earlier.

-25-

132.    Defendant DeVries subsequently testified at trial that his experimental spread test of the carpet sample demonstrated that the carpet would not burn independently without the presence of an accelerant.

133.    Upon returning the "spread test samples" to Defendant Klein, which were preserved as evidence, Defendant DeVries advised Defendants Klein and Kalman that he had conducted an analysis of all of the physical evidence, including the bleach water in which Gavitt's pants were soaking, and he was "unable to find any 'trace evidence' of accelerants".

(Compl., ¶¶ 119, 128-133.)  Rather than Defendant Klein failing to follow evidence preservation protocol with regard to this "control sample" of carpeting, Gavitt alleges in his Complaint that it was Michigan State Police crime laboratory technician DeVries who did so.  (*Id.* at ¶¶ 134-135.)  Gavitt makes similar allegations regarding other evidence that Defendant Klein seized from the Gavitt home fire, i.e., wooden floor tiles and additional samples of living room carpet:

138.    On April 2, 1985, Defendant DeVries subjected the fire debris samples, which were preserved in accordance with evidence protocol, to gas chromatographic analysis and the presence of volatile petroleum distillates was not shown.

* * * * *

141.    Thus, on all evidence samples obtained and stored in accordance to evidence preservation protocol – no evidence of gasoline was detected; it was only on a "control sample" (which should not have had any gasoline present) – that Defendant DeVries claims to have detected trace evidence of gasoline.

(*Id.* at ¶¶ 138, 141 (emphasis added).)

Construing the allegations in Gavitt's Complaint in the light most favorable to him, it is apparent that it is not Ionia City Defendants' policies, practices, or customs regarding evidence preservation protocol that he challenges.  Rather it is the policies, practices, and customs of the Michigan State Police and its crime laboratory technician DeVries's handling of evidence.  This paragraph from Gavitt's Complaint makes this apparent:

-26-

156.    Defendants Kalman and Fatchett's erroneous conclusion that arson was the cause of the 515 N Johnson Street fire went unchecked because inadequate policies and procedures within the [Michigan State Police] crime laboratories, and Defendant DeVries' failure to follow known and established operating protocols for performing gas chromatography analysis of fire debris to detect the presence of gasoline or other known accelerants.

(*Id.* at ¶ 156.) Gavitt's Complaint does not assert a *Monell*-type claim against the Michigan State Police Defendants because any such claims for money damages would be barred by the Eleventh Amendment. Gavitt acknowledges this fact in his Response to the MSP Directors' motion to dismiss (Resp. at 15-16) and in his Response to Defendants Kalman and Fatchett, former Michigan State Police Detective/Sergeants assigned to the Arson Strike Force Unit that investigated suspected arson at the Gavitt home (Resp. at 4 n.2). Gavitt's *Monell*-type claims against Ionia City Defendants are not barred by the Eleventh Amendment. They nonetheless fail for another reason – Gavitt's failure to allege facts showing the required causal link between his alleged constitution violation and Defendant City's challenged policy, custom, or practice. *See Bright*, 753 F.3d at 660 (observing that, to survive a motion to dismiss, a § 1983 plaintiff must adequately plead "that a municipality's policy or custom caused [the plaintiff's alleged] violation to happen.").

### 3.  Count VIII - Injunctive Relief - Failure to State a Claim

In Count VIII, Gavitt asserts a claim for injunctive relief against Defendant City of Ionia for "develop[ing] policies and procedures of not enforcing their police powers conferred upon them by State statute and constitution pursuant to MCL 117.1, but rather to intentionally or with deliberate indifference overlook enforcement of evidence protocols and/or failing to train and educate their officers as it relates to the need to adhere to evidence protocols and/or to fulfill their duties to inform and advise the Prosecutor's office

of any and all exculpatory evidence known to them in a pending <u>or former</u> criminal prosecution that has or may result in conviction of an innocent party."  (Compl., ¶ 289 (emphasis added).)  Gavitt alleges that he suffered constitutional harm as a result of Defendant City of Ionia's policies and procedures, and it is likely other individuals have already or will in the future suffer similar constitutional harms.  (Compl., ¶¶ 291, 294.) Accordingly, Gavitt is seeking an order compelling Defendant City of Ionia to:   (1) "undertake the necessary analysis to identify other individuals similarly harmed by the Defendant[s'] policies and procedures," and (2) disclose "any and all discovered exculpatory evidence" that "would marginally impact others who may have been convicted of the crime of arson under circumstances similar to [Gavitt]."  (Compl., ¶¶ 294-295.)

City of Ionia Defendants argue that because Gavitt fails to allege that he is currently suffering or will in the future suffer from a continuing constitutional harm, he lacks standing to state a claim for the injunctive relief he seeks.  These Defendants further argue that Gavitt lacks standing to assert a § 1983 claim for injunctive relief on behalf of others who are not a party to this lawsuit.  This Court agrees with both arguments.

Gavitt concedes that "[s]tanding requires plaintiff to demonstrate actual present harm or a significant possibility of future harm."  *Savage v. Gee*, 665 F.3d 732, 740 (6th Cir. 2012) (internal quotation marks and citation omitted).  *See also Daubenmire v. City of Columbus*, 507 F.3d 383, 388 (6th Cir. 2007) (same).  "[A]llegation of past injury is not sufficient to confer standing for . . . injunctive relief."  *Cohn v. Brown*, 161 F. App'x 450, 455 (6th Cir. 2005).  *Accord, Grendell v. Ohio Supreme Court*, 252 F.3d 828, 832 (6th Cir. 2001) (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983), "'past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive

-28-

relief . . . if unaccompanied by any continuing, present adverse effects.'"). The Supreme Court's decision in *Lyons* illustrates this point.

In *Lyons*, the respondent sought an injunction against the City of Los Angeles barring the "use of chokeholds absent the threat of immediate use of deadly force." *Lyons*, 461 U.S. at 98. The Supreme Court held that Lyons failed to satisfy the prerequisites for injunctive relief. It explained why past conduct is insufficient to supply standing:

> Lyons' standing to seek the injunction requested depended on whether he was likely to suffer future injury from the use of the chokeholds by police officers. Count V of the complaint alleged the traffic stop and choking incident five months before. That Lyons may have been illegally choked by the police on October 6, 1976, while presumably affording Lyons standing to claim damages against the individual officers and perhaps against the City, does nothing to establish a real and immediate threat that he would again be stopped for a traffic violation, or for any other offense, by an officer or officers who would illegally choke him into unconsciousness without any provocation or resistance on his past.

*Id.* at 105.

The *Lyons* Court then addressed and rejected the respondent's claim that he had standing to obtain the injunctive relief he sought because "the police in Los Angeles routinely apply chokeholds in situations where they are not threatened by the use of deadly force." *Id.* It explained:

> In order to establish an actual controversy in this case, Lyons would have had not only to allege that he would have another encounter with the police but also to make the incredible assertion either (1) that *all* police officers in Los Angeles *always* choke any citizen with whom they happen to have an encounter, whether for the purpose of arrest, issuing a citation, or for questioning, or (2) that the City ordered or authorized police officers to act in such manner.

*Id.* at 106. As the Court observed, Lyons made no such allegations nor could he credibly do so.

-29-

Of course, it may be that among the countless encounters between the police and the citizens of a great city such as Los Angeles, there will be certain instances in which strangleholds will be illegally applied and injury and death unconstitutionally inflicted on the victim.  As we have said, however, it is no more than conjecture to suggest that in every instance of a traffic stop, arrest, or other encounter between the police and a citizen, the police will act unconstitutionally and inflict injury without provocation or legal excuse.  And it is surely no more than speculation to assert either that Lyons himself will again be involved in one of those unfortunate instances, or that he will be arrested in the future and provoke the use of a chokehold by resisting arrest, attempting to escape, or threatening deadly force or serious bodily injury.

*Id.* at 108.  The *Lyons* Court thus held that "[a]bsent a sufficient likelihood that he will again be wronged in a similar way, Lyons is no more entitled to an injunction than any other citizen of Los Angeles; and a federal court may not entertain a claim by and or all citizens who no more than assert that certain practices of law enforcement officers are unconstitutional."  *Id.* at 111.  Gavitt's claim for injunctive relief against Defendant City of Ionia fails for the same reasons.

Here, Gavitt's claim for injunctive relief does not allege either actual present harm or a significant possibility of future harm to him.  Rather, he attempts to obtain discovery on behalf of third parties who may wish to assert claims similar to those rejected here.  Gavitt lacks standing to assert any claim for injunctive relief on behalf of unnamed third parties. *See, e.g., Kowalski v. Tanner*, 543 U.S. 125, 130, 134 (2004) (holding that "attorneys do not have third-party standing to assert the rights of Michigan indigent defendants denied appellate counsel" and observing that third-party standing has been limited only to those circumstances where (1) the party seeking third-party standing "has a 'close' relationship with the person who possess the right;" and (2) "there is a 'hinderance' to the possessor's ability to protect his own interests.").

For all these reasons, Gavitt fails to state a claim for the injunctive relief he seeks.

**IV.   Conclusion**

For the above-stated reasons, Defendants City of Ionia's, Kenneth Voet's, and Randall

Klein's motion for judgment on the pleadings [44] is GRANTED; and Gavitt's claims against

these Defendants are DISMISSED.


s/Nancy G. Edmunds
Nancy G. Edmunds
United States District Judge

Dated:  December 15, 2014

I hereby certify that a copy of the foregoing document was served upon counsel of record
on December 15, 2014, by electronic and/or ordinary mail.

s/Carol J. Bethel
Case Manager