UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DAVID L. GAVITT,

        Plaintiff,

Case No. 14-12164

Honorable Nancy G. Edmunds

v.

BRUCE BORN, special personal
representative of the estate of JOHN E.
DEVRIES, deceased,

        Defendant.

_____/

**OPINION AND ORDER DENYING DEFENDANT DEVRIES' MOTION TO DISMISS
[87]**

The series of events giving rise to this action revolve around Plaintiff David Gavitt's arrest and 1986 conviction on state criminal charges of arson and felony murder. *See People v. David Lee Gavitt*, Ionia County Circuit Court Case No. 85-007555. Gavitt's conviction was vacated in 2012 after the Michigan Innocence Clinic successfully argued that there was newly discovered scientific analysis of the origin and cause of the fire establishing that there was no arson. On June 6, 2012, following a stipulation from the Ionia County Prosecuting Attorney's Office, all charges against Gavitt were dismissed and he was released from custody. All told, Gavitt spent over 26 years in prison.

On June 2, 2014, Gavitt filed this civil rights action against numerous individuals involved with the State's prosecution of the criminal case. The Court has entertained significant motion practice resulting in the dismissal of all Defendants with the exception of John DeVries- a former technician employed by the Michigan State Police Crime

Laboratory.[1] Currently before the Court is DeVries' motion to dismiss the sole remaining count in this action. For the reasons explained below, the Court DENIES DeVries' motion.

## I.    BACKGROUND

The facts related to Gavitt's criminal prosecution–and subsequent release–have been thoroughly documented in several of the Court's previous decisions. *See* (Dkt. 65, Order). In order to more fully understand DeVries' role in the State's criminal case against Gavitt, and the broader context in which this case is premised, the Court reproduces those facts below.

## II.    FACTS

### A.  Fire, Investigation, Arrest, Trial, and Conviction

Gavitt survived a March 9, 1985 house fire.  His wife and two daughters tragically did not. (Compl., ¶¶ 61-67.)  An investigation was initiated by the City of Ionia Police Department and the Michigan State Police Arson Task Force.  (*Id.* at ¶¶ 71-101.)

On the morning of March 10, 1985, Defendants Kalman and Fatchett, then-Michigan State Police ("MSP") officers assigned to the MSP Arson Strike Force Unit ("Det./Sgt. Kalman" and "Det./Sgt. Fatchett" respectively), were dispatched to the scene of the house fire to investigate its cause and origin.  Based on their initial review of the evidence, they concluded that the fire was incendiary in nature.  (*Id.* at ¶¶ 48-49, 101-103.)  At 2:30 in the afternoon that same day, Det./Sgts. Kalman and Fatchett summoned Defendant Klein, then-Sergeant with the Ionia Police Department ("Sgt. Klein"), to the burned home, walked

---

[1] DeVries died over 20 years before this action was filed. After a great deal of procedural hand wringing, Gavitt successfully moved to substitute a special personal representative to defend DeVries' estate.

him through the evidence at the fire scene that led them to their initial conclusion that the

fire was incendiary in nature, and collected evidence that Sgt. Klein then placed in an Ionia

Police Department evidence locker.  (*Id.* at ¶¶ 21, 108-115.)  Sgt. Klein then continued his

investigation by obtaining evidence from and interrogating Plaintiff David Gavitt ("Gavitt"),

and obtaining more evidence from the burned home.  (*Id.* at ¶¶ 116-121, 125-129.)

On March 12, 1985, as reported in Det./Sgt. Kalman's March 1985 Report, a meeting

was held "for the purpose of reviewing the evidence and determining the course of the

investigation."  (Defs. Fatchett's and Kalman's Mot., Ex. C, Kalman Rpt. at 10.)  Defendant

Prosecutor Gabry is listed as being present.  (*Id.*)  Det./Sgt. Kalman reported that he

presented evidence, a discussion was held, and a conclusion reached that Gavitt may have

set the fire himself and was unable to save his family once the fire started:

> Undersigned officer explained the burn patterns and also relating [sic] the burn
> patterns to the burns on the victim.  A formal discussion was held on all the
> evidence obtained and it is the feeling that there is strong evidence pointing to
> the fact that MR. DAVID GAVITT may have indeed set the fire himself and was
> unable to save his family once the fire started.

(*Id.*)  Sgt. Klein's March 20, 1985 Report also discussed the March 12th meeting and calls

it a "'skull session' starting at/around 8:30 am, ending a short time later."  (Ionia Cnty. Defs.'

Mot., Ex. 2, 3/20/85 Rpt. at 1, "Journal Entry.")  Sgt. Klein does not list Prosecutor Gabry

as being present.  Rather, he reports:

> Journal Entry:  It was on TUES, MARCH 12th, 1985 that this investigating officer,
> Sgt. Wieczorek and Chief Voet met with the following:  City Superintendent Allen
> Housler, Det/Sgt. JOHN KALMAN and Det/Sgt. JOE DeKRACKER of the Arson
> Strike Force, MSP Rockford Post, this meeting was an "initial assessment of the
> case".  It should be noted that this meeting was a "skull session" starting
> at/around 8:30 am, ending a short time later.

(*Id.*)  (*See also* Compl., ¶¶ 122-123, 232-233, 270 for discussion of March 12, 1985

3

meeting.)

On June 10, 1985, a felony complaint was issued, and state criminal charges were brought against Gavitt – three counts of murder, three counts of felony murder, arson, and arson insured property –  and he was subsequently arrested.  (Ionia Cnty. Defs.' Mot., Ex. 4, 6/10/85 criminal complaint and information.)  Sgt. Klein was the complaining witness on the criminal complaint.  (*Id.*)

On June 21, 1985, a preliminary examination hearing was held on the criminal charges brought against Gavitt.  District Court Judge James Ward was the presiding judge and Defendant Gabry was the prosecutor.  The District Court found that probable cause existed on the charged offenses – murder, felony murder, and arson – but dismissed the insurance fraud charge.  (Compl., ¶¶ 177-178.)

 A jury trial was held in the Circuit Court for the County of Ionia.  *See People v. David Lee Gavitt*, Ionia County Circuit Court Case No. 85-007555.  On February 14, 1986, a jury convicted Gavitt on three counts of murder committed in the perpetration of arson (first degree felony murder) and one count of arson to a dwelling place.  (Ionia Cnty. Defs.' Mot., Ex. 6, 2/14/86 Verdict.)  The one count of arson was dismissed by the Court at sentencing.  (*Id.*, Ex. 7, 4/18/86 Sent. Tr. at 2-3.)

On April 18, 1986, Gavitt was sentenced to "imprisonment for life on each of the three counts of murder, to be served concurrently with each other."  (Ionia Cnty. Defs.' Mot, Ex. 5, 5/1/86 Judg. of Sentence.)

**B.  Innocence Clinic's Post-trial Motion for Relief, Stipulation, and Dismissal**

In September 2011, a motion for relief from judgment was filed on Gavitt's behalf by the University of Michigan Law School's Innocence Clinic, arguing that there was newly

4

discovered scientific analysis of the origin and cause of the March 1985 fire establishing

that there was no arson.  (Defs. Fatchett's and Kalman's Mot., Ex. A, Gavitt Mot. for Relief,

Brief at 16-37.)  That motion explained that evidence of actual innocence was only recently

discovered because, beginning in 1992, there has been a complete revolution in the field

of fire investigation:

> 14.  The field of fire investigation has undergone a complete revolution since Mr. Gavitt was convicted in 1986.  In 1992, the National Fire Protection Association adopted NFPA 921, the current standard of care for fire investigations, which for the first time put the field of fire investigation on a scientific basis.
>
> 15.  In light of the changes in the field of fire investigation, John Lentini – a world-renowned fire investigator who has reviewed all available testimony and evidence in this case – has concluded that <u>there is no basis to conclude that arson was the cause of the Gavitt fire.</u>  Mr. Lentini's affidavit is attached to the brief accompanying this motion.
>
> 16.  <u>Mr. Lentini's findings are rooted in the crucial concept of "flashover," which was not well understood by the fire investigation community at the time of Mr. Gavitt's trial</u>.  During flashover – a phenomenon that takes place when a compartment like the Gavitt living room catches fire – a room becomes so hot that every exposed combustible surface can catch fire.
>
> * * * * *
>
> 29.  Mr. Lentini's scientific conclusions regarding the origin and cause of the Gavitt fire meet this [newly discovered evidence] test.  <u>His findings are based on the new standards of origin and cause investigation, which were not adopted until the early 1990s, at the earliest, years after Mr. Gavitt's trial</u>.  The evidence refutes all scientific evidence presented at trial, so it is not cumulative.  Further, because the prosecution's case relied wholly on the testimony of fire experts, no rational jury could have found Mr. Gavitt guilty of murder if the findings of Mr. Lentini or any competent fire investigator <u>applying modern standards</u> had been presented.  This is particularly true when this evidence is considered alongside the new evidence regarding the absence of gasoline on the carpet samples. . . .
>
> 30.  Finally, <u>because the field of gas chromatography was much less precise in 1986 than it is today, trial counsel could not have discovered the new evidence that undermines Mr. DeVries's testimony</u> through the exercise of due diligence, and the fourth and final prong for granting a new trial based on newly-discovered

5

evidence is satisfied.

(*Id.*, Mot. at 3 (emphasis added).)

The supporting brief relied heavily on John Lentini's Affidavit and similarly argued that,

because of "significant advancements in the field of fire science and arson investigation,"

there is newly-discovered evidence that undermines the prosecution's case against Gavitt:

> While the investigation of this case was, perhaps, normal for a fire investigation conducted in the mid-1980s, approximately a decade before scientific principles were first applied to fire investigation, practically all of the investigative methods and conclusions reached by the various fire investigators in this case fail to meet modern standards of accuracy and reliability.
>
> * * * * *
>
> The field of fire investigation has undergone a complete revolution <u>since Mr. Gavitt's conviction</u>. John Lentini Affidavit ¶¶ 15-59. <u>Theories</u> that low-burning, alligatoring, pour patterns, depth of char, and temperature and speed of fires can serve as indicators of arson <u>were once unquestioned, but have been completely and unequivocally repudiated by rigorous scientific testing</u>. *Id.* at ¶¶ 36-59. As such, every indicator of arson relied upon by the prosecution's experts at Mr. Gavitt's trial has been discredited and is understood to be useless in determining the true origin and cause of fires. *Id.* <u>Many factors once thought to be present only in accelerated fires are now understood to be present in natural fires that have undergone flashover and progressed to full room involvement, a phenomenon that was not understood in 1986</u>[.] *Id.* at ¶¶ 29-35.
>
> * * * * *
>
> Mr. Lentini's finding that Mr. DeVries's testimony about the carpet flame tests was false meets all parts of the standard for newly-discovered evidence. <u>Given that the understanding of flashover is a novel concept in arson science and certainly was not known outside of a very small subset of the scientific community at the time of Mr. Gavitt's trial, the evidence itself and not merely its materiality is newly-discovered.</u> For this same reason, <u>it is clear that the evidence could not have been discovered with due diligence at the time of trial; indeed the concept of flashover would not become widely known and understood by fire investigators until at least a decade after Mr. Gavitt's conviction</u>. . . .

(*Id.*, Br. at 7, 13, 36-37 respectively (emphasis added).)

As Mr. Lentini admitted in his affidavit, at the time that Sgt. Fatchett and the Ionia

County Prosecutor's expert, Dr. Edwards, considered the impact of flashover, they had no way of knowing that their generally accepted interpretations of burn patterns would be refuted years later:

> Neither Sgt. Fatchett nor Dr. Edwards considered the impact of flashover and the impact of the burning curtains when they attempted to discern what caused the patterns they observed on the living room floor in the course of their investigation. <u>Nor would such consideration have been expected in 1986</u>, because the state of the art in fire investigation had not come to fully recognize flashover at that time.
>
> * * * * *
>
> <u>All of the above testimony</u> [Defendant Fatchett's trial testimony evaluating evidence from the fire and opining that the fire was intentionally set] <u>can be shown by today's standards to have been false and misleading</u>, <u>albeit without malicious intent.</u> . . .
>
> * * * * *
>
> <u>The State's experts had no way of knowing that their interpretation of the burn patterns at the Gavitt residence was without any scientific validity because, at the time of the trial, those interpretations were, in fact, generally accepted by most fire investigators, including your affiant.</u>  The misinterpretation was bolstered by the incorrect laboratory analysis performed by Mr. DeVries.  The state's fire investigators "expectations" were not properly "calibrated."  They expected the confined fire in the Gavitt residence to behave like an unconfined fire.  Because the fire did not meet their expectations of normal fire behavior, they incorrectly determined the fire to be incendiary.

(Defs. Fatchett's and Kalman's Mot., Ex. A, Gavitt Mot. for Relief, Appendix B, Lentini Aff. at ¶¶ 66, 70, 100 (emphasis added).)

An experienced fire investigator that Gavitt's defense attorney consulted with in 1985 also provided an affidavit which was attached as an exhibit to Gavitt's motion for relief. (Defs. Fatchett's and Kalman's Mot., Ex. A, Lentini Aff., Appendix R, Churchwell Aff. at ¶¶ 1-5.)  Mr. Churchwell, like Mr. Lentini, stressed that "the world of fire science is vastly different today than it was in 1985;" that the way he "would have viewed the fire scene in 1985 is completely different from the way" he "would view the same scene today;" and "the

advancements in fire science would enable [him] to have far better insights and be wary of false findings today." (*Id.* at ¶ 6.) Mr. Churchwell, like Mr. Lentini, stated that he subscribed to the same beliefs that science has now proven to be false; that he can say now that Gavitt was falsely convicted; but could not have reached that conclusion in 1985-86 when he was consulting with defense counsel:

> Well into the 1980's, the arson investigation profession believed that things like floor burn patterns, low burning, deep charring and alligatoring were automatic indicators of arson: <u>I subscribed to those beliefs at one time as well.</u> <u>But in the 1990s</u>, with a wider understanding of the concept of flashover and the emergence of NFPA 921, <u>the profession grew up and began to embrace the rigors of actual science.</u> Upon doing so, the open-minded among us <u>discovered that the old indicators that we thought were automatic markers of arson were in fact not.</u> This led to the realization that each of us – investigators who had worked in the 1970s and 1980s – had misread many fire scenes, possibly leading to the conviction of innocent people. I have no doubt in my mind that David Gavitt is one such falsely-convicted person. <u>I can say this knowing what I know today, but such a conclusion would have been impossible for me to make in 1985-86 (when Mr. Kolenda consulted with me) because the profession had yet to become enlightened to the errors of the old ways of arson investigation at that time.</u>

(*Id.* at ¶ 10 (emphasis added).)

Mr. Churchwell also admitted that he "would likely have made the same mistake" as those investigating the Gavitt home fire by failing to give adequate consideration to possible accidental causes of that fire:

> As I know from having worked many similar fires in the 1980s, the fact that obvious sources of ignition and the presence of various fuels (candles, ashtray, oil lamps, paneling, etc.) went largely ignored at the trial is not all that surprising. In those days, fire investigators would look first for pour patterns, alligatoring and other such things, and upon finding them, we would assume the fire was arson – so much so that we'd ignore far more obvious accidental sources of the fire. I have no doubt that the investigators who looked at the fire scene at the Gavitt home made this mistake. <u>As cautious and careful as I always try to be, I would likely have made the same mistake upon seeing the Gavitt fire scene in 1986: Fire investigators simply did not have enough knowledge about the true nature of enclosed (compartment) fires at that time.</u> <u>Today, years later, being wise to</u>

8

<u>the many advancements</u> and the rigors of actual science <u>that have</u> <u>finally come</u> <u>to dominate the arson investigation profession</u>, I can say that the prosecution's experts were blinded by the myths (alligatoring, charred glass, low burning, etc.), and failed to give due deference to far more obvious and likely accidental sources of the fire.

(*Id.* at ¶ 12 (emphasis added).)

The parties stipulated to a stay of Gavitt's motion, allowing the Ionia Prosecutor's Office time for scientific review of Gavitt's claims. (Ionia Ctny. Defs.' Mot., Ex. 12, 9/15/11 Stip.) On June 6, 2012, after a thorough investigation, current Ionia County Prosecutor Ronald Schafer, on behalf of the People of the State of Michigan, responded to Gavitt's motion.

Prosecutor Schafer acknowledged that, although "fire investigators" involved in the original investigation "held to a common understanding within fire investigation," it is now known that that "was inaccurate, specifically regarding the recognition and identification of unusual burn patterns in the floor as definitive evidence of ignitable liquid pour patterns. Unfortunately, during that time period many fire investigators did not understand the phenomena of flashover and post-flashover and their effects on the production of unusual burn patterns in floors within compartments." (Defs. Fatchett's and Kalman's Mot., Ex. B, People's Resp. at 16.) Prosecutor Schafer also acknowledged that Gavitt had satisfied the requirements for a new trial.

[T]he Peoples [sic] recent investigation confirms the 1985 findings which found the presence of accelerants on the carpet samples introduced at trial can no longer be independently verified as having a presence of ignitable liquids, specifically gasoline. Therefore, the parameters for meeting the legal requirement for a new trial are not disputed.

(*Id.*)

Despite an admission that "three independent analyses of the evidence suggest there

9

was likely no gasoline on the carpet samples taken out of the Gavitt house in 1985," Prosecutor Schafer emphasized that "there are still a great deal of questions surrounding this case which raise significant questions." (*Id.* at 18.) "Still today, these unanswered questions linger when looking at the case on the whole, even in light of the acknowledged findings in this response. In fact, this is the exact type of case that would have remained open had it not been prosecuted earlier; the type of case where justice would demand that it stay open." (*Id.* at 19.) Nonetheless, Prosecutor Schafer acknowledged, "it does not change the fact that fire investigation has advanced in the twenty-seven years since this fire." (*Id.* at 19-20.)

Prosecutor Schafer identified some of those fire investigation advances and explained why, in light of those advances, Gavitt cannot be retried.

> In particular, our understanding of flashover, post-flashover and the production of unusual burn patterns in floors, potentially identified as pour patterns, is different today than in 1985. Testing of materials in fire cases has also advanced, with more sophisticated instrumentation and analysis. Consequently, there is new evidence in this case and [Gavitt] is entitled to a new trial. As outlined, based on today's understanding of fire dynamics and the evolved level of fire investigation, this fire incident would likely be classified as undetermined and consequently the People will not be able to retry [Gavitt] . . . . there is only one thing known with certainty, as of today, this case involves a fire of undetermined origin and cause. Having no laboratory verification of the presence of an accelerant, combined with what the People now know through scientific research and testing regarding flashover and post-flashover compartment fires, and the production of unusual burn patterns in the floor, the determination that an ignitable liquid (gasoline) was used to initiate the fire at the Gavitt residence cannot be verified. As a result, this is a case this office could not charge as arson based on the evidence available today. However, this is also a case that, if it was new today, this office would not close. There are simply too many questions, questions which may never be answered. Ultimately, this remains a case in which the lives of three innocent people were taken by a fire that can only be classified as having an undetermined origin and cause.

(*Id.* at 20 (emphasis added).)

10

On June 6, 2012, the People of the State of Michigan and Gavitt stipulated that Gavitt's motion for relief from judgment be granted, that all charges against Gavitt be immediately dismissed, and that the Court order his immediate release from the custody of the Michigan Department of Corrections.  (Ionia Ctny. Defs.'s Mot, Ex. 15, 6/6/12 Stip.)

## III.   PROCEDURAL HISTORY

On December 15, 2014, the Court dismissed all of Gavitt's claims and further denied his motion to amend the complaint with one limited exception, finding that: "the only claim that would survive a Rule 12(b)(6) motion to dismiss and thus not be futile in Count I is that based on alleged misrepresentations occurring during the investigation time period" asserted against DeVries. (Order, Dkt. No. 69 at 10) (emphasis added). Following the Court's order, Gavitt filed a third amended complaint against DeVries maintaining, in essence, that he "fabricated, concealed and offered false and misleading test reports, data, and testimony as evidence utilized by the Ionia County Prosecutor for the criminal prosecution of David Gavitt." (Third Amend, Compl. ¶ 51). On June 5, 2015, Bruce Born, as personal representative of the Estate of John DeVries, filed the instant motion to dismiss the last remaining count of the amended complaint pursuant to Fed. R. Civ. P. 12(b)(6).

## IV.   STANDARD OF REVIEW

The Sixth Circuit recently noted that under the United States Supreme Court's heightened pleading standard laid out in *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544 (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), "a complaint only survives a motion to dismiss if it contains sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Estate of Barney v. PNC Bank, Nat'l Ass'n,* 714 F.3d 920, 924-25 (6th Cir. 2013) (internal quotation marks and citations omitted). The court in *Estate of*

*Barney* goes on to state that under *Iqbal*, "[a] claim is plausible when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (internal quotation marks and citations omitted). Furthermore, "[w]hile the plausibility standard is not akin to a 'probability requirement,' the plausibility standard does ask for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678. Finally, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.' " *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2)). If the plaintiffs do "not nudge[ ] their claims across the line from conceivable to plausible, their complaint must be dismissed." *Twombly*, 550 U.S. at 570.

## V.   ANALYSIS

Gavitt's amended complaint relies on three factual premises in support of the theory that DeVries intentionally misrepresented evidence in violation of his constitutional right to due process under the Fourteenth Amendment. More specifically, Gavitt maintains that DeVries falsely reported that (1) "the 'flame spread test' of the carpet sample proved that the carpet would not burn without the presence of an accelerant[]'", and (2) the "gas chromatograph[] analysis [of the carpet] showed two of the pieces to contain residues of highly evaporated gasoline . . . ." (Amend. Compl. at ¶¶ 26, 33). Gavitt further claims that DeVries concealed "from the Prosecutors, David Gavitt, or his attorneys that [the Michigan State Police] regional crime laboratories from 1980-1985 were experiencing contamination of samples resulting in false positive findings of accelerants in gas chromatograph analysis . . . . " (*Id.* at  ¶ 41).

DeVries, for his part, argues that he is immune from any civil liability stemming from

12

Gavitt's wrongful conviction for two reasons. First, he maintains that the real source of Gavitt's alleged injury is "his trial and conviction for felony murder. And all of DeVries' action in connection with those events are subject to . . . absolute immunity." (Def.'s Mot. 5). In the alternative, DeVries suggests that he is protected under the doctrine of qualified immunity on the basis that all of his actions were objectively reasonable and "consistent with understandings of fire behavior and other science at the time." (*Id*. at 11). The Court considers each of DeVries' arguments in turn.

### A.  Absolute Immunity

According to Defendant, "the real gist of Gavitt's Amended Complaint is that he was wrongfully convicted based on DeVries's testimony at his trial." (Def.'s Mot. 8). Extending this logic to its natural conclusion, Defendant maintains that DeVries is entitled to absolute immunity for all of his conduct in connection with Gavitt's prosecution. This argument misapprehends both Gavitt's complaint and well-settled Sixth Circuit precedent regarding the scope of absolute immunity.

The federal courts have adopted a functional approach to determine whether absolute immunity applies to bar civil liability. *See Spurlock v. Thompson,* 330 F.3d 791, 797 (6th Cir. 2003) (citing cases). "Using this approach, courts must look to the nature of the function performed, not the identity of the actor who performed it." *Koubriti v. Convertino*, 593 F.3d 459, 467 (6th Cir. 2010) (internal quotation marks and citation omitted). "Functions that serve as an integral part of the judicial process or that are intimately associated with the judicial process are absolutely immune from civil suits. Meanwhile, functions which are more investigative or administrative in nature, because they are more removed from the judicial process, are subject only to qualified immunity." *Id.* (internal

quotation marks and citations omitted).

In *Gregory v. City of Louisville,* 444 F.3d 725, 738 (6th Cir. 2006), the Sixth Circuit further clarified the important distinction between testimonial and pretrial acts. Similar to here, the plaintiff in *Gregory* alleged that a detective "fabricated evidence when she construed and documented [p]laintiff's hairs as a 'match' to those found at [a] crime scene.'" *Id.* at 737. The detective argued that such "pretrial acts [were] [] inextricably linked to [her] testimony at trial and therefore [could not] be the basis of liability under the doctrine of absolute immunity." *Id.* The court disagreed, holding that "absolute testimonial immunity does not 'relate backwards' to 'protect [a defendant] for any activities he allegedly engaged in prior to taking the witness stand for his [] testimony." *Id.* at 738. In other words, "[s]ubsequent testimony can not insulate previous fabrications of evidence merely because the testimony relies on that fabricated evidence." *Id.* at 739.

As Gavitt's amended complaint makes clear, the bulk of his claims against DeVries are focused squarely on acts taking place during the investigatory stage. Indeed, Gavitt alleges that "DeVries falsely *reported* . . . that the 'flame spread test' of the carpet sample demonstrated that the carpet would not burn without the presence of an accelerant", and that the "Court was materially misled by DeVries' . . . *laboratory reports* that physical evidence secured from the scene had been forensically analyzed and proven to contain residues of highly evaporated gasoline . . . . " (Amend. Compl. ¶¶ 23, 33) (emphasis added).[2] As in *Gregory*, any "report affected the course of the criminal proceedings

---

[2] To the extent that Gavitt is attempting to lump statements made by DeVries during the preliminary exam and/or trial into the claims asserted in the amended complaint, the Court finds no reason to disturb its prior ruling concluding that such claims are barred under the doctrine of absolute immunity. *See* (Dkt. 69, Order at 8-10).

independent of [the defendant's] testimony to its contents." 444 F.3d at 741. (concluding that the "report [was] a piece of documentary evidence upon which [the] [p]laintiff argue[d] that the prosecutors justifiably relied to continue their prosecution of [the] [p]laintiff" and thus it "exist[ed] independently of [his] subsequent testimony.")  Accordingly, the Court finds that DeVries' pretrial/investigatory acts do not fall within the scope of conduct protected by absolute immunity.

### B. Qualified Immunity

In the alternative, DeVries maintains that he is protected under the doctrine of qualified immunity on the basis that he "conducted his testing consistent with understandings of fire behavior and other science of the time." (Def.'s Mot. 11). This argument fails for at least two reasons. First, the Sixth Circuit has been clear that "[i]t is generally inappropriate for a district court to grant a 12(b)(6) motion to dismiss on the basis of qualified immunity. Although an officer's entitlement to qualified immunity is a threshold question to be resolved at the earliest possible point, that point is usually summary judgment and not dismissal under Rule 12." *Wesley v. Campbell*, 779 F.3d 421, 433-34 (6th Cir. 2015) (internal citations and quotation marks omitted); *See Grose v. Caruso*, 284 Fed. Appx. 279, 283 (6th Cir.2008) ("[T]he standard for a 12(b)(6) motion is whether the allegations, if taken as true, could state a claim upon which relief may be granted, [and] dismissal of Appellants on the basis of qualified immunity is premature.").  The reason for this is simple: determining whether an official's conduct was "objectively reasonable"–a central component of the application of qualified immunity–requires careful consideration of the entire record. *See also Jacobs v. City of Chicago*, 215 F.3d 758, 775 (7th Cir. 2000) (Easterbrook, J., concurring) ("Rule 12(b)(6) is a mismatch for immunity and almost always

a bad ground of dismissal.") While Defendant correctly notes that DeVries is deceased, the Court has no means of assessing the reasonableness of his testing methods–or, more importantly, whether he intentionally misrepresented his results–at this juncture of the case.

Moreover, notwithstanding the Sixth Circuit's general admonition against granting qualified immunity at the pleading stage, the allegations in Gavitt's amended complaint, accepted as true, suggest that DeVries would not be entitled to immunity. Indeed, a government official enjoys qualified immunity unless the facts, when viewed in the light most favorable to the plaintiff, would permit a reasonable juror to find that: "(1) the defendant violated a constitutional right; and (2) the right was clearly established." *Morrison v. Bd. of Trs. of Green Twp.*, 583 F.3d 394, 400 (6th Cir. 2009) (internal citations omitted). Once it is determined that the right is clearly established, the court must determine "whether the plaintiff has alleged sufficient facts supported by sufficient evidence to indicate what [the officer] allegedly did was objectively unreasonable in light of [the] clearly established constitutional rights." *Dickerson v. McClellan*, 101 F.3d 1151, 1158 (6th Cir. 1996) (quoting *Adams v. Metiva*, 31 F.3d 375, 387 (6th Cir. 1994)) (alteration in original).

Here, Gavitt offers a number of specific allegations in support of his contention that DeVries' conduct was not objectively reasonable. Indeed, according to Gavitt, DeVries "fabricated, concealed, and offered false and misleading test reports, [and] data . . . ." related to the flame spread test and gas chromatograph analysis. (Amend. Compl. ¶¶ 51; 21-29). In response, Defendant summarily argues that the "public records acknowledge that there was no malicious intent on the part of DeVries, and no intentional misrepresentation or fabrication." (Def.'s Mot. 12). Even assuming, *arguendo*, that the

16

Court was inclined to accept Defendant's interpretation of DeVries' conduct based on the extensive public record in this case, there is a plethora of evidence supporting the opposite conclusion. In fact, both of the experts retained in connection with Gavitt's motion for relief from judgment in the State court concluded that the gas chromatographs did not indicate the presence of gasoline. *See* (Plf.'s Resp. Ex. K, Balliet Affidavit, Ex. M, Hedglin Report). While far from dispositive of DeVries' liability, the Court is hard-pressed to imagine a scenario less deserving of qualified immunity at the pleadings stage. *See Grose,* 284 Fed. Appx. at 283 ("[s]upplemented by more detailed facts ascertained through discovery, it is possible Grose could set forth a viable . . . ." claim. "Grose has not yet had an opportunity to initiate discovery in order to develop a factual record upon which a court may determine whether dismissal based on qualified immunity is proper.")

Finally, while Defendant does not address this factor, there can be no question that Gavitt's amended complaint implicates constitutional rights that were clearly established at the time in question. As the Sixth Circuit held in *Spurlock v. Satterfiled,* 167 F.3d 995, 1006-07 (6th Cir. 1999), a "reasonable police officer would be on notice that unlawfully detaining a suspect, despite the fact that the evidence used to detain that individual was fabricated, would . . . be unlawful." Indeed, "[Plaintiff] cannot seriously contend that a reasonable [lab technician] would not know that such actions were inappropriate and performed in violation of an individual's constitutional and/or statutory rights." *Id.* at 1005. Moreover, there is similarly no dispute that Gavitt's rights were clearly established at the time in question. *See Pyle v. Kansas*, 317 U.S. 213, 216, 63 S.Ct. 177, 87 L.Ed. 214 (1942) (knowing use of false testimony to obtain conviction violates Fourteenth Amendment).

As such, the Court concludes that Gavitt has successfully pled a violation of his clearly

17

established rights under the Fourth and Fourteenth Amendments to the Constitution. Furthermore, the strength of Gavitt's amended complaint precludes the Court from finding that DeVries' conduct was objectively reasonable. As such, the Court must, and does, DENY DeVries' motion to dismiss on qualified immunity grounds.

### C. Statute of Limitations

In a last ditch appeal, Defendant argues, for the first time in his reply brief, that Gavitt's claims are barred by the statute of limitations. (Def.'s Reply, 8). The Court sees no reason to depart from the well-settled rule that "[r]aising [an] issue for the first time in a reply brief does not suffice; reply briefs reply to arguments made in the response brief—they do not provide the moving party with a new opportunity to present yet another issue for the court's consideration. Further the non-moving party ordinarily has no right to respond to the reply brief, . . . . As a matter of litigation fairness and procedure, then, we must treat [such issues] as waived." *Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 553 (6th Cir. 2008) (citations omitted).

Moreover, the primary authority relied upon by Defendant in support of the proposition that the statute of limitations has expired is easily distinguishable. In *Wallace v. Kato*, 549 U.S. 384 (2007) the Court held that, with respect to the tort of false imprisonment, the limitations period begins to run "once the victim becomes held pursuant to such process—when, for example, he is bound over by a magistrate or arraigned on charges." *Id.* at 389. "From that point on, any damages recoverable must be based on a malicious prosecution claim and on the wrongful use of judicial process rather than detention itself." *Id.* Here, Gavitt's claim is based on the intentional misrepresentation of evidence–i.e. a wrongful use of the judicial process. In other words, Gavitt does not allege that he was

18

detained *without* legal process–as in *Wallace*–but rather that DeVries tainted the process he was afforded by knowingly relying on fabricated evidence. Accordingly, the Court finds that Defendant's statute of limitations argument is procedurally and substantively devoid of merit.

## VI.   Conclusion

For the above stated reasons, Defendant DeVries' motion to dismiss [87] is DENIED.


SO ORDERED.


s/Nancy G. Edmunds
Nancy G. Edmunds
United States District Judge

Dated:  August 24, 2015

I hereby certify that a copy of the foregoing document was served upon counsel of record on August 24, 2015, by electronic and/or ordinary mail.

s/Carol J. Bethel
Case Manager